This case assigned to District Judge _Mooy_
and to Magistrate Judge _Kay_

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

AUG 1 5 2012

JAMES W. McCORMACK, CLERK
By: _____
DEP CLERK

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

OJSC TNK-BP HOLDING                                    PLAINTIFF

vs.                          Case No. _4:12cv512JMM_

ROYCHAMP TRADING LLC, AN ARKANSAS                      DEFENDANT
LIMITED LIABILITY COMPANY

---

## COMPLAINT TO RECOGNIZE AND ENFORCE
## FOREIGN FREEZING INJUNCTION

---

Comes now Plaintiff, OJSC TNK-BP Holding, and for its Complaint, states:

### I.  THE PARTIES

1.      OJSC TNK-BP Holding ("HOLDING") is a holding company of TNK-BP Group ("TNK-BP").  TNK-BP is the second largest privately owned crude oil production company in Russia.  TNK-BP and HOLDING are organized under the laws of the Russian Federation.

2.      Roychamp Trading LLC ("ROYCHAMP") is an Arkansas limited liability company whose registered agent is Robert Hardin, a North Little Rock, Arkansas attorney.

3.      ROYCHAMP is owned by foreign entities.  Seventy-five percent (75%) of ROYCHAMP is owned by Prokurations-Anstalt, an entity which is believed to be organized under the laws of Leichtenstein. The precise ownership structure of Prokurations-Anstalt remains unknown, but, at all material times, the minority shareholder of ROYCHAMP (described in paragraph 4 below) understood Prokurations-Anstalt to be beneficially owned by Mr. Igor Lazurenko, a Russian citizen.

4.      The remaining twenty-five percent (25%) of ROYCHAMP is owned by Caldero Trading Limited ("Caldero"), an entity organized under the laws of Cyprus, which is beneficially owned by Mr. Zoran Becirovic, a Montenegrin businessman.

## II. OVERVIEW

5.      For a number of years, Mr. Lazurenko, while acting as a managerial level employee of a related entity and an agent of HOLDING, carried out a fraudulent scheme to divert millions of dollars in funds belonging and/or due to HOLDING.   Mr. Lazurenko established an elaborate scheme of corporate entities to conceal and to invest the stolen moneys. He also enlisted the services of various individuals.

6.      HOLDING is pursuing claims against Mr. Lazurenko and the corporate entities and individuals that assisted him in his fraudulent scheme (a total of 13 defendants) in an action filed in the High Court of Justice in London, England.

7.      This action is filed for the sole purpose of asking this United States District Court to recognize and enforce the freezing injunction entered by the English court against ROYCHAMP and anyone within the jurisdiction of this Court who purports to act on its behalf. Simultaneously with the filing of this Complaint, HOLDING is filing a motion for that purpose, with a supporting brief establishing this Court's authority to so act.

## III.      JURISDICTION AND VENUE

8.      The Court has federal diversity subject matter jurisdiction because there is complete diversity of citizenship between the parties and the amount in controversy involves more than $75,000.   Upon information and belief, the defendant ROYCHAMP has in its possession or control millions of dollars in property or cash fraudulently misappropriated from HOLDING.

9.     This Court has personal jurisdiction over the Defendant ROYCHAMP because it is organized under the laws of Arkansas.

10.    Venue is proper in the Court under 28 U.S.C. § 1391 because the sole defendant resides in this judicial district by virtue of the fact that it is organized under the laws of Arkansas.

### IV.     SUMMARY OF LITIGATION PENDING IN LONDON, ENGLAND

11.    Two separate lawsuits are pending in London, England, both of which relate to the underlying fraudulent conduct of Mr. Lazurenko.

**The English Fraud Action**

12.    As stated above, HOLDING is the claimant in an action filed on August 6, 2012, in the High Court of Justice in London, England. HOLDING seeks to recover for the fraudulent actions of Mr. Lazurenko and his associates, who conspired to defraud HOLDING of many millions of dollars by corrupting the tender process used to award contracts for the transportation of oil and oil products and thereafter concealing the proceeds of that fraud from HOLDING. The facts supporting HOLDING's claims against ROYCHAMP and the other defendants are described more particularly in the Particulars of Claim filed in the High Court of Justice in London, England on August 6, 2012, and assigned Claim No: HC12B03162 (hereinafter referred to as "the English fraud action"). A copy of the Claim Form and Particulars of Claim filed in the English fraud action is attached hereto as Exhibit 1 and incorporated herein by reference. On August 14, 2012, Mr. Justice Sales in the High Court of Justice in London, England, ruled that ROYCHAMP is a necessary and proper party to the English fraud action. A copy of Justice Sales' order relating to service of the proceedings outside the English jurisdiction is attached hereto as Exhibit 2. At paragraph 10 of Justice Sales' order, HOLDING is granted permission to serve ROYCHAMP with the English fraud action at its registered office in Arkansas.

13.     ROYCHAMP is one of the defendants named in the English fraud action. HOLDING contends that all property or sums held by ROYCHAMP (as well as the other defendants) are the proceeds of funds fraudulently misappropriated from HOLDING, and should be held in constructive trust for the benefit of HOLDING.

14.     On Monday, August 13, 2012, HOLDING applied for a freezing injunction in the English fraud action.  A copy of the motion papers filed in the English fraud action and the supporting affidavits are attached to HOLDING's motion to recognize and enforce foreign freezing injunction filed simultaneously with this Complaint.

15.     Also on Monday, August 13, 2012, HOLDING appeared, through counsel, in the English fraud action for the purpose of presenting its case for the entry of a freezing injunction. After the hearing, the English court granted the request and entered the freezing injunction against ROYCHAMP, Mr. Lazurenko and five other defendants.  A copy of the freezing injunction entered in the English fraud action is attached hereto as Exhibit 3.   The English court specifically granted HOLDING permission to seek to enforce this order in Arkansas.[1]  A copy of the transcript from the August 13th hearing is attached to HOLDING's motion to recognize and enforce foreign freezing injunction filed simultaneously with this Complaint.

**The English liquidation proceeding**

16.     ROYCHAMP's minority owner, Caldero (which is owned by Mr. Becirovic) is pursuing separate litigation in England to wind up the affairs of BJUK, an English company which Mr. Lazurenko incorporated in 2001. BJUK is the registered owner of 100% of the shares in Beppler & Jacobsen Montenegro D.O.O. ("BJM").   BJUK is currently in provisional

---

[1]     Freezing injunction, Exh. 2, at p. 7, Schedule B (7).

liquidation. HOLDING and Mr. Lazurenko are both parties to the English liquidation proceeding.

17.     The presiding judge in the English liquidation proceeding has already entered an injunction against Mr. Lazurenko and others to protect against the dissipation of the assets of BJUK, which includes two luxury hotels, the Avala and Bianca, located in Montenegro.[2] The current value of the two hotels is estimated to be in excess of $150,000,000.00.

18.     The injunctive relief granted in the English liquidation proceeding does not prevent Mr. Lazurenko (either personally or through one of his agents) from acting in a way to dissipate or deal adversely with the property owned by ROYCHAMP in Montenegro or the ownership of ROYCHAMP.

## V.     FACTUAL BACKGROUND

### Mr. Lazurenko's Fraud and ROYCHAMP's involvement

19.     The Particulars of Claim describes in great detail the factual basis for HOLDING's contentions. To summarize, Mr. Lazurenko abused his position as a managerial employee of a HOLDING subsidiary and as an agent of HOLDING to illegally obtain millions of dollars in funds belonging and/or due to HOLDING.

20.     After learning of facts which suggested that Mr. Lazurenko had engaged in unlawful conduct, HOLDING launched an internal investigation. During one meeting, Mr. Lazurenko admitted wrongdoing and agreed to make recompense by transferring two properties in Moscow or by paying their cash equivalent valued at $8,000,000.00. Although a written

---

[2]   See www.avalaresort.com and www.biancaresort.com.

agreement was prepared, Mr. Lazurenko never signed it and no monies have been paid to HOLDING.[3]

21.　　It is believed that Mr. Lazurenko fled Russia in late April or early May 2012. He is believed to be living in London, England, but his specific whereabouts are unknown.

22.　　As detailed in the Particulars of Claim, the funds Mr. Lazurenko misappropriated from HOLDIING were funneled through an elaborate web of entities and individuals to invest in assets and property located in Russia and in Montenegro. The assets in Montenegro included hotels, land, and a now defunct newspaper.

23.　　ROYCHAMP is one of several offshore vehicles used by Mr. Lazurenko to purchase hotel properties in Montenegro using stolen funds belonging to HOLDING. ROYCHAMP is the 100% owner of ROYCHAMP Trading Montenegro D.O.O., a Montenegrin company which is the registered owner of land in Montenegro. The current estimated value of the land owned by ROYCHAMP in Montenegro is in excess of $25,000,000.00.[4]

24.　　The claims against ROYCHAMP are outlined in paragraphs 125-131 of the Particulars of Claim attached hereto as Exhibit 1. HOLDING intends to pursue its claims for relief against ROYCHAMP and the other entities in the English fraud action. ROYCHAMP is being served, using the procedures recognized by the Hague Convention, with a copy of the English fraud action.

25.　　ROYCHAMP's minority owner, Caldero, is owned by Mr. Becirovic. Mr. Becirovic was also involved with Mr. Lazurenko in developing hotel properties in Montenegro. The relationship between Mr. Becirovic and Mr. Lazurenko eventually broke down, in part because of suspicions on the part of Mr. Becirovic regarding the true source of the funding for

[3]　Particulars of Claim at ¶¶ 27-28.
[4]　Particulars of Claim at ¶¶ 11, 41(i), and 45.

their hotel projects.   Mr. Lazurenko had represented that he was acting as the agent for Mr. Khan, a prominent Russian businessman, and that Mr. Khan was the funding source.   Mr. Becirovic approached Mr. Khan in September of 2011, which prompted Mr. Khan to launch an internal investigation that revealed the fraud.[5]

26.     Thus, Caldero's interests as a minority owner of ROYCHAMP are adverse to those of ROYCHAMP's majority owner.   HOLDING is authorized to represent to this Court that Caldero does not object to, and in fact joins in HOLDING's request to recognize and to enforce in Arkansas the freezing injunction entered in England.

### VI.   REQUESTED RELIEF - ENFORCE FREEZING ORDER

27.     As part of its application for the freezing injunction in England, HOLDING specifically requested that the English court exercise its discretion to permit HOLDING to seek "mirror orders" abroad.   By its terms, the freezing injunction entered in the English action does not apply to persons outside of the jurisdiction of the English court.   However, the freezing injunction specifically contemplates that an Arkansas court may enforce the injunction in which case all persons within the jurisdiction of the Arkansas court will be bound.[6]

28.     Good cause exists to believe that Mr. Lazurenko will attempt to use ROYCHAMP to dissipate assets in which HOLDING has an equitable interest.

29.     Unless the English freezing injunction is enforced in Arkansas, Mr. Lazurenko and his associates will remain free to attempt to use the defendant ROYCHAMP to conceal, move, or hide assets which should remain available to satisfy any Judgment entered in the English fraud action.

---

[5]   Particulars of Claim at ¶ 41-43.
[6]   Freezing Order, Exh. B, at p. 6, ¶19 (c) and p. 7 at (7).

WHEREFORE, Plaintiff OJSC TNK-BP HOLDING prays that this Court recognize and enforce the freezing injunction entered by the English Court by entering the same injunction with respect to ROYCHAMP, to be binding on any person within the jurisdiction of this Court, and for all other just and proper relief.

Respectfully submitted,

KEVIN A. CRASS  (84029)
EDIE R. ERVIN  (93198)
PHILLIP M. BRICK, JR. (2009116)
FRIDAY, ELDREDGE & CLARK, LLP
400 West Capitol Avenue, Suite 2000
Little Rock, Arkansas  72201-3522
(501) 376-2011
Crass@fridayfirm.com
EErvin@fridayfirm.com
PBrick@fridayfirm.com

Attorneys for Plaintiff,
OJSC TNK-BP HOLDING

By: _____
    KEVIN A. CRASS



# Claim Form

<table>
<tr><td colspan="3">In the<br>**High Court of Justice**<br>**Chancery Division**</td></tr>
<tr><td colspan="3">for court use only</td></tr>
<tr><td>Claim No.</td><td colspan="2">HC12B03162</td></tr>
<tr><td>Issue date</td><td colspan="2">6 - Aug - 12</td></tr>
</table>

Claimant(s) name(s) and address(es) including postcode

OJSC TNK-BP Holding
3.bl 1 Bogovagn Street
Moscow
Russian Federation
125284



Defendant(s) name

1.      Beppler & Jacobson Limited
        (In provisional liquidation)
        c/o Mark Shaw and Malcolm Cohen
        BDO LLP
        55 Baker Street
        London
        W1U 7EU

2.      Igor Lazurenko
        c/o Michael Armstrong
        Mishcon de Reya
        Summit House
        12 Red Lion Square
        London
        WC1R 4QD

3.      Leibson Corporation
        c/o AMS Trustees Ltd
        PO Box 116
        Sea Meadow House
        Blackburne Highway
        Road Town
        Tortola
        British Virgin Islands

4.      Belinda Capital Limited
        c/o Morning Star Holdings Limited
        P.O. Box 556
        Hunkins Plaza
        Main Street
        Charlestown
        Nevis

---

When corresponding with the court, please address forms or letters to the Court Manager and quote the claim number.

**N1** Claim form (CPR Part 7) (03.12)
This form is reproduced from *http://hmctsformfinder.justice.gov.uk/HMCTS/FormFinder.do* and is subject to Crown copyright
protection.  Contains public sector information licensed under the Open Government Licence v1.0



**EXHIBIT**

1

PENGAD 800-631-6989

5.      Lawson Trading Limited
        c/o Morning Star Holdings Limited
        P.O. Box 556
        Hunkins Plaza
        Main Street
        Charlestown
        Nevis

6.      Sergey Scheklanov
        c/o Michael Armstrong
        Mishcon de Reya
        Summit House
        12 Red Lion Square
        London
        WC1R 4QD

7.      Marcel Telser
        8, Am Bach
        Triesen
        Lichtenstein
        LI-9495

8.      Svetlana Lazurenko
        c/o Michael Armstrong
        Mishcon de Reya
        Summit House
        12 Red Lion Square
        London
        WC1R 4QD

9.      Delaila Investment Limited
        c/o AMS Trustees Ltd
        PO Box 116
        Sea Meadow House
        Blackburne Highway
        Road Town
        Tortola
        British Virgin Islands

10.     Roychamp Trading LLC
        c/o G. Robert Hardin, Esq
        500 Main Street
        Suite A
        North Little Rock
        AR 72114

11.     Centelux Inc
        c/o AMS Trustees Ltd
        PO Box 116
        Sea Meadow House
        Blackburne Highway
        Road Town
        Tortola
        British Virgin Islands

12.   Adelaide Enterprises LLC
      c/o Morning Star Holdings Limited
      P.O. Box 556
      Hunkins Plaza
      Main Street
      Charlestown
      Nevis

13.   Trockley Investments Limited
      c/o AMS Trustees Ltd
      PO Box 116
      Sea Meadow House
      Blackburne Highway
      Road Town
      Tortola
      British Virgin Islands

Brief details of claim

The Claimant is the victim of a fraudulent conspiracy devised by the Second Defendant in which all the Defendants participated. Pursuant to the conspiracy the Second Defendant fraudulently caused the Claimant, for whom he acted, to enter into contracts with counterparties for the transportation of the Claimant's oil products at inflated and excessive prices. The counterparties in return diverted part of the inflated and excessive prices paid ("the Payments") to the Second Defendant or at his direction. The Defendants conspired to defraud the Claimant by depriving it of its property and/or dishonestly concealing such fraud and the proceeds of such fraud from the Claimant. Further, save for the Sixth and Seventh Defendants, the Defendants received and dealt with the Payments knowing that they constituted monies belonging and/or due to the Claimant obtained through the fraudulent conduct of the Second Defendant to which he had no title and accordingly hold such Payments and any property representing the same on constructive trust for the benefit of the Claimant.

The Claimant accordingly seeks the following relief:

Against the First, Second, Third, Fourth, Fifth, Eighth, Ninth, Tenth, Eleventh, Twelfth and Thirteenth Defendants:

(1) A declaration that each of the above mentioned Defendants holds all property and/or sums received by it in fraud of the Claimant as resulting or constructive trustee for the Claimant.

(2) An order pursuant to the declaration at (1) above that each of the above mentioned Defendants pay those sums and/or reconstitute the property which is held on trust for the Claimant and deliver up that property to the Claimant and/or the proceeds of that property.

(3) An account of all sums belonging and/or due to the Claimant which each of the above mentioned Defendants had and received and an order for repayment of such sums to the Claimant.

(4) Damages.

Against the Second Defendant:

(5) A declaration that as provided for by Article 1064 and Article 15 of the Russian Civil Code the Second Defendant has caused loss and damage to the Claimant.

(6) An order that the Second Defendant compensate the Claimant pursuant to the declaration obtained at paragraph (5) above.

(7) A declaration that as provided for by Article 1102 and Article 1103 part 4 of the Russian Civil Code, the Second Defendant has, without bases established by any statute, other legal act or transaction, acquired property at the expense of the Claimant.

(8) An order that the Second Defendant shall reconstitute and/or deliver up all property found due to the Claimant pursuant to the declaration at paragraph (7) above and/or the proceeds of that property.

(9) An account of all sums belonging and/or due to the Claimant which he had and received and repayment of such sums to Holdings.

(10) Damages.

<u>Against all Defendants</u>

(11) Damages for unlawful means conspiracy.

(12) An enquiry into and account of all sums misappropriated by the Second Defendant and paid away by him or at his direction from the Claimant and the use to which such sums were put.

(13) An order for payment to the Claimant of all sums found due on the taking of the account sought in paragraph (12) above and/or delivery up of all property held on trust for the Claimant and/or the proceeds of that property.

(14) Interest.

(15) Costs.

(16) All such further or other necessary relief.

<u>Value</u>

The Claimant cannot say how much it expects to recover, but it will be more than £300,000.

Defendant's
name and
address,
including
postcode

|  | £ |
|---|---|
| Amount claimed | Unknown |
| Court fee | £1,670.00 |
| Solicitor's costs | To be assessed. |
| Total amount | To be determined. |

| Claim No. | |
|---|---|

Does, or will, your claim include any issues under the Human Rights Act 1998?   [ ] Yes  [ X ] No

**Statement of Truth**

The Claimant believes that the facts stated in this claim form are true.

* I am duly authorised by the claimant to sign this statement

Full name     Richard Jason Alvera Stewart

Name of claimant's solicitor's firm     Bryan Cave

signed _Richard Stew_____     position or office held     Partner
           Claimant's solicitor     (if signing on behalf of firm or company)

*delete as appropriate

Bryan Cave
88 Wood Street
London
EC2V 7AJ

Fax:  020 3207 1881

Claimant's or claimant's solicitor's address
to which documents or payments should be
sent if different from overleaf including (if
appropriate) details of DX, fax or e-mail.

IN THE HIGH COURT OF JUSTICE                    CLAIM NO: HC12B 0316 2

CHANCERY DIVISION

BETWEEN:


### (1) OJSC TNK-BP HOLDING


-and-


### (1) BEPPLER & JACOBSON LIMITED (in provisional liquidation)
### (2) IGOR LAZURENKO
### (3) LEIBSON CORPORATION
### (4)    BELINDA CAPITAL LIMITED
### (5)    LAWSON TRADING LIMITED
### (6)    SERGEY SCHEKLANOV
### (7)    MARCEL TELSER
### (8)    SVETLANA LAZURENKO
### (9)    DELAILA INVESTMENT LIMITED
### (10)    ROYCHAMP TRADING LLC
### (11)    CENTELUX INC
### (12)    ADELAIDE ENTERPRISES INC
### (13)    TROCKLEY INVESTMENTS LIMITED


---

### PARTICULARS OF CLAIM

---


## The Parties

1.    The Claimant ("Holdings") is part of the TNK-BP Group ("TNK-BP"). TNK-BP is the
second largest privately owned Russian crude oil production company. TNK-BP was
formed in 2003 as a result of the merger of BP's Russian oil and gas assets with the oil
and gas assets of Alfa Access/Renova group ("AAR"). BP and AAR each own 50%

1

of TNK-BP. Holdings is a Russian holding company of TNK-BP, and holds the major assets of TNK-BP within the Russian Federation.

2.    The First Defendant ("BJUK") is an English company incorporated by the Second Defendant on 7 November 2001. BJUK is the registered owner of 100% of the shares in Beppler & Jacobson Montenegro D.O.O ("BJM") and is the registered owner of land in Montenegro where two hotels owned by BJM are situated.

3.    The Second Defendant ("Mr. Lazurenko") is a Russian citizen and a former employee of OJSC TNK-BP Management ("Management"). Mr. Lazurenko is the ultimate beneficial owner and controlling mind of the Third, Fourth, Fifth, Ninth, Tenth, Eleventh, Twelfth and Thirteenth Defendants. Mr. Lazurenko is also a de facto director of the First, Third, Fourth, Fifth, Ninth, Tenth, Eleventh, Twelfth and Thirteenth Defendants.

4.    The Third Defendant ("Leibson") is a BVI registered company which currently holds 70% less one share of the issued shares of BJUK.

5.    The Fourth Defendant ("Belinda") is a Nevis company which currently holds 5% of the issued shares of BJUK.

6.    The Fifth Defendant ("Lawson") is a Nevis company which claims to have entered into a series of agency agreements with BJUK whereby it is alleged that Lawson provided funding for the purchase of hotels in Montenegro and that in doing so BJUK acted as agent for Lawson. For the avoidance of doubt Holdings believes the alleged agency agreements to be shams and that Lawson is a front for Mr. Lazurenko.

7.    The Sixth Defendant ("Mr. Scheklanov") appears to be a business associate of Mr. Lazurenko. Mr. Scheklanov claims to be the ultimate beneficial owner of the shares in Lawson and as such claims to be the ultimate beneficial owner of the entirety of the assets owned by BJUK and BJM. For the avoidance of doubt Holdings believes Mr. Scheklanov is a front for Mr. Lazurenko.

8.    The Seventh Defendant ("Mr. Telser") is a Liechtenstein lawyer and fiduciary. Mr. Telser is the sole de jure director of BJUK and a director of other Defendants. He is a nominee director, having been appointed by Mr. Lazurenko and acts under his direction.

2

9.      The Eighth Defendant ("Mrs. Lazurenko") is Mr. Lazurenko's wife. Mrs. Lazurenko is a former director of Adelaide Montenegro D.O.O ("Adelaide Montenegro") and a director of Trockley MN D.O.O. ("Trockley Montenegro"); both are Montenegrin companies ultimately controlled by Mr. Lazurenko and each is the registered owner of land in Montenegro.

10.     The Ninth Defendant ("Delaila") is a company incorporated in the BVI and the registered owner of land in Montenegro.

11.     The Tenth Defendant ("Roychamp") is a company incorporated in Arkansas and the 100% owner of Roychamp Trading Montenegro D.O.O. ("Roychamp Montenegro"); a Montenegrin company which is the registered owner of land in Montenegro.

12.     The Eleventh Defendant ("Centelux") is a company incorporated in the BVI and the registered owner of land in Montenegro.

13.     The Twelfth Defendant ("Adelaide") is a company incorporated in Nevis and the 100% owner of Adelaide Montenegro.

14.     The Thirteenth Defendant ("Trockley") is a company incorporated in BVI and the 100% owner of Trockley Montenegro.

**Facts and background**

For the purpose of this pleading all sums have been converted into US dollars at a rate of 1 Euro =US$1.24.

15.     Mr. Lazurenko was employed by a Russian company Alfa Echo from October 1993. Alfa Echo (now known as "Investment Company A1") is the major investment company of Alfa Group, which is one of the Russian shareholders in TNK-BP. Mr. Lazurenko was then an employee of Management from 1 September 2003 until 27 April 2012, at which point his contract was terminated. Mr. Lazurenko was initially employed as the Head of the Logistics Department, and on 1 February 2010 he became the Head of Department for New Business and Development and Processing.

16.     During his employment with Management Mr. Lazurenko was responsible, inter alia, for the negotiation of contracts for the transport of oil products produced by TNK-BP by rail and via pipelines from the production fields to refineries and other destinations

3

primarily within the Russian Federation and elsewhere in the Commonwealth of Independent States ("CIS").

17.   Mr. Lazurenko was also responsible for negotiating with state owned bodies and agencies, for example, OJSC AK Transneft, the state owned monopoly responsible for the national oil pipelines, and with privately owned companies for (i) the transportation by rail of TNK-BP products, (ii) contracts for sale and purchase of oil products, (iii) auxiliary contracts relevant to the transportation of oil products.

18.   Transportation costs are significant and efficient delivery of products is essential for successful trading by TNK-BP. The area of Mr. Lazurenko's responsibilities was therefore material to the success of TNK-BP's business. TNK-BP has a prominent position in the market and many of the contracts placed by Mr. Lazurenko were entered into after a tender process which he controlled.

19.   In carrying out the responsibilities set out above, Mr. Lazurenko was authorised by companies within TNK-BP, including Holdings, to negotiate on their behalf and he acted as agent on behalf of those companies.

*Payments to Mr. Lazurenko from Transoil*

20.   In or around March 2012 Mr. German Khan ("Mr. Khan"), the Executive Director of Management and TNK-BP, was approached by Mr. Konstantin Nikolaev. Mr. Nikolaev is Head of N-trans which is a large privately owned rail freight business operating within Russia and elsewhere within the CIS. N-Trans owns OOO TK TransOil ("Transoil"), with which TNK-BP had previously contracted for the transportation of oil and oil products. Mr. Lazurenko was responsible for the prequalification of Transoil, negotiations of the terms of the relevant contracts and preparing the final agreements.

21.   Mr. Nikolaev informed Mr. Khan of the following matters ("the Nikolaev Information"):

    (a)   In early 2010 Mr. Lazurenko had approached those with whom he was negotiating at Transoil, claiming he was acting with the consent and knowledge of Mr. Khan;

(b)    Mr. Lazurenko had solicited significant payments to be made in order for Transoil to do business with TNK-BP;

(c)    In the period from January 2010 to December 2011, at Mr. Lazurenko's direction, Transoil made wire transfers of funds amounting to US$3,941,193 to the accounts of the following foreign companies:

(i)     US$1,369,881 transferred to the account of Macanudo Union Inc, held at Komercbanka Baltikums, Riga, Latvia;

(ii)    US$1,548,009 transferred to the account of Luwes Trade LLP held at Trust Commercial Bank, Riga, Latvia;

(iii)   US$560,229 transferred to the account of Anabella Ltd, held at TrstaKomercbanca Nicosia, Cyprus;

(iv)   US$463,074 transferred to the account of Venturex Limited, held at Privatbank, Riga, Latvia.

(d)    In addition to the foregoing payments, Mr. Nikolaev informed Mr. Khan that during this period Mr. Lazurenko received not less than US$4 million in cash payments from Transoil. (The aforementioned wire transfers and cash payments made by Transoil will be referred to collectively as "the Transoil Payments").

22.    Bank confirmations for the payments into the account of Macanudo Union Inc cited the following reasons for payment: "For supply of equipment in accordance with contract MS09-406 from 08.06.2009 (Specifications 406-006 and 406-009)" and "Following invoice 2306 from 23.06.2010". Macanudo Union Inc is a 'mediator company', which is to say a company owned by financial institutions in Cyprus for the benefit of individuals who do not wish funds to be traced. In the premises, it is to be inferred that none of the underlying contracts or invoices mentioned above had any real basis.

23.    Until the conversation with Mr. Nikolaev, Mr. Khan was wholly unaware of the Transoil payments which he had neither solicited nor authorised. As Transoil would have been aware, there was no reason for any payment to be made by it to do business with TNK-BP, as TNK-BP had no policy of restricting the persons with whom it

would do business. It is accordingly to be inferred that in fact the reason and purpose for the Transoil Payments to Mr. Lazurenko was so that Transoil would be paid by Holdings an excessive and inflated price for its services over and above the price that would otherwise have been chargeable and that Mr. Lazurenko would share personally in that wrongful overpayment. That plan was put into effect, such that part of the wrongful overpayments made by Holdings for Transoil's services were wrongly diverted to Mr. Lazurenko or to third parties at his direction. .

24.     In the premises it is to be inferred that the money received by Mr. Lazurenko was misappropriated by him from Holdings.

25.     Further and in any event the Transoil Payments were received by Mr. Lazurenko improperly and in breach of the Russian Criminal and Civil Codes. In the premises Mr. Lazurenko is liable to account to Holdings for all Transoil Payments.

26.     Following receipt of the Nikolaev Information and upon having received other information concerning BJUK, as set out in more detail below, Mr. Khan ordered an internal enquiry into the allegations concerning Transoil and BJUK ("the Internal Enquiry") which was led by Mr. Boris Levin, TNK-BP's Vice-President for Economic Security ("Mr. Levin").

27.     During the course of the Internal Enquiry, Mr Khan had several meetings with Mr. Lazurenko. At one of the meetings, Mr. Lazurenko admitted to Mr. Khan that he owed a liability to TNK-BP of at least US$8 million in respect of the Transoil Payments taken by him. Mr. Lazurenko offered to make recompense by transferring two properties in Moscow or to pay their cash equivalent to TNK-BP.

28.     Following the admission by Mr. Lazurenko, a draft agreement was drawn up on 16 April 2012 by Mr. Vladislav Egorov, Vice-President for Legal Affairs ("Mr. Egorov") to reflect Mr. Lazurenko's acknowledgement of damage that he inflicted on TNK-BP and the offer he had made ("the Draft Agreement"). On the same day, Mr Egorov provided a hard copy of the Draft Agreement by hand to Mr. Lazurenko, at which point Mr. Lazurenko again confirmed to Mr. Egorov that he accepted that he owed the money to TNK-BP and was ready to pay compensation.  However, Holdings and TNK-BP were not prepared to accept this offer in full and final settlement of Mr. Lazurenko's potential liability as enquiries into Mr. Lazurenko's activities were continuing. In

the event, Mr. Lazurenko did not sign the Draft Agreement and has made no payment, nor transferred any assets.

29.     On 26 March 2012 Mr. Lazurenko submitted a request to Management to take unpaid leave until 26 April 2012. The request was granted. On 2 May 2012 Management received a letter of resignation dated 26 April 20120 ("the Letter of Resignation"). Public holidays in Russia in the first week of May meant that the Letter of Resignation was not read by the human resources department of Management until 10 May 2012.

30.     As far as Holdings is aware Mr. Lazurenko left Russia in late April or early May 2012 and has not returned since. It is believed that Mr. Lazurenko is currently residing in London.

31.     Following a report of the foregoing matters, in July 2012 the Moscow police began a criminal investigation.  The Claimant has not yet been officially provided with the copy of the relevant order.

*Payments by Sovfracht to Mr. Lazurenko*

32.     In May 2012 the remit of the Internal Enquiry was extended to review a set of allegations made against Mr. Lazurenko a few years earlier by representatives of a transportation company, Sovfracht ("Sovfracht"). The allegations had been made by Mr. Alexander Ivanov ("Mr. Ivanov"), Chairman of the Board of Sovfracht.

33.     Mr. Ivanov had alleged that for several years prior to 2010, representatives of Sovfracht had been solicited by Mr. Lazurenko to make a series of cash payments to him totalling more than US$5 million which they had been led to believe by Mr. Lazurenko were for the benefit of TNK-BP shareholders ("the Sovfracht Payments"). It was further alleged by Sovfracht that other transportation companies had also been solicited by Mr. Lazurenko to make similar payments over an extended period of time ("the Transportation Payments").

34.     Mr. Ivanov further alleged that in exchange for these cash payments (including the Sovfracht Payments) Mr. Lazurenko manipulated the tender process for the placing of transportation contracts. This was achieved at a series of meetings between Mr. Lazurenko and representatives of Sovfracht and other transportation companies. Mr. Lazurenko allocated contracts in specific regions to a particular company and instructed

the companies how to bid so as achieve the desired result. In return for the Sovfracht Payments and the Transportation Payments to Mr. Lazurenko, the successful bidder obtained a commercial price advantage in excess of the sums paid to Mr. Lazurenko as a result of Holdings paying that pre-determined bidder a greater price than would have resulted from an uncorrupt tender process with competitive bidders willing to propose better commercial terms for TNK-BP.

35.    Mr. Ivanov stated that some time in 2008, due to the economic crisis, the said transportation agreements stopped being profitable for Sovfracht owing to changes in the commercial conditions. Mr. Ivanov further stated that he had had a dispute with Mr. Lazurenko regarding the arrangement and, as a result, Mr. Ivanov had approached Mr. Khan whom he believed to be one of beneficiaries of the said payments.

36.    Mr. Khan had been very concerned to learn of the allegation of the illegal arrangement supposedly made on his behalf. However, Sovfracht did not have any documentary evidence to substantiate its claim.

37.    When Sovfracht's allegations were put to Mr. Lazurenko by Mr. Khan, Mr. Lazurenko had denied that he had changed the contractual conditions with Sovfracht in the manner alleged. In the absence of anything to substantiate the allegations of wrongdoing and Mr. Lazurenko's flat denial of any wrongdoing, TNK-BP management was unable to pursue the matter further at that time.

38.    However, in the light of the Transoil Payments, it is to be inferred that Mr. Ivanov's allegations were true and that the Sovfracht Payments and the Transportation Payments had been solicited by Mr. Lazurenko. It is further to be inferred that the reason for the Sovfracht Payments and the Transportation Payments to Mr. Lazurenko was for Sovfracht and other transportation companies to be paid a price for their services over and above the price that should properly have been charged to Holdings. The net effect on Holdings of the overpayment for Sovfracht and the transportation companies services and the retentions by Mr. Lazurenko was that part of the excessive and inflated price paid by Holdings was diverted to Mr. Lazurenko to achieve this unlawful result.

39.    In the premises it is to be inferred that the money received by Mr. Lazurenko was misappropriated by him from Holdings.

40.    Further and in any event the Sovfracht Payments and the Transportation Payments were received by Mr. Lazurenko improperly and in breach of the Russian Criminal and Civil Code. In the premises Mr. Lazurenko is liable to account to Holdings for all Sovfracht and Transportation Payments.

*The Becirovic Allegations*

41.    In late September 2011 TNK-BP was contacted by Mr. Zoran Becirovic ("Mr. Becirovic"), a Montenegrin businessman. Following this initial contact from Mr. Becirovic in September 2011, Mr. Becirovic subsequently made the following allegations to TNK-BP:

(a)    Mr. Becirovic had met Mr. Lazurenko in 2002, when Mr. Lazurenko was seeking investment opportunities in Montenegro.

(b)    He had identified to Mr. Lazurenko a potential opportunity in the soon-to-be privatised Avala Hotel in Budva, on the coast of Montenegro ("Avala").

(c)    Mr. Lazurenko had stated to him that he represented Mr. Khan and that Mr. Khan sought to enter into partnership with him for the purposes of acquiring an investment in Avala. Under the impression that he was entering into a partnership with Mr. Khan, Mr. Becirovic agreed with Mr. Lazurenko to use BJUK, a pre-existing company, controlled at all material times by Mr. Lazurenko, as the vehicle for bidding for Avala. If successful, BJUK would be used as the vehicle for refurbishing and operating the hotel.

(d)    The terms upon which the quasi-partnership would operate were agreed between Mr. Becirovic and Mr. Lazurenko. If Avala was acquired, Mr. Lazurenko (supposedly acting on behalf of Mr. Khan) would supply all of the financing for business. Mr. Becirovic would provide on the ground local expertise, connections and management. Important business decisions would be taken jointly by him and Mr. Lazurenko, with Mr. Lazurenko supposedly representing Mr. Khan. Mr. Lazurenko was to be personally compensated for his contribution (alleged representation of Mr. Khan) by shares in BJUK.

9

(e)    An initial minority stake of 20% in BJUK was issued to Mr. Becirovic. These shares were to be paid up by Mr. Lazurenko, purportedly on behalf of Mr. Khan. Mr. Becirovic subsequently transferred those shares to his wholly owned company, Caldero Trading Limited ("Caldero") registered in Cyprus.

(f)    Initially, 80% of the shares in BJUK were held by Leibson. Mr. Lazurenko informed Mr. Becirovic that Mr. Khan was the owner of Leibson. Subsequently, 5% of Leibson's interest, less one one share was transferred to Mr. Becirovic  (a holding that was subsequently also transferred by him to Caldero). Liebson's interest was then further reduced to 70% plus one share when 5% of its remaining holding was transferred to Belinda. Mr. Becirovic was told by Mr. Lazurenko that Belinda was owned by him to hold the shares given to him by Mr. Khan.

(g)    The bid by BJUK for Avala was successful. For tax planning reasons, BJUK incorporated a wholly-owned Montenegrin subsidiary, BJM, to hold the hotel, whilst BJUK retained ownership of the land on which the hotel was located.

(h)    Another hotel ("Bianca") in Montenegro was also acquired and the same ownership structure used. Both hotels underwent substantial work and are now operating as luxury hotels. (The acquisition, refurbishment and operation of Avala and Bianca will be referred to in these Particulars of Claim as "the Montenegrin Hotel Project").

(i)    In addition, Mr. Lazurenko funded the purchase of various plots of land in Montenegro, still purportedly on behalf of Mr. Khan, for a cost in excess of US$12.5 million. Several offshore vehicles were used for these purchases including Delaila, Roychamp and Centelux. Mr. Lazurenko also invested substantial sums of money in a newspaper business though a BVI incorporated company called Hadiflake Limited, for sums in excess of $2 million.

(j)    In total, Mr. Lazurenko transferred sums in excess of US$78.5 million to fund these businesses. US$64 million of these funds were paid via BJUK for the Montenegrin Hotel Project.

(k)    As a result, inter alia, of suspicions over the source of the monies being supplied by Mr. Lazurenko to fund the Montenegrin Hotel Project, the

relationship between Mr. Becirovic and Mr. Lazurenko broke down. Mr. Becirovic found himself excluded from the management of the business. Fearing that this business would be destroyed, or taken from him, Mr. Becirovic approached Mr. Khan to raise the matter at a higher level.

42. Prior to Mr. Becirovic approaching TNK-BP and having conversations with Mr. Khan about BJUK, Mr. Khan had been wholly unaware of the Montenegrin Hotel Project, or any of the matters referred to above, which he had neither solicited nor authorised. Mr. Khan has never appointed Mr. Lazurenko as his agent in respect of his private financial affairs.

43. In the light of Mr. Becirovic's allegations and the Nikolaev Information, Mr. Khan set in train an internal investigation which in due course led to the Internal Enquiry as hereinbefore pleaded.

*Other Montenegrin Properties*

44. As referred to at paragraph 40(i) above, Mr. Becirovic also gave information to TNK-BP about other land plots in Montenegro which Mr. Lazurenko (again falsely stating that he was acting as agent for Mr. Khan) had purchased in partnership with Mr. Becirovic ("the Montenegrin Properties").

45. Mr. Becirovic stated that BJUK was not used as a vehicle for the Montenegrin Properties. Three offshore companies were used. These were Roychamp, Delaila, and Centelux. The purchases made by these companies and the approximate current values of these plots are as follows:

   (a) Land situated on a former military base on the Lustica peninsula, currently worth in excess of US$5 million (registered in the name of Delaila Montenegro).

   (b) Land situated in the area of the beach at Trsteno, currently worth in excess of US$6 million (registered in the name of Centelux).

   (c) Land situated in the area of the beach at Drobny Pesok in the area of Sveti Stefan Island, currently worth in excess of US$25 million (registered in the name of Roychamp, Montenegro).

46.     The Montenegrin Properties were bought and intended to be developed on the same basis as the Montenegrin Hotel Project; namely, that Mr. Lazurenko (representing himself as acting on behalf of Mr. Khan) would provide all of the funds for the acquisition and development of the properties, whilst Mr. Becirovic would provide the local knowledge. It was further agreed between Mr. Becirovic and Mr. Lazurenko that their respective interests were 75% Mr. Lazurenko (purportedly as agent for Mr. Khan) and 25% Mr. Becirovic through Caldero. Mr. Becirovic subsequently disposed of his interest in Centelux.

47.     Mr. Becirovic stated that Mr. Lazurenko also owns substantial further real estate in Montenegro worth approximately $US5 million in which Mr. Becirovic has no interest. This consists of plots of land and buildings in prestigious areas of the Bay of Kotor and the Sveti Stefan Island. According to Mr. Becirovic, the real estate was held through:

(a)     Adelaide, which is the 100% shareholder of Adelaide Montenegro the registered owner of part of the properties; and

(b)     Trockley, which is the 100% shareholder of Trockley Montenegro. the registered owner of the other part of the properties.

(collectively "the Adelaide and Trockley Properties").

*Russian Properties*

48.     Investigations carried out by Mr. Levin's department show that Mr. Lazurenko's family, namely his mother-in-law Ekaterina Andreevna Filatova ("Mrs. Filatova"), his son, Igor Igorevich Lazurenko ("Mr. Lazurenko Junior") and Mrs. Lazurenko are the registered owners of properties in the Moscow area worth approximately US$25 million. The details of the currently known property are as follows:

(a)     A 86m$^2$ apartment at the address flat 37, 32 Frunzenskaya embankment, Moscow, owned by Mrs. Lazurenko;

(b)     A 214m$^2$ apartment at the address Flat 2, Korobeynikov Pereulok 1, Moscow, co-owned by Mr. Lazurenko Junior and Mrs. Filatova;

(c)     A 1228m$^2$ land plot and 900m$^2$ house at the address 40A, Zhukovka village, Moscow region co-owned by Mrs. Lazurenko and Mr. Lazurenko Junior;

(d)    A 3-storey house and a garage with total area of 1146 m² at the address 3 Proezd Ozerny, Rumyantsevo village, Fedoskinskoe rural settlement, Mytischinsky district, Moscow region, owned by Mrs. Lazurenko;

(e)    Land plots with total area of 8540 m² at the address, plot 3-4, near Rumyantsevo village, Sukharevsky county district, Mytischinsky district, Moscow region, owned by Mrs. Lazurenko;

(f)    Land plots with total area of 15,000 m², located at the address: plots 218, 219, CJSC SKZ4, Nikolina Gora, Uspensky County District, Odintsovsky District, Moscow region, owned by Mrs. Filatova; and

(g)    Land plot with total area of 4816 m², 826 m² house, and 265 m² garage lodge all located at the address lot 1, Korabelnyie Sosny KIZ, Village of Maslovo, Uspensky County District, Odintsovsky, Moscow region, owned by Mrs. Filatova ("the Russian Properties").

49.    As Mr. Lazurenko offered two of the Russian Properties to TNK-BP as recompense for the Transoil Payments, it is to be inferred that Mr. Lazurenko provided the funds for the purchase of the Russian Properties and that these properties are in reality held on his behalf by members of his family.

*Subsequent events*

50.    On 11 April 2012, Mr. Khan met with Mr. Becirovic at TNK-BP's offices in Moscow and, at one point during the meeting, Mr. Khan asked Mr. Lazurenko to come into the meeting. About an hour after leaving the meeting, Mr. Becirovic was contacted on his mobile phone by an individual claiming to be Mr. Scheklanov, who Mr. Becirovic now believes to have been the Sixth Defendant, Mr. Sergey Scheklanov. Mr. Scheklanov claimed to be Mr. Becirovic's "partner" and that he was the source of the funding for the Montenegro business. Mr. Becirovic asked for a meeting with Mr. Scheklanov and Mr. Khan. No such meeting has taken place and was not pursued by Mr. Scheklanov.

51.    On 3 May 2012, Caldero presented a petition in the High Court for the winding up of BJUK on just and equitable grounds or in the alternative for Caldero's interest in BJUK to be bought out. Provisional liquidators have been appointed over BJUK and

injunctive relief granted to prevent dissipation of its assets pending the trial of the petition.

52.     In early May 2012, Mr. Scheklanov put forward a claim that he is the ultimate owner of the Montenegrin Hotel Project through Lawson, of which he asserts he is the ultimate owner. Lawson is a party to a series of alleged agency agreements entered into with BJUK whereby BJUK is named as Lawson's agent and it is agreed holds its assets in that capacity.

53.     Although Mr. Scheklanov has subsequently offered on several occasions to provide proof of ownership, no such proof has been provided. It is believed that Mr. Scheklanov is a front for Mr. Lazurenko and the alleged agency agreements are shams.

*Application of dishonestly obtained funds*

54.     It is to be inferred that the Transoil Payments, the Sovfracht Payments and the Transportation Payments dishonestly misappropriated by Mr. Lazurenko were applied in funding the Montenegrin Hotel Project, the Montenegrin Properties, the Adelaide and Trockley Properties and the Russian Properties for the reasons set out below:

(a)     Mr. Lazurenko was a full time salaried employee of TNK-BP Management from 2003 until 27 April 2012. Over that period his total income including bonuses and before tax was less than US$10 million;

(b)     The total cost of the Montenegrin Hotel Project with funds provided by Mr. Lazurenko was approximately US$64 million;

(c)     The combined value of the Montenegrin Properties and the Adelaide and Trockley Properties held by Mr. Lazurenko in Montenegro is approximately US$17.5 million;

(d)     the value of the Russian Properties is in excess of US$25 million;

(e)     Mr. Lazurenko failed to declare any interest in any of the above named assets in the declaration of assets filed by him with TNK-BP annually during the term of his employment (2003-2012);

14

(f)     Mr. Lazurenko also failed to identify any conflict of interest under sections 12, 13 or 14 of his Ethical Declaration for year 2011;

(g)     The fact that Mr. Lazurenko falsely informed Mr. Becirovic that Mr. Khan was the ultimate source of funding for investments via BJUK, Centelux, Roychamp and Delaila;

(h)     The appearance of Mr. Schekalnov claiming to be the ultimate owner of the Montenegrin Hotel Project immediately after Mr. Lazurenko discovered Mr. Becirovic had spoken to Mr. Khan, coupled with Mr. Schekalnov's failure to make good his claims;

(i)     Mr. Lazurenko's sudden resignation and departure from Russia in late April/early May 2012 after his wrongdoing was discovered.

## Claims

*Claims against BJUK*

55.     Mr. Lazurenko dishonestly and illegally misappropriated the Transoil Payments, Sovfracht Payments and the Transportation Payments belonging and/or due to Holdings and diverted them to BJUK. BJUK received the monies for its own use and benefit. As hereinafter pleaded, under the Civil Code of the Russian Federation and/or any other applicable Russian laws Mr. Lazurenko received no legal title and/or rights to the said monies.

56.     Mr. Lazurenko was, at all material times, a de facto director of BJUK and in consequence BJUK knew (a) the provenance of monies it received and (b) the fact that it was in receipt of monies belonging and/or due to Holdings obtained through the fraudulent conduct of Mr. Lazurenko to which he had no title (the Transoil Payments, Sovfracht Payments and/or Transportation Payments). Accordingly, BJUK holds all such monies received by it and all property acquired with such monies (including but not limited to the shares in BJM) on constructive trust for the benefit of Holdings.

57.     Further and in the alternative, receipt of the said monies enriched BJUK at the expense of Holdings. There is no basis for BJUK to retain the monies by which it has been enriched and accordingly BJUK is liable to account for and to repay

Holdings all of those sums belonging and/or due to Holdings which it had and received.

58.    Further and in the alternative BJUK and the other Defendants participated in a corporate structure which was used as a conduit for fraud. The structure concealed and continues to conceal the facts and matters set out in these Particulars of Claim and the whereabouts of the proceeds of Mr. Lazurenko's misappropriation from Holdings. In so participating BJUK, by its de facto director, Mr. Lazurenko, acted dishonestly and in the knowledge that the Transoil Payments, the Sovfracht Payments and the Transportation Payments had been paid in breach of the Russian Criminal and Civil Codes.

59.    By reason of the matters set out above, BJUK, and the other Defendants (or any two or more together) wrongfully and with intent to injure Holdings and/or to cause loss to Holdings by unlawful means conspired and combined together to defraud Holdings by depriving it of its property and/or dishonestly concealing such fraud and the proceeds of such fraud from Holdings.

60.    Pursuant to and in furtherance of the conspiracy BJUK and the other Defendants carried out the unlawful acts and means by which Holdings was injured in the manner set out above in these Particulars of Claim.

61.    As a result of the matters set out above Holdings has suffered loss and damage. The Defendants are jointly and severally liable to Holdings in damages for conspiracy.

*Claims against Mr. Lazurenko*

62.    Mr. Lazurenko dishonestly and illegally misappropriated the Transoil Payments, Sovfracht Payments and the Transportation Payments belonging and/or due to Holdings and diverted them to BJUK. Under the Civil Code of the Russian Federation and/or any other applicable Russian laws Mr. Lazurenko received no legal title and/or rights to the said monies and accordingly holds all such monies received by him and all property acquired with such monies on constructive trust for the benefit of Holdings.

63.    Further, Mr. Lazurenko's dishonest misappropriation of the Transoil Payments, the Sovfracht Payments and the Transportation Payments, described above, was in breach

16

of the Russian Criminal Code and in consequence TNK-BP has reported that wrongdoing to the Russian police.

64. Mr. Lazurenko's dishonest misappropriation of the Transoil Payments, the Sovfracht Payments and the Transportation Payments, described above, gives rise to liability under the following provisions of the Russian Civil Code:

65. Article 1064 part 1 of the Civil Code of the Russian Federation provides:

*"Harm caused to the person or property of a citizen and also harm caused to the property of a legal person shall be subject to compensation in full by the person who has caused the harm."*

66. Article 15 of the Civil Code of the Russian Federation provides:

*"1. A person whose right has been violated may demand full compensation for the losses caused to him unless a statute or a contract provides for compensation for losses in a lesser amount.*

*2. Losses means the expenses that the person whose right was violated made or must make to reinstate the right that was violated, the loss of or injury to his property (actual damage), and also income not received that this person would have received under the usual conditions of civil commerce if his right had not been violated (lost profit).*

*If the person who has violated a right has received income thereby, the person whose right has been violated has the right to demand – along with other losses – compensation for lost profit in a measure not less than such income."*

67. Holdings has suffered loss and damage by reason of the harm caused to its property by Mr. Lazurenko as set out in these Particulars of Claim. Pursuant to Article 15 and/or Article 1064 of the Civil Code of the Russian Federation, Holdings demands full compensation for all harm caused to it.

68. Further or alternatively Article 1102 of the Civil Code of the Russian Federation provides:

*"A person who without bases established by a statute, other legal acts, or a transaction has acquired or economised property (the recipient) at the expense of another person (the victim) shall have a duty to return to the latter the unjustly acquired or economised property (unjust enrichment) with the exception of the cases provided for in Article 1109 of the present code."*

17

69.     As hereinbefore pleaded, Mr. Lazurenko has, without bases established by any statute, other legal act or transaction, acquired property (the Transoil Payments, the Sovfracht Payments and the Transportation Payments) at the expense of Holdings thus giving rise to the application of Article 1102 of the Civil Code of the Russian Federation.

70.     Accordingly pursuant to Article 1102 of the Civil Code of the Russian Federation Mr. Lazurenko is under a duty to return to Holdings the property unjustly acquired by him. Receipt of the said funds enriched Mr. Lazurenko at the expense of Holdings. There is no basis for Mr. Lazurenko to retain any funds by which he has been enriched and accordingly Mr. Lazurenko is liable to account for and to repay Holdings all of those sums belonging and/or due to Holdings which he had and received.

71.     Further or alternatively, Article 1103 part 4 of the Civil Code of the Russian Federation provides:

        *"To the extent not otherwise established by the present Code, other statutes or other legal acts, nor otherwise follows from the nature of the respective relations, the rules provided by the present Chapter shall also be applied to claims: ... 4) for compensation for harm including that caused by the bad-faith conduct of the enriched person".*

72.     As hereinbefore pleaded, Mr. Lazurenko's conduct in dishonestly and illegally misappropriating the Transoil Payments, the Sovfracht Payments and the Transportation Payments was manifestly in bad faith and illegal (with no lawful basis) and as a consequence Mr. Lazurenko is under a duty to compensate Holdings.

73.     Further or alternatively, Mr. Lazurenko and the other Defendants participated in a corporate structure which was used as a conduit for fraud. The structure concealed and continues to conceal the facts and matters set out in these Particulars of Claim and the whereabouts of the proceeds of Mr. Lazurenko's misappropriation from Holdings. In so participating Mr. Lazurenko acted dishonestly and in the knowledge that the Transoil Payments, the Sovfracht Payments and the Transportation Payments had been paid in breach of Mr. Lazurenko's duties as agent to Holdings.

74.     By reason of the matters set out above, Mr. Lazurenko and the other Defendants (or any two or more together) wrongfully and with intent to injure Holdings and/or to cause loss to Holdings by unlawful means conspired and combined together to

defraud Holdings by depriving it of its property and/or dishonestly concealing such fraud and the proceeds of such fraud from Holdings.

75. Pursuant to and in furtherance of the conspiracy Mr. Lazurenko and the other Defendants carried out the unlawful acts and means by which Holdings was injured in the manner set out above in these Particulars of Claim.

76. As a result of the matters set out above Holdings has suffered loss and damage. Mr. Lazurenko and the other Defendants are jointly and severally liable to Holdings in damages for conspiracy.

*Claims against Leibson*

77. Mr. Lazurenko dishonestly and illegally misappropriated the Transoil Payments, Sovfracht Payments and the Transportation Payments belonging and/or due to Holdings and in doing so received the monies for his own use and benefit. Under the Civil Code of the Russian Federation and/or any other applicable Russian laws Mr. Lazurenko received no legal title and/or rights to the said monies.

78. Mr. Lazurenko was, at all material times, a de facto director of Leibson and in consequence Leibson knew (a) the provenance of monies BJUK received and (b) the fact that BJUK was in receipt of monies belonging and/or due to Holdings obtained through the fraudulent conduct of Mr. Lazurenko to which he had no title (the Transoil Payments, Sovfracht Payments and/or Transportation Payments).

79. Leibson is the owner of 75% less one share of the shares of BJUK which shares are fully paid up in the amount of £262,499.00. It is to be inferred that this money was provided by Mr. Lazurenko from monies dishonestly misappropriated by him from Holdings. Accordingly, Leibson holds all such monies received by it and all property acquired with such monies on constructive trust for the benefit of Holdings.

80. Further and in the alternative, receipt of the said monies enriched Leibson at the expense of Holdings. There is no basis for Leibson to retain the monies by which it has been enriched and accordingly Leibson is liable to account for and to repay Holdings all of those sums belonging and/or due to Holdings which it had and received.

81. Further or alternatively, Leibson and the other Defendants participated in a corporate structure which was used as a conduit for fraud. The structure concealed

and continues to conceal the facts and matters set out in these Particulars of Claim and the whereabouts of the proceeds of Mr. Lazurenko's misappropriation from Holdings. In so participating Leibson acted dishonestly and in the knowledge that the Transoil Payments, the Sovfracht Payments and the Transportation Payments had been paid in breach of the Russian Criminal and Civil Codes.

82. By reason of the matters set out above, Leibson and the other Defendants (or any two or more together) wrongfully and with intent to injure Holdings and/or to cause loss to Holdings by unlawful means conspired and combined together to defraud Holdings by depriving it of its property and/or dishonestly concealing such fraud and the proceeds of such fraud from Holdings.

83. Pursuant to and in furtherance of the conspiracy Leibson and the other Defendants carried out the unlawful acts and means by which Holdings was injured in the manner set out above in these Particulars of Claim.

84. As a result of the matters set out above Holdings has suffered loss and damage. Leibson and the other Defendants are jointly and severally liable to Holdings in damages for conspiracy.

*Claims Against Belinda*

85. Mr. Lazurenko dishonestly and illegally misappropriated the Transoil Payments, Sovfracht Payments and the Transportation Payments belonging and/or due to Holdings and in doing so received the monies for his own use and benefit. Under the Civil Code of the Russian Federation and/or any other applicable Russian laws Mr. Lazurenko received no legal title and/or rights to the said monies.

86. Mr. Lazurenko was, at all material times, a de facto director of Belinda and in consequence Belinda knew (a) the provenance of monies BJUK received and (b) the fact that BJUK was in receipt of monies belonging and/or due to Holdings obtained through the fraudulent conduct of Mr. Lazurenko to which he had no title (the Transoil Payments, Sovfracht Payments and/or Transportation Payments).

87. Belinda is the owner of 5% of the shares of BJUK which shares are fully paid up in the amount of £17,500.00. It is to be inferred that this money was provided by Mr. Lazurenko from monies fraudulently misappropriated by him from Holdings.

Accordingly, Belinda holds all such monies received by it and all property acquired with such monies on constructive trust for the benefit of Holdings.

88.    Further and in the alternative, receipt of the said monies enriched Belinda at the expense of Holdings. There is no basis for Belinda to retain the monies by which it has been enriched and accordingly Belinda is liable to account for and to repay Holdings all of those sums belonging and/or due to Holdings which it had and received.

89.    Further or alternatively, Belinda and the other Defendants participated in a corporate structure which was used as a conduit for fraud. The structure concealed and continues to conceal the facts and matters set out in these Particulars of Claim and the whereabouts of the proceeds of Mr. Lazurenko's misappropriation from Holdings. In so participating Belinda acted dishonestly and in the knowledge that the Transoil Payments, the Sovfracht Payments and the Transportation Payments had been paid in breach of the Russian Civil and Criminal Codes.

90.    By reason of the matters set out above, Belinda and the other Defendants (or any two or more together) wrongfully and with intent to injure Holdings and/or to cause loss to Holdings by unlawful means conspired and combined together to defraud Holdings by depriving it of its property and/or dishonestly concealing such fraud and the proceeds of such fraud from Holdings.

91.    Pursuant to and in furtherance of the conspiracy Belinda and the other Defendants carried out the unlawful acts and means by which Holdings was injured in the manner set out above in these Particulars of Claim.

92.    As a result of the matters set out above Holdings has suffered loss and damage. Belinda and the other Defendants are jointly and severally liable to Holdings in damages for conspiracy.

*Claims against Lawson*

93.    Mr. Lazurenko dishonestly and illegally misappropriated the Transoil Payments, Sovfracht Payments and the Transportation Payments belonging and/or due to Holdings and in doing so received the monies for his own use and benefit. Under the Civil Code of the Russian Federation and/or any other applicable Russian laws Mr. Lazurenko received no legal title and/or rights to the said monies.

21

94.    Lawson has claimed to have provided the funding for BJUK and that BJUK acted as agent for Lawson by virtue of a series of agency agreements ("the Agency Agreements") and that it is therefore the owner of all assets held by BJUK including without limitation the shares in BJM and the Montenegrin Properties. Holdings says that the Agency Agreements are a sham and of no validity or effect.

95.    If the Agency Agreements are found to be valid then it is to be inferred that the monies provided by Lawson to BJUK were monies Mr. Lazurenko dishonestly and illegally misappropriated (the Transoil Payments, Sovfracht Payments and the Transportation Payments) belonging and/or due to Holdings. Mr. Lazurenko was, at all material times, a de facto director of Lawson and in consequence Lawson knew (a) the provenance of monies it received and (b) the fact that Lawson was in receipt of monies belonging and/or due to Holdings obtained through the fraudulent conduct of Mr. Lazurenko to which he had no title. Accordingly, Lawson holds all such monies received by it and all property acquired with such monies on constructive trust for the benefit of Holdings.

96.    Further and in the alternative, receipt of the said monies enriched Lawson at the expense of Holdings. There is no basis for Lawson to retain the monies by which it has been enriched and accordingly Lawson is liable to account for and to repay Holdings all of those sums belonging and/or due to Holdings which it had and received.

97.    Further or alternatively, Lawson and the other Defendants participated in a corporate structure which was used as a conduit for fraud. The structure concealed and continues to conceal the facts and matters set out in these Particulars of Claim and the whereabouts of the proceeds of Mr. Lazurenko's misappropriation from Holdings. In so participating Lawson acted dishonestly and in the knowledge that the Transoil Payments, the Sovfracht Payments and the Transportation Payments had been paid in breach of the Russian Criminal and Civil Codes.

98.    By reason of the matters set out above, Lawson and the other Defendants (or any two or more together) wrongfully and with intent to injure Holdings and/or to cause loss to Holdings by unlawful means conspired and combined together to defraud Holdings by depriving it of its property and/or dishonestly concealing such fraud and the proceeds of such fraud from Holdings.

99.    Pursuant to and in furtherance of the conspiracy Lawson and the other Defendants carried out the unlawful acts and means by which Holdings was injured in the manner set out above in these Particulars of Claim.

100.   As a result of the matters set out above Holdings has suffered loss and damage. Lawson and the other Defendants are jointly and severally liable to Holdings in damages for conspiracy.

*Claims against Mr. Scheklanov*

101.   Mr. Lazurenko dishonestly and illegally misappropriated the Transoil Payments, Sovfracht Payments and the Transportation Payments belonging and/or due to Holdings and in doing so received the monies for his own use and benefit. Under the Civil Code of the Russian Federation and/or any other applicable Russian laws Mr. Lazurenko received no legal title and/or rights to the said monies.

102.   Mr. Scheklanov claims to be the ultimate beneficial owner of 100% of the shares in Lawson, which he claims provided the funding for BJUK and therefore in reliance on the Agency Agreements is the ultimate beneficial owner of all assets held by BJUK including without limitation the shares in BJM and the Montenegrin Properties. Holdings says that the Agency Agreements are a sham and of no validity or effect and that Mr. Scheklanov is a front for Mr. Lazurenko.

103.   Mr. Scheklanov and the other Defendants participated in a corporate structure which was used as a conduit for fraud. The structure concealed and continues to conceal the facts and matters set out in these Particulars of Claim and the whereabouts of the proceeds of Mr. Lazurenko's misappropriation from Holdings. In so participating Mr. Scheklanov acted dishonestly and in the knowledge that the Transoil Payments, the Sovfracht Payments and the Transportation Payments had been paid in breach of the Russian Criminal and Civil Codes.

104.   By reason of the matters set out above, Mr. Scheklanov and the other Defendants (or any two or more together) wrongfully and with intent to injure Holdings and/or to cause loss to Holdings by unlawful means conspired and combined together to defraud Holdings by depriving it of its property and/or dishonestly concealing such fraud and the proceeds of such fraud from Holdings.

105.   Pursuant to and in furtherance of the conspiracy Mr. Scheklanov and the other Defendants carried out the unlawful acts and means by which Holdings was injured in the manner set out above in these Particulars of Claim.

106.   As a result of the matters set out above Holdings has suffered loss and damage. Mr. Scheklanov and the other Defendants are jointly and severally liable to Holdings in damages for conspiracy.

*Claims against Mr. Telser*

107.   Mr. Telser is the sole de jure director of BJUK. He is a nominee director, having been appointed by Mr. Lazurenko on 15 October 2010 and acting under his direction and control since that date. Mr. Telser is also a nominee director of Roychamp Montenegro, Delaila and Centelux each of which owns a Montenegrin Property. Mr. Telser acts under the direction and control of Mr. Lazurenko as regards the conduct of the affairs of Roychamp Montenegro, Delaila and Centelux.

108.   Mr. Telser and the other Defendants participated in a corporate structure which was used as a conduit for fraud. The structure concealed and continues to conceal the facts and matters set out in these Particulars of Claim and the whereabouts of the proceeds of Mr. Lazurenko's misappropriation from Holdings. In so participating Mr. Telser acted dishonestly and in the knowledge that the Transoil Payments, the Sovfracht Payments and the Transportation Payments had been obtained in breach of the Russian Civil and Criminal Codes.

109.   By reason of the matters set out above, Mr. Telser and the other Defendants (or any two or more together) wrongfully and with intent to injure Holdings and/or to cause loss to Holdings by unlawful means conspired and combined together to defraud Holdings by depriving it of its property and/or dishonestly concealing such fraud and the proceeds of such fraud from Holdings.

110.   Pursuant to and in furtherance of the conspiracy Mr. Telser and the other Defendants carried out the unlawful acts and means by which Holdings was injured in the manner set out above in these Particulars of Claim.

111.  As a result of the matters set out above Holdings has suffered loss and damage. Mr. Telser and the other Defendants are jointly and severally liable to Holdings in damages for conspiracy.

*Claims against Mrs. Lazurenko*

112.  Mr. Lazurenko consulted Mrs. Lazurenko in relation to decision making aspects of the joint venture between Mr. Lazurenko and Mr. Becirovic which was funded by Mr. Lazurenko. Further, Mrs. Lazurenko was a director of Adelaide Montenegro and is a director of Trockley. It is to be inferred from the level and nature of Mrs. Lazurenko's involvement in the corporate structure designed as a conduit of her husband's fraudulent misappropriation from Holdings that Mrs. Lazurenko knew (a) the provenance of monies she received directly or indirectly from Mr. Lazurenko and (b) the fact that she was in receipt of funds obtained through the fraudulent conduct of Mr. Lazurenko. Mrs. Lazurenko therefore received the funds knowing that they comprised monies fraudulently misappropriated from Holdings and accordingly holds all such monies received by her and all property acquired with such monies on constructive trust for the benefit of Holdings.

113.  Further and in the alternative, receipt of the said monies enriched Mrs Lazurenko at the expense of Holdings. There is no basis for Mrs. Lazurenko to retain the monies by which she has been enriched and accordingly Mrs. Lazurenko is liable to account for and to repay Holdings all of those sums belonging and/or due to Holdings which she had and received.

114.  Further or alternatively, Mrs. Lazurenko and the other Defendants participated in a corporate structure which was used as a conduit for fraud. The structure concealed and continues to conceal the facts and matters set out in these Particulars of Claim and the whereabouts of the proceeds of Mr. Lazurenko's misappropriation from Holdings. In so participating Mrs. Lazurenko acted dishonestly and in the knowledge that the Transoil Payments, the Sovfracht Payments and the Transportation Payments had been paid in breach of the Russian Civil and Criminal Codes.

115.  By reason of the matters set out above, Mrs. Lazurenko and the other Defendants (or any two or more together) wrongfully and with intent to injure Holdings and/or to cause loss to Holdings by unlawful means conspired and combined together to

defraud Holdings by depriving it of its property and/or dishonestly concealing such fraud and the proceeds of such fraud from Holdings.

116.   Pursuant to and in furtherance of the conspiracy Mrs. Lazurenko and the other Defendants carried out the unlawful acts and means by which Holdings was injured in the manner set out above in these Particulars of Claim.

117.   As a result of the matters set out above Holdings has suffered loss and damage. Mrs. Lazurenko and the other Defendants are jointly and severally liable to Holdings in damages for conspiracy.

*Claims against Delaila*

118.   Mr. Lazurenko dishonestly and illegally misappropriated the Transoil Payments, Sovfracht Payments and the Transportation Payments belonging and/or due to Holdings and in doing so received the monies for his own use and benefit. Under the Civil Code of the Russian Federation and/or any other applicable Russian laws Mr. Lazurenko received no legal title and/or rights to the said monies.

119.   Mr. Lazurenko was, at all material times, a de facto director of Delaila and in consequence Delaila knew (a) the provenance of monies it received and (b) the fact that Delaila was in receipt of monies belonging and/or due to Holdings obtained through the fraudulent conduct of Mr. Lazurenko to which he had no title. Accordingly, Delaila holds all such monies received by it and all property acquired with such monies on constructive trust for the benefit of Holdings.

120.   Further and in the alternative, receipt of the said monies enriched Delaila at the expense of Holdings. There is no basis for Delaila to retain the monies by which it has been enriched and accordingly Delaila is liable to account for and to repay Holdings all of those sums belonging and/or due to Holdings which it had and received.

121.   Further or alternatively, Delaila and the other Defendants participated in a corporate structure which was used as a conduit for fraud. The structure concealed and continues to conceal the facts and matters set out in these Particulars of Claim and the whereabouts of the proceeds of Mr. Lazurenko's misappropriation from Holdings. In so participating Delaila acted dishonestly and in the knowledge that the Transoil

Payments, the Sovfracht Payments and the Transportation Payments had been paid in breach of the Russian Civil and Criminal Codes.

122. By reason of the matters set out above, Delaila and the other Defendants (or any two or more together) wrongfully and with intent to injure Holdings and/or to cause loss to Holdings by unlawful means conspired and combined together to defraud Holdings by depriving it of its property and/or dishonestly concealing such fraud and the proceeds of such fraud from Holdings.

123. Pursuant to and in furtherance of the conspiracy Delaila and the other Defendants carried out the unlawful acts and means by which Holdings was injured in the manner set out above in these Particulars of Claim.

124. As a result of the matters set out above Holdings has suffered loss and damage. Delaila and the other Defendants are jointly and severally liable to Holdings in damages for conspiracy.

*Claims against Roychamp*

125. Mr. Lazurenko dishonestly and illegally misappropriated the Transoil Payments, Sovfracht Payments and the Transportation Payments belonging and/or due to Holdings and in doing so received the monies for his own use and benefit. Under the Civil Code of the Russian Federation and/or any other applicable Russian laws Mr. Lazurenko received no legal title and/or rights to the said monies.

126. Mr. Lazurenko was, at all material times, a de facto director of Roychamp and in consequence Roychamp knew (a) the provenance of monies it received and (b) the fact that Roychamp was in receipt of monies belonging and/or due to Holdings obtained through the fraudulent conduct of Mr. Lazurenko to which he had no title. Accordingly, Roychamp holds all such monies received by it and all property acquired with such monies on constructive trust for the benefit of Holdings.

127. Further and in the alternative, receipt of the said monies enriched Roychamp at the expense of Holdings. There is no basis for Roychamp to retain the monies by which it has been enriched and accordingly Roychamp is liable to account for and to repay Holdings all of those sums belonging and/or due to Holdings which it had and received.

128.    Further or alternatively, Roychamp and the other Defendants participated in a corporate structure which was used as a conduit for fraud. The structure concealed and continues to conceal the facts and matters set out in these Particulars of Claim and the whereabouts of the proceeds of Mr. Lazurenko's misappropriation from Holdings. In so participating Roychamp acted dishonestly and in the knowledge that the Transoil Payments, the Sovfracht Payments and the Transportation Payments had been paid in breach of the Russian Civil and Criminal Codes.

129.    By reason of the matters set out above, Roychamp and the other Defendants (or any two or more together) wrongfully and with intent to injure Holdings and/or to cause loss to Holdings by unlawful means conspired and combined together to defraud Holdings by depriving it of its property and/or dishonestly concealing such fraud and the proceeds of such fraud from Holdings.

130.    Pursuant to and in furtherance of the conspiracy Roychamp and the other Defendants carried out the unlawful acts and means by which Holdings was injured in the manner set out above in these Particulars of Claim.

131.    As a result of the matters set out above Holdings has suffered loss and damage. Roychamp and the other Defendants are jointly and severally liable to Holdings in damages for conspiracy.

*Claims against Centelux*

132.    Mr. Lazurenko dishonestly and illegally misappropriated the Transoil Payments, Sovfracht Payments and the Transportation Payments belonging and/or due to Holdings and in doing so received the monies for his own use and benefit. Under the Civil Code of the Russian Federation and/or any other applicable Russian laws Mr. Lazurenko received no legal title and/or rights to the said monies.

133.    Mr. Lazurenko was, at all material times, a de facto director of Centelux and in consequence Centelux knew (a) the provenance of monies it received and (b) the fact that Centelux was in receipt of monies belonging and/or due to Holdings obtained through the fraudulent conduct of Mr. Lazurenko to which he had no title. Accordingly, Centelux holds all such monies received by it and all property acquired with such monies on constructive trust for the benefit of Holdings.

134.   Further and in the alternative, receipt of the said monies enriched Centelux at the expense of Holdings. There is no basis for Centelux to retain the monies by which it has been enriched and accordingly Centelux is liable to account for and to repay Holdings all of those sums belonging and/or due to Holdings which it had and received.

135.   Further or alternatively, Centelux and the other Defendants participated in a corporate structure which was used as a conduit for fraud. The structure concealed and continues to conceal the facts and matters set out in these Particulars of Claim and the whereabouts of the proceeds of Mr. Lazurenko's misappropriation from Holdings. In so participating Centelux acted dishonestly and in the knowledge that the Transoil Payments, the Sovfracht Payments and the Transportation Payments had been paid in breach of the Russian Civil and Criminal Codes.

136.   By reason of the matters set out above, Centelux and the other Defendants (or any two or more together) wrongfully and with intent to injure Holdings and/or to cause loss to Holdings by unlawful means conspired and combined together to defraud Holdings by depriving it of its property and/or dishonestly concealing such fraud and the proceeds of such fraud from Holdings.

137.   Pursuant to and in furtherance of the conspiracy Centelux and the other Defendants carried out the unlawful acts and means by which Holdings was injured in the manner set out above in these Particulars of Claim.

138.   As a result of the matters set out above Holdings has suffered loss and damage. Centelux and the other Defendants are jointly and severally liable to Holdings in damages for conspiracy.

*Claims against Adelaide*

139.   Mr. Lazurenko dishonestly and illegally misappropriated the Transoil Payments, Sovfracht Payments and the Transportation Payments belonging and/or due to Holdings and in doing so received the monies for his own use and benefit. Under the Civil Code of the Russian Federation and/or any other applicable Russian laws Mr. Lazurenko received no legal title and/or rights to the said monies.

140.   Mr. Lazurenko was, at all material times, a de facto director of Adelaide and in consequence Adelaide knew (a) the provenance of monies it received and (b) the fact

that Adelaide was in receipt of monies belonging and/or due to Holdings obtained through the fraudulent conduct of Mr. Lazurenko to which he had no title. Accordingly, Adelaide holds all such monies received by it and all property acquired with such monies on constructive trust for the benefit of Holdings

141. Further and in the alternative, receipt of the said monies enriched Adelaide at the expense of Holdings. There is no basis for Adelaide to retain the monies by which it has been enriched and accordingly Adelaide is liable to account for and to repay Holdings all of those sums belonging and/or due to to Holdings which it had and received.

142. Further or alternatively, Adelaide and the other Defendants participated in a corporate structure which was used as a conduit for fraud. The structure concealed and continues to conceal the facts and matters set out in these Particulars of Claim and the whereabouts of the proceeds of Mr. Lazurenko's misappropriation from Holdings. In so participating Adelaide acted dishonestly and in the knowledge that the Transoil Payments, the Sovfracht Payments and the Transportation Payments had been paid in breach of the Russian Civil and Criminal Codes.

143. By reason of the matters set out above, Adelaide and the other Defendants (or any two or more together) wrongfully and with intent to injure Holdings and/or to cause loss to Holdings by unlawful means conspired and combined together to defraud Holdings by depriving it of its property and/or dishonestly concealing such fraud and the proceeds of such fraud from Holdings.

144. Pursuant to and in furtherance of the conspiracy Adelaide and the other Defendants carried out the unlawful acts and means by which Holdings was injured in the manner set out above in these Particulars of Claim.

145. As a result of the matters set out above Holdings has suffered loss and damage. Adelaide and the other Defendants are jointly and severally liable to Holdings in damages for conspiracy.

*Claims against Trockley*

146. Mr. Lazurenko dishonestly and illegally misappropriated the Transoil Payments, Sovfracht Payments and the Transportation Payments belonging and/or due to

Holdings and in doing so received the monies for his own use and benefit. Under the Civil Code of the Russian Federation and/or any other applicable Russian laws Mr. Lazurenko received no legal title and/or rights to the said monies.

147. Mr. Lazurenko was, at all material times, a de facto director of Trockley. and in consequence Trockley knew (a) the provenance of monies it received and (b) the fact that Trockley was in receipt of monies belonging and/or due to Holdings obtained through the fraudulent conduct of Mr. Lazurenko to which he had no title. Accordingly, Trockley holds all such monies received by it and all property acquired with such monies on constructive trust for the benefit of Holdings.

148. Further and in the alternative, receipt of the said monies enriched Trockley at the expense of Holdings. There is no basis for Trockley to retain the monies by which it has been enriched and accordingly Trockley is liable to account for and to repay Holdings all of those sums belonging and/or due to Holdings which it had and received.

149. Further or alternatively, Trockley and the other Defendants participated in a corporate structure which was used as a conduit for fraud. The structure concealed and continues to conceal the facts and matters set out in these Particulars of Claim and the whereabouts of the proceeds of Mr. Lazurenko's misappropriation from Holdings. In so participating Trockley acted dishonestly and in the knowledge that the Transoil Payments, the Sovfracht Payments and the Transportation Payments had been paid in breach of the Russian Civil and Criminal Codes.

150. By reason of the matters set out above, Trockley and the other Defendants (or any two or more together) wrongfully and with intent to injure Holdings and/or to cause loss to Holdings by unlawful means conspired and combined together to defraud Holdings by depriving it of its property and/or dishonestly concealing such fraud and the proceeds of such fraud from Holdings.

151. Pursuant to and in furtherance of the conspiracy Trockley and the other Defendants carried out the unlawful acts and means by which Holdings was injured in the manner set out above in these Particulars of Claim.

152. As a result of the matters set out above Holdings has suffered loss and damage. Trockley and the other Defendants are jointly and severally liable to Holdings in damages for conspiracy.

*Interest*

153.    Further, the Claimant claims and is entitled to interest on all sums found to be due to it at such rates as the Court thinks fit pursuant to the Court's equitable jurisdiction and/or section 35A of the Senior Courts Act 1981.

## AND the Claimant claims:

Against the First, Second, Third, Fourth, Fifth, Eighth, Ninth, Tenth, Eleventh, Twelfth and Thirteenth Defendants:

1.    A declaration that each of the above mentioned Defendants holds all property and/or sums received by it in fraud of the Claimant as resulting or constructive trustee for the Claimant.

2.    An order pursuant to the declaration at (1) above that each of the above mentioned Defendants pay those sums and/or reconstitute the property which is held on trust for the Claimant and deliver up that property to the Claimant and/or the proceeds of that property.

3.    An account of all sums belonging and/or due to the Claimant which each of the above mentioned Defendants had and received and an order for repayment of such sums to the Claimant.

4.    Damages.

Against the Second Defendant:

5.    A declaration that as provided for by Article 1064 and Article 15 of the Russian Civil Code the Second Defendant has caused loss and damage to the Claimant.

6.    An order that the Second Defendant compensate the Claimant pursuant to the declaration obtained at paragraph (5) above.

7.    A declaration that as provided for by Article 1102 and Article 1103 part 4 of the Russian Civil Code, the Second Defendant has, without bases established by any statute, other legal act or transaction, acquired property at the expense of Holdings.

8.   An order that the Second Defendant shall reconstitute and/or deliver up all property found due to the Claimant pursuant to the declaration at paragraph (7) above and/or the proceeds of that property.

9.   An account of all sums belonging and/or due to the Claimant which he had and received and repayment of such sums to the Claimant.

10.   Damages.

<u>Against all Defendants</u>

11.   Damages for unlawful means conspiracy.

12.   An enquiry into and account of all sums misappropriated by the Second Defendant and paid away by him or at his direction from the Claimant and the use to which such sums were put.

13.   An order for payment to the Claimant of all sums found due on the taking of the account sought in paragraph (12) above and/or delivery up of all property held on trust for the Claimant and/or the proceeds of that property.

14.   Interest.

15.   Costs.

16.   All such further or other necessary relief.

STEPHEN MOVERLEY-SMITH, Q.C.

LYNDSEY DE MESTRE

**Statement of Truth**

The Claimant believes that the facts stated in these Particulars of Claim are true.  I am duly authorised to sign this statement on the Claimant's behalf.

_Richard Stewart_

Richard Stewart, Solicitor for the Claimant

33

Bryan Cave, 88 Wood Street, London EC2V 7AJ

Tel: 020 3207 1100
Fax: 020 3207 1881

Ref: RS4/KU1/A38

CLAIM NO: HC12B03162

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

BETWEEN:

(1) OJSC TNK-BP HOLDING

-and-

(1) BEPPLER & JACOBSON LIMITED (in
provisional liquidation)
(2) IGOR LAZURENKO
(3) LEIBSON CORPORATION
(4)   BELINDA CAPITAL LIMITED
(5)   LAWSON TRADING LIMITED
(6)   SERGEY SCHEKLANOV
(7)   MARCEL TELSER
(8)   SVETLANA LAZURENKO
(9)   DELAILA INVESTMENT
LIMITED
(10)   ROYCHAMP TRADING LLC
(11)   CENTELUX INC
(12)   ADELAIDE ENTERPRISES INC
(13)   TROCKLEY INVESTMENTS
LIMITED

_____

PARTICULARS OF CLAIM

_____

**BRYAN CAVE**
88 Wood Street
London
EC24 7AJ

Tel: 020 3207 1100
Fax: 020 3207 1881

Ref: RS4/KU1/A38

35

CLAIM NO. HC12B03162

**IN THE HIGH COURT OF JUSTICE**

**CHANCERY DIVISION**

BEFORE:      Mr Justice Sales

DATE:       14 August 2012

BETWEEN:



OJSC TNK-BP HOLDINGS

<u>Claimant</u>

-and-

(1) BEPPLER & JACOBSON LIMITED

(in provisional liquidation)

(2) IGOR LAZURENKO

(3) LEIBSON CORPORATION

(4)   BELINDA CAPITAL LIMITED

(5)   LAWSON TRADING LIMITED

(6)   SERGEY SCHEKLANOV

(7)   MR. MARCEL TELSER

(8)   SVETLANA LAZURENKO

(9)   DELAILA INVESTMENT LIMITED

(10)   ROYCHAMP TRADING LLC

(11)   CENTELUX INC

(12)   ADELAIDE ENTERPRISES INC

(13)  TROCKLEY INVESTMENTS LIMITED

<u>Defendants</u>

**UPON** the Claimant's Application by notice dated 10 August 2012.

**AND UPON** reading the witness statement of Richard Stewart.

**IT IS ORDERED THAT:**

1.    The Claimant have permission to serve the Claim Form, Particulars of Claim, Application Notice, this order granting permission, evidence filed in support of the Application and any

273562.1

EXHIBIT

2

PENGAD 800-631-6989

documents pursuant to the Application Notice required to be served, including upon the Second, Third, Fourth, Fifth, Seventh and Ninth to Thirteenth Defendants out of the jurisdiction, as follows.

2.      Upon the Second Defendant pursuant to CPR 6.15(1) by alternative means by:

        (a)      Sending it by email to the email addresses laser256@yahoo.com, laser256@lycos.com, la_x@mac.com and ialazurenko@gmail.com;

        (b)      sending them to Mishcon de Reya at their address, Summit House, 12, Red Lion Square, London, WC1R 4QD with the reference NZ/MCA/EC/JKA and with email notification to michael.armstrong@mishcon.com and massoud.zabati@mishcon.com; and

        (c)      notifying him by telephone or voice message and SMS to telephone number +7 985 764 9405.

3.      Upon the Third Defendant at its registered office.

4.      Upon the Fourth Defendant at its registered office.

5.      Upon the Fifth Defendant at its registered office.

6.      Upon the Sixth Defendant pursuant to CPR 6.15(1) by alternative means by sending them to Mishcon de Reya at their address, Summit House, 12, Red Lion Square, London, WC1R 4QD with the reference NZ/MCA/EC/JKA and with email notification to michael.armstrong@mishcon.com and massoud.zabati@mishcon.com.

7.      Upon the Seventh Defendant by delivering it to 8, Am Bach, Triesen, LI-9495, Liechtenstein, and Aeulstrasse 74, Postfach 461, 9490 Vaduz, Liechtenstein.

8.      Upon the Eighth Defendant pursuant to CPR 6.15(1) by alternative means by:

        (a)      sending it by email to the email addresses laser256@yahoo.com, laser256@lycos.com, la_x@mac.com and ialazurenko@gmail.com;

        (b)      sending them to Mishcon de Reya at their address, Summit House, 12, Red

Lion Square, London, WC1R 4QD with the reference NZ/MCA/EC/JKA and with email notification to michael.armstrong@mishcon.com and massoud.zabati@mishcon.com; and

(c)     notifying her by telephone or voice message and SMS to telephone number +7 985 764 9405.

9.      Upon the Ninth Defendant at its registered office.

10.     Upon the Tenth Defendant at its registered office.

11.     Upon the Eleventh Defendant at its registered office.

12.     Upon the Twelfth Defendant at its registered office.

13.     Upon the Thirteenth Defendant at its registered office.

14.     The Seventh Defendant has:

14.1    21 days after service of the Particulars of Claim to file an Acknowledgement of Service under CPR Part 10 and/or an admission under CPR Part 14; or

14.2    21 days after service of the Particulars of Claim to file a Defence, or 35 days after service of the Particulars of Claim to file a Defence where a Defendant has filed an Acknowledgement of Service.

15.     The Fourth, Fifth, Twelfth Defendants have:

15.1    24 days after service of the Particulars of Claim to file an Acknowledgement of Service under CPR Part 10 and/or an admission under CPR Part 14; or

15.2    24 days after service of the Particulars of Claim to file a Defence, or 38 days after service of the Particulars of Claim to file a Defence where a Defendant has filed an Acknowledgement of Service.

16.     The Third, Ninth, Eleventh and Thirteenth Defendants have:

16.1    31 days after service of the Particulars of Claim to file an Acknowledgement of

Service under CPR Part 10 and/or an admission under CPR Part 14; or

16.2    31 days after service of the Particulars of Claim to file a Defence, or 45 days after service of the Particulars of Claim to file a Defence where a Defendant has filed an Acknowledgement of Service.

17.    The Tenth Defendant has:

17.1    22 days after service of the Particulars of Claim to file an Acknowledgement of Service under CPR Part 10 and/or an admission under CPR Part 14; or

17.2    22 days after service of the Particulars of Claim to file a Defence, or 36 days after service of the Particulars of Claim to file a Defence where a Defendant has filed an Acknowledgement of Service.

18.    The costs of this application be costs in the case.

273562.1

CLAIM NO. HC12B03162

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

BETWEEN:

OJSC TNK-BP HOLDINGS

Claimant

-and-

(1) BEPPLER & JACOBSON LIMITED

(in provisional liquidation)

(2) IGOR LAZURENKO

(3) LEIBSON CORPORATION

(4)  BELINDA CAPITAL LIMITED

(5)  LAWSON TRADING LIMITED

(6)  SERGEY SCHEKLANOV

(7)  MR. MARCEL TELSER

(8)  SVETLANA LAZURENKO

(9)  DELAILA INVESTMENT LIMITED

(10)  ROYCHAMP TRADING LLC

(11)  CENTELUX INC

(12)  ADELAIDE ENTERPRISES INC

(13)  TROCKLEY INVESTMENTS LIMITED

Defendants

---

### MINUTE OF ORDER

---

Bryan Cave
88, Wood Street
London
EC2V 7AJ

Tel: 020 3207 1100

Fax: 020 3207 1881

Ref: RS4/KU1

**Solicitors for the Claimant**

273562.1

```
                                        #
                                            #
   ####     ####    #  ###     #       #    ##    #####
  #    #   #    #   #  ##   #  #       #     #    #     #
  #####    #####    #      #      #    #     #    #
  #        #        #          #   #        #    #
  #    #   #    #   #         #  #          #    #
   ####     ####    #          #       ###    #    #
```

Job : 86
Date: 8/15/2012
Time: 11:41:17 AM

**IN THE HIGH COURT OF JUSTICE**                    **Claim No: HC12B03162**
**CHANCERY DIVISION**

**BEFORE:**     **The Honourable Mr Justice Sales**
**DATED:**      **14 August 2012**

**BETWEEN:**

(1)    OJSC TNK-BP HOLDING

<u>Claimant</u>

-and-



(1)    **BEPPLER & JACOBSON LIMITED (in provisional liquidation)**
(2)    **IGOR LAZURENKO**
(3)    **LEIBSON CORPORATION**
(4)    **BELINDA CAPITAL LIMITED**
(5)    **LAWSON TRADING LIMITED**
(6)    **SERGEY SCHEKLANOV**
(7)    **MARCEL TELSER**
(8)    **SVETLANA LAZURENKO**
(9)    **DELAILA INVESTMENT LIMITED**
(10)   **ROYCHAMP TRADING LLC**
(11)   **CENTELUX INC**
(12)   **ADELAIDE ENTERPRISES INC**
(13)   **TROCKLEY INVESTMENTS LIMITED**

<u>Defendants</u>

<u>FREEZING INJUNCTION</u>

<u>PENAL NOTICE</u>

IF YOU:          IGOR LAZURENKO
                 SVETLANA LAZURENKO
                 DELAILA INVESTMENT LIMITED
                 ROYCHAMP TRADING LLC
                 CENTELUX INC
                 ADELAIDE ENTERPRISES INC
                 TROCKLEY INVESTMENTS LIMITED

DISOBEY THIS ORDER YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE YOUR ASSETS SEIZED.

ANY OTHER PERSON WHO KNOWS OF THIS ORDER AND DOES ANYTHING WHICH HELPS OR PERMITS THE RESPONDENT TO BREACH THE TERMS OF THIS ORDER MAY ALSO BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED.

EXHIBIT

3

**THIS ORDER**

1.    This is a Freezing Injunction made against **IGOR LAZURENKO, SVETLANA LAZURENKO, DELAILA INVESTMENT LIMITED, ROYCHAMP TRADING LLC, CENTELUX INC, ADELAIDE ENTERPRISES INC** and **TROCKLEY INVESTMENTS LIMITED** ('the Respondent') on 14 August 2012 by Mr Justice Sales on the application of **OJSC TNK-BP HOLDING** ('the Applicant'). The Judge read the Affidavits listed in Schedule A and accepted the undertakings set out in Schedules B and C at the end of this Order.

2.    This order was made at a hearing without notice to the Respondent. The Respondent has a right to apply to the court to vary or discharge the order — see paragraph 13 below.

3.    There will be a further hearing in respect of this order on 29 August 2012 ('the return date').

4.    If there is more than one Respondent—

      (a)    Unless otherwise stated, references in this order to 'the Respondent' mean both or all of them; and

      (b)    This order is effective against any Respondent on whom it is served or who is given notice of it.

**FREEZING INJUNCTION**

5.    Until the return date or further order of the court, the Respondents must not—

      (1)    remove from England and Wales any of his assets which are in England and Wales up to the value of €39,000,000; or

      (2)    in any way dispose of, deal with or diminish the value of any of his assets whether they are in or outside England and Wales up to the same value

6.    Paragraph 5 applies to all of the Respondent's assets whether or not they are in his own name and whether they are solely or jointly owned. For the purpose of this order the Respondent's assets include any asset which he has the power, directly or indirectly, to dispose of or deal with as if it was his own. The Respondent is to be regarded as having such power if a third party holds or controls the asset in accordance with his direct or indirect instructions.

2

7.     This prohibition includes the following assets in particular—

    (a)     Land situated in the area of the beach at Trsteno, Montenegro owned by the Eleventh Defendant/Respondent or the net sale money after payment of any mortgages if it has been sold;

    (b)     The shares of the Ninth, Tenth, Eleventh, Twelfth and Thirteenth Defendants/Respondents.

8.     (1)     If the total value free of charges or other securities ('unencumbered value') of the Respondent's assets in England and Wales exceeds €39,000,000, the Respondent may remove any of those assets from England and Wales or may dispose of or deal with them so long as the total unencumbered value of the Respondent's assets still in England and Wales remains above €39,000,000.

    (2)     If the total unencumbered value of the Respondent's assets in England and Wales does not exceed €39,000,000, the Respondent must not remove any of those assets from England and Wales and must not dispose of or deal with any of them. If the Respondent has other assets outside England and Wales, he may dispose of or deal with those assets outside England and Wales so long as the total unencumbered value of all his assets whether in or outside England and Wales remains above €39,000,000.

### PROVISION OF INFORMATION

9.     (1)     Unless paragraph (2) applies, the Respondent must within 24 hours of service of this order and to the best of his ability inform the Applicant's solicitors of all his assets worldwide whether in his own name or not and whether solely or jointly owned, giving the value, location and details of all such assets. In particular, the Respondent must provide the names and addresses of the directors and shareholders of the Ninth, Tenth, Eleventh, Twelfth and Thirteenth Defendants/Respondents.

    (2)     If the provision of any of this information is likely to incriminate the Respondent, he may be entitled to refuse to provide it, but is recommended to take legal advice before refusing to provide the information. Wrongful refusal to provide the information is contempt of court and may render the Respondent liable to be imprisoned, fined or have his assets seized.

10.   Within 7 working days after being served with this order, the Respondent must swear and serve on the Applicant's solicitors an affidavit setting out the above information.

**EXCEPTIONS TO THIS ORDER**

11.   (1)   This order does not prohibit the Second and Eighth Defendants/Respondents from spending £5,000 each a month towards their ordinary living expenses but before spending any money the Respondent must tell the Applicant's legal representatives where the money is to come from.

      (2)   This order does not prohibit the Respondent from spending a reasonable sum on legal advice and representation but before spending any money the Respondent must tell the Applicant's legal representatives where the money is to come from.

      (3)   The Respondent may agree with the Applicant's legal representatives that the above spending limits should be increased or that this order should be varied in any other respect, but any agreement must be in writing.

      (4)   The order will cease to have effect if the Respondent—

          (a)   provides security by paying the sum of €39,000,000 into court, to be held to the order of the court; or

          (b)   makes provision for security in that sum by another method agreed with the Applicant's legal representatives.

      (5)   This order does not prohibit the Ninth to Thirteenth Defendants/Respondents from dealing with or disposing of any of their assets in the ordinary and proper course of business.

**COSTS**

12.   The costs of this application are reserved to the judge hearing the application on the return date.

**VARIATION OR DISCHARGE OF THIS ORDER**

13.   Anyone served with or notified of this order may apply to the court at any time to vary or discharge this order (or so much of it as affects that person), but they must first inform the Applicant's solicitors. If any evidence is to be relied upon in support of the application, the substance of it must be communicated in writing to the Applicant's solicitors in advance.

4

**INTERPRETATION OF THIS ORDER**

14.     A Respondent who is an individual who is ordered not to do something must not do it himself or in any other way. He must not do it through others acting on his behalf or on his instructions or with his encouragement.

15.     A Respondent which is not an individual which is ordered not to do something must not do it itself or by its directors, officers, partners, employees or agents or in any other way.

**PARTIES OTHER THAN THE APPLICANT AND RESPONDENT**

16.     EFFECT OF THIS ORDER

It is a contempt of court for any person notified of this order knowingly to assist in or permit a breach of this order. Any person doing so may be imprisoned, fined or have their assets seized.

17.     SET OFF BY BANKS

This injunction does not prevent any bank from exercising any right of set off it may have in respect of any facility which it gave to the respondent before it was notified of this order.

18.     WITHDRAWALS BY THE RESPONDENT

No bank need enquire as to the application or proposed application of any money withdrawn by the Respondent if the withdrawal appears to be permitted by this order.

19.     PERSONS OUTSIDE ENGLAND AND WALES

(1)     Except as provided in paragraph (2) below, the terms of this order do not affect   or concern anyone outside the jurisdiction of this court.

(2)     The terms of this order will affect the following persons in a country or state outside the jurisdiction of this court —

(a)     the Respondent or his officer or agent appointed by power of attorney;

(b)     any person who—

(i)      is subject to the jurisdiction of this court;

(ii)     has been given written notice of this order at his residence or place of business within the jurisdiction of this court; and

(iii)  is able to prevent acts or omissions outside the jurisdiction of this court which constitute or assist in a breach of the terms of this order;

and

(c)  any other person, only to the extent that this order is declared enforceable by or is enforced by a court in that country or state.

20.  ASSETS OUTSIDE ENGLAND AND WALES

Nothing in this order shall, in respect of assets located outside England and Wales, prevent any third party from complying with—

(1)  what it reasonably believes to be its obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between itself and the Respondent; and

(2)  any orders of the courts of that country or state, provided that reasonable notice of any application for such an order is given to the Applicant's solicitors.

## COMMUNICATIONS WITH THE COURT

All communications to the court about this order should be sent to —

The Senior Associate, Fifth Floor, The Rolls Building, 7 Rolls Building, Fetter Lane, London EC4A 1NL, quoting the case number. The telephone number is 020 7947 6733. The office is open between 10 a.m. and 4.30 p.m. Monday to Friday

## SCHEDULE A

## AFFIDAVITS

The Applicant relied on the following affidavits—

The First Affidavit of Craig Deuchrass sworn on 10 August 2012
The Second Affidavit of Craig Deuchrass sworn on 13 August 2012
The Third Affidavit of Craig Deuchrass sworn on 14 August 2012

6

## SCHEDULE B

### UNDERTAKINGS GIVEN TO THE COURT BY THE APPLICANT

(1)     If the court later finds that this order has caused loss to the Respondent, and decides that the Respondent should be compensated for that loss, the Applicant will comply with any order the court may make. TOC Investments Limited has given the undertaking set out in Schedule C below.

(2)     As soon as practicable, the Applicant will place a sum of $200,000 with the Applicant's solicitors to be held in their client account to the order of the Court and undertakes to the Court that the said sum is to be held as security to meet any award of compensation made under paragraph (1) above and/or as security for the costs of the Respondents, or any of them, in the proceedings, as may be directed by the Court.

(3)     The Applicant will serve upon the Respondent together with this order as soon as practicable—

(i)     copies of the affidavits and exhibits containing the evidence relied upon by the Applicant, particulars of claim and claim form and a note of the hearing of the application for this order and any other documents provided to the court on the making of the application;

(ii)     an application notice for continuation of the order.

(4)     Anyone notified of this order will be given a copy of it by the Applicant's legal representatives.

(5)     The Applicant will pay the reasonable costs of anyone other than the Respondent which have been incurred as a result of this order including the costs of finding out whether that person holds any of the Respondent's assets and if the court later finds that this order has caused such person loss, and decides that such person should be compensated for that loss, the Applicant will comply with any order the court may make.

(6)     If this order ceases to have effect (for example, if the Respondent provides security or the Applicant does not provide a bank guarantee as provided for above) the Applicant will immediately take all reasonable steps to inform in writing anyone to whom he has given notice of this order, or who he has reasonable grounds for supposing may act upon this order, that it has ceased to have effect.

(7)     The Applicant will not without the permission of the court use any information obtained as a result of this order for the purpose of any civil or criminal proceedings, either in England and Wales or in any other jurisdiction, other than this claim.

7

(8)      The Applicant will not without the permission of the court seek to enforce this order in any country outside England and Wales save against the Ninth, Eleventh and Thirteenth Defendants in the British Virgin Islands, the Twelfth Defendant in Nevis and/or the Tenth Defendant in Arkansas, USA or seek an order of a similar nature including orders conferring a charge or other security against the Respondent or the Respondent's assets save against the Ninth, Eleventh and Thirteenth Defendants/Respondents in the British Virgin Islands, the Twelfth Defendant/Respondent in Nevis and/or the Tenth Defendant/Respondent in Arkansas, USA

## SCHEDULE C

### UNDERTAKINGS GIVEN TO THE COURT BY TOC Investments Limited

(1)      If the court later finds that this order has caused loss to the Respondent, and decides that the Respondent should be compensated for that loss, TOC Investments Limited will comply with any order the court may make in respect of the payment of damages. TOC Investments Limited submits to the jurisdiction of the Court for the purpose of enforcement of this undertaking.

### NAME AND ADDRESS OF APPLICANT'S LEGAL REPRESENTATIVES

The Applicant's legal representatives are—

Richard Stewart
Bryan Cave
88 Wood Street
London EC2V 7AJ
Reference: RS4/KU1
Telephone (General): +44 (0)203 207 1200
Telephone (Direct): +44 (0) 203 207 1225
Telephone (Mobile): +44 (0) 7977567195
Fax: + 44 (0)207 1881
E-mail: rjstewart@BryanCave.com

8

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**Claim No: HC12B03162**
**BETWEEN:**

**OJSC TNK-BP HOLDING**

<u>Claimant</u>

**-and-**

(1) **BEPPLER & JACOBSON LIMITED**
     **(in provisional liquidation)**
(2) **IGOR LAZURENKO**
(3) **LEIBSON CORPORATION**
(4) **BELINDA CAPITAL LIMITED**
(5) **LAWSON TRADING LIMITED**
(6) **SERGEY SCHEKLANOV**
(7) **MARCEL TELSER**
(8) **SVETLANA LAZURENKO**
(9) **DELAILA INVESTMENT LIMITED**
(10) **ROYCHAMP TRADING LLC**
(11) **CENTELUX INC**
(12) **ADELAIDE ENTERPRISES INC**
(13) **TROCKLEY INVESTMENTS LIMITED**

<u>Defendants</u>

<u>**FREEZING INJUNCTION**</u>

Richard Stewart
Bryan Cave
88 Wood Street
London EC2V 7AJ
Reference: RS4/KU1
Telephone (General): +44 (0)203 207 1200
Telephone (Direct): +44 (0) 203 207 1225
Telephone (Mobile): +44 (0) 7977567195
Fax: + 44 (0)207 1881
E-mail: rjstewart@BryanCave.com

Solicitors to the Claimant/Applicant

9