FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

AUG 15 2012

JAMES W. McCORMACK, CLERK
By: _____
                    DEP CLERK

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

**OJSC TNK-BP HOLDING**                                    **PLAINTIFF**

**vs.**                    Case No. 4:12 cv 512 JMM

**ROYCHAMP TRADING LLC, AN ARKANSAS**              **DEFENDANT**
**LIMITED LIABILITY COMPANY**

---

## MOTION TO RECOGNIZE AND ENFORCE FOREIGN FREEZING INJUNCTION

OJSC TNK-BP Holding ("HOLDING") files this Motion to Recognize and Enforce Foreign Freezing Injunction. For cause, HOLDING states:

1.      HOLDING is the claimant and Roychamp Trading LLC ("ROYCHAMP") is one of several defendants in an action pending in the High Court of Justice in London, England (also referred to as "the English Court").

2.      On Monday, August 13, 2012, the High Court of Justice entered a "freezing injunction" against ROYCHAMP, Igor Lazurenko (who is understood by HOLDING to control ROYCHAMP), and others. The English Court found good cause for the entry of relief, *ex parte*, and scheduled a return hearing for August 29, 2012, at which ROYCHAMP will have the opportunity to appear and defend.

3.      Courts in the BVI and Nevis, where other defendants involved in the international fraudulent scheme are located, have entered orders enforcing the English Court's *ex parte* injunction.

4.      HOLDING sought and was granted permission from the English Court to seek enforcement of the freezing injunction in Arkansas.

5.      This Court has the authority to recognize and to enforce the English freezing injunction.  It is appropriate to do so in this action.  Absent such relief, it is likely that efforts will be made to dissipate or to conceal the assets of ROYCHAMP, which should be held in constructive trust until such time as the English court can resolve HOLDING's claims on the merits.

6.      Principles of international law and comity support the requested relief.

7.      Copies of the substantive papers submitted to the English Court in support of the application for a freezing injunction, the *ex parte* freezing injunction, and the transcript of the English Court proceeding are attached hereto and include:

    (a)    Outline Submissions of the Claimant (referred to as an "Outline for Freezing Injunction"), attached as Exhibit A.

    (b)    First Affidavit of Craig Deuchrass, with supporting documents, attached as Exhibit B.

    (c)    Second Affidavit of Craig Deuchrass, with supporting documents, attached as Exhibit C.

    (d)    Third Affidavit of Craig Deuchrass with supporting documents, attached as Exhibit D.

    (e)    The *ex parte* freezing injunction entered by the English Court on August 13, 2012, attached as Exhibit E.

    (f)    Transcript of English Court hearing held on August 13, 2012, attached as Exhibit F.

8.      This motion is supported by a brief filed contemporaneously herewith and incorporated by reference.

9.      HOLDING requests a prompt hearing with the Court.  Efforts are underway to serve ROYCHAMP's registered agent for service, Mr. G. Robert Hardin, of North Little Rock, Arkansas, with the Complaint, this motion, and supporting brief.

WHEREFORE, OJSC TNK-BP Holding prays for the entry of a Freezing Injunction which mirrors the injunction entered by the High Court of Justice in London, England, to be binding on any person within the jurisdiction of this Court, and for all other just and proper relief.

Respectfully submitted,

KEVIN A. CRASS  (84029)
EDIE R. ERVIN  (93198)
PHILLIP M. BRICK, JR. (2009116)
FRIDAY, ELDREDGE & CLARK, LLP
400 West Capitol Avenue, Suite 2000
Little Rock, Arkansas  72201-3522
(501) 376-2011
Crass@fridayfirm.com
EErvin@fridayfirm.com
PBrick@fridayfirm.com

Attorneys for Plaintiff,
OJSC TNK-BP HOLDING

By: _____
KEVIN A. CRASS

## CERTIFICATE OF SERVICE

I, Kevin A. Crass, hereby certify that a copy of the foregoing has been served upon the following Defendant on this 15th day of August, 2012:

Mr. G. Robert Hardin
As Registered Agent for Service for
Roychamp Trading LLC
500 Main Street, Suite "A"
North Little Rock, Arkansas 72114

_____
Kevin A. Crass

gIN THE HIGH COURT OF JUSTICE                                    Claim No: HC12B03162
CHANCERY DIVISION

BETWEEN:

| | | |
|---|---|---|
| (1) | **OJSC TNK-BP HOLDING** | |

**Claimant**

-and-

| | |
|---|---|
| (1) | **BEPPLER & JACOBSON LIMITED (in provisional liquidation)** |
| (2) | **IGOR LAZURENKO** |
| (3) | **LEIBSON CORPORATION** |
| (4) | **BELINDA CAPITAL LIMITED** |
| (5) | **LAWSON TRADING LIMITED** |
| (6) | **SERGEY SCHEKLANOV** |
| (7) | **MARCEL TELSER** |
| (8) | **SVETLANA LAZURENKO** |
| (9) | **DELAILA INVESTMENT LIMITED** |
| (10) | **ROYCHAMP TRADING LLC** |
| (11) | **CENTELUX INC** |
| (12) | **ADELAIDE ENTERPRISES INC** |
| (13) | **TROCKLEY INVESTMENTS LIMITED** |

**Defendants**

---

### OUTLINE SUBMISSIONS OF THE CLAIMANT

---

*The Application*

1.      By a notice of application dated 10 August 2012 ("the Application") The Claimant ('Holding'), applies without notice for worldwide freezing injunctions against its former agent, the Second Defendant, ('Mr. Lazurenko'), his wife, the Eighth Defendant ("Mrs. Lazurenko") and a number of offshore companies (the Ninth to Thirteenth Defendants) who, together with the remaining Defendants, have conspired to defraud Holding of many millions of dollars by corrupting the tender process used to award contracts for the transportation of oil and oil products and thereafter concealing the proceeds of that fraud from Holding.

2.      The Application is made in proceedings issued by Holding in the Chancery Division on 6 August 2012 under claim number HC12B03162 to recover the money misappropriated by Mr. Lazurenko and his associates, to claim damages for conspiracy and compensation under the Russian Civil Code.


**EXHIBIT**

A

3.   Holding relies on the witness statement of Craig Deuchrass dated 10 August 2012 ("**Deuchrass 1**") in support of the Application.

**Pre-reading**

4.   Time permitting, the Court is invited to read the following material in advance of the hearing:

   (a)   these submissions;
   (b)   the Particulars of Claim ("**PoC**");
   (c)   Deuchrass 1

6.   It is anticipated that this will take the Court approximately one hour.

**Parties**

7.   The parties to the claim are as follows:

| | Party | | |
|---|---|---|---|
| | **Claimant** | | |
| | OJSC TNK-BP Holding | 'Holding' | Part of the TNK-BP Group ("TNK-BP"). TNK-BP is the second largest privately owned Russian crude oil production company. TNK-BP was formed in 2003 as a result of the merger of BP's Russian oil and gas assets with the oil and gas assets of Alfa Access/Renova group ("AAR"). BP and AAR each own 50% of TNK-BP. Holding is a Russian holding company of TNK-BP, and holds the major assets of TNK-BP within the Russian Federation. |
| | **Defendants** | | |
| 1 | Beppler & Jacobson Limited (In Provisional Liquidation) | 'BJUK' | An English company incorporated by the Second Defendant on 7 November 2001. BJUK is the registered owner of 100% of the shares in Beppler & Jacobson Montenegro D.O.O ("BJM") and is the registered owner of land in Montenegro where two hotels owned by BJM are situated. |
| 2 | Igor Lazurenko | 'Mr. Lazurenko' | A Russian citizen and a former employee of OJSC TNK-BP Management ("Management"). Mr. Lazurenko is the ultimate beneficial owner and controlling |

2

| | | | |
|---|---|---|---|
| | | | mind of the Third, Fourth, Fifth, Ninth, Tenth, Eleventh, Twelfth and Thirteenth Defendants. Mr. Lazurenko is also a de facto director of the First, Third, Fourth, Fifth, Ninth, Tenth, Eleventh, Twelfth and Thirteenth Defendants. |
| 3 | Leibson Corporation | 'Leibson' | A BVI registered company which currently holds 70% less one share of the issued shares of BJUK. |
| 4 | Belinda Capital Ltd | 'Belinda' | A Nevis company which currently holds 5% of the issued shares of BJUK. |
| 5 | Lawson Trading Ltd | 'Lawson' | A Nevis company which claims to have entered into a series of agency agreements with BJUK whereby it is alleged that Lawson provided funding for the purchase of hotels in Montenegro and that in doing so BJUK acted as agent for Lawson. For the avoidance of doubt Holding believes the alleged agency agreements to be shams and that Lawson is a front for Mr. Lazurenko. |
| 6 | Sergey Scheklanov | 'Mr Scheklanov' | Apparently a business associate of Mr. Lazurenko. Mr. Scheklanov claims to be the ultimate beneficial owner of the shares in Lawson and as such claims to be the ultimate beneficial owner of the entirety of the assets owned by BJUK and BJM. For the avoidance of doubt Holding believes Mr. Scheklanov is a front for Mr. Lazurenko. |
| 7 | Marcel Telser | 'Mr Telser' | A Liechtenstein lawyer and fiduciary. Mr. Telser is the sole de jure director of BJUK and a director of other Defendants. He is a nominee director, having been appointed by Mr. Lazurenko and acts under his direction. |
| 8 | Svetlana Lazurenko | 'Mrs Lazurenko' | Mr. Lazurenko's wife. Mrs. Lazurenko is a former director of Adelaide Montenegro D.O.O ("Adelaide Montenegro") and a director of Trockley MN D.O.O. |

| | | | ("Trockley Montenegro"); both are Montenegrin companies ultimately controlled by Mr. Lazurenko and each is the registered owner of land in Montenegro. |
|---|---|---|---|
| 9 | Delaila Investment Ltd | 'Delaila' | A company incorporated in the BVI and the registered owner of land in Montenegro. |
| 10 | Roychamp Trading Llc | 'Roychamp' | A company incorporated in Arkansas and the 100% owner of Roychamp Trading Montenegro D.O.O. ("Roychamp Montenegro"); a Montenegrin company which is the registered owner of land in Montenegro. |
| 11 | Centelux Inc | 'Centelux' | A company incorporated in the BVI and the registered owner of land in Montenegro. |
| 12 | Adelaide Enterprises Inc | 'Adelaide' | A company incorporated in Nevis and the 100% owner of Adelaide Montenegro. |
| 13 | Trockley Investments Ltd | 'Trockley' | A company incorporated in BVI and the 100% owner of Trockley Montenegro. |

8.    The Respondents to the Application are Mr. and Mrs. Lazurenko, four entities owning shares in companies that have invested in land in Montenegro, namely Delaila, Roychamp, Adelaide and Trockley and Centelux which owns land in Montenegro (together the 'Respondent Offshore companies').

*Factual background*

9.    The factual background to this matter is set out in detail in Deuchrass 1. A summary is set out below.

10.   Holding is part of the TNK-BP Group ("TNK-BP") [PoC § 1; Deuchrass 1 § 5]. TNK-BP is the second largest privately owned Russian crude oil production company. Holding holds the major assets of TNK-BP within the Russian Federation. Its role inter alia is to enter into contractual arrangements for the transportation of oil produced by TNK-BP.

11.   Between 1 September 2003 and 27 April 2012, when he resigned, Mr. Lazurenko was an employee of OJSC TNK-BP Management ("Management"), another company within the TNK-BP Group [PoC § 15; Deuchrass 1 § 6].

12.   One of Mr. Lazurenko's roles was to act as agent for Holding with responsibility inter alia for the negotiation of contracts for the transportation of oil products produced by TNK-BP by rail and via pipelines from the production fields to refineries and other

4

destinations primarily within the Russian Federation and elsewhere in the Commonwealth of Independent States. Many of the contracts involved a tender process which Mr. Lazurenko controlled [PoC § 16-19; Deuchrass 1 § 10].

13.   In March 2012 Holding discovered that a rail transportation company, OOO TK TransOil ("Transoil"), with which it had contracted, had been approached by Mr. Lazurenko with a demand for money. Transoil told Mr. German Khan ("Mr. Khan"), the executive director of Management and TNK-BP, that Mr. Lazurenko had demanded payments for Transoil to do business with TNK-BP and that payments of some US$8m had been made to him ("the Transoil Payments"). As TNK-BP had no policy of restricting the persons with whom it would do business, it is to be inferred that the purpose of the payments was so that Transoil would be paid by Holding an excessive and inflated price for its services over and above the price that would otherwise have been chargeable; the overpayment being shared by Transoil and Mr. Lazurenko [PoC § 20-31; Deuchrass 1 § 11-12 and 17; Egorov § 10-13; Stewart; § 10].

14.   Transoil identified some US$4m which was paid by wire transfers to various bank accounts in Latvia and Cyprus in the names of third parties and US$4m which was paid in cash [PoC § 21(c)].

15.   During the course of a subsequent internal inquiry Mr. Lazurenko was questioned about the Transoil Payments. He admitted that he owed at least US$8m in relation to those payments and offered to make recompense by transferring two properties in Moscow or to pay their cash equivalent. In the event no sum has been paid, nor has any property been transferred [PoC § 27; Deuchrass 1 § 17; Egorov § 13; Stewart § 17].

16.   Following its discovery of the Transoil Payments and Mr. Lazurenko's admission of wrongdoing, TNK-BP and Holding revisited an earlier series of allegations that had been made by another oil transportation company, Sovfracht, in 2010. The chairman of Sovfracht, Mr. Alexander Ivanov, had alleged that Mr. Lazurenko had procured a series of cash payments to be made to him totalling some US$5m ("the Sovfracht Payments"), in exchange for which he had manipulated the tender process for the placing of transportation contracts, such that the price paid by Holding exceeded the price that would have been paid had there been a non-corrupt process. It was alleged that this had occurred not only with Sovfracht, but also with other transportation companies. At the time Mr. Lazurenko had denied the allegations and in the absence of anything to substantiate them the matter had not then been taken further; but the similarity in the pattern of behaviour suggested that these earlier allegations were in fact also true [PoC § 32-40; Deuchrass 1 § 13 and 16; Egorov § 17-20; Stewart § 11].

17.   The third development took place in late September 2011, when TNK-BP was contacted by Mr. Zoran Becirovic ("Mr. Becirovic"), a Montenegrin businessman. Mr. Becirovic made a series of allegations about Mr. Lazurenko. In summary, Mr. Beciroivic claimed that he had met Mr. Lazurenko in 2002. Mr. Lazurenko had been looking for opportunities to invest; he claimed he was acting on behalf of Mr. Khan.

Mr. Becirovic had subsequently identified an investment opportunity in relation to the privatisation of a luxury hotel, the Avala, in Montenegro, which was then pursued.  The vehicle for the project was the BJUK.  Mr. Lazurenko, on behalf of Mr. Khan, was to provide the finance and Mr. Becirovic local expertise, connections and management.  Mr. Becirovic initially received 20% of the share capital of BJUK, the remaining shares being issued to the Third Defendant ("Liebson") which Mr. Lazurenko claimed was owned by Mr. Khan.   Subsequently Liebson transferred 5% (less one share to Mr. Becirovic) and 5% to the Fourth Defendant ("Belinda").  Mr. Lazurenko claimed that the shares transferred to Belinda.  Mr. Becirovic's shares were subsequently transferred to Caldero Trading Limited ("Caldero") [PoC § 41-43 Egorov § 21-29, Deuchrass 1 § 14-15, 20-24, Stewart § 12-13].

18.  BJUK incorporated a Montenegrin subsidiary, Beppler & Jacobson Montenegro D.O.O. ("BJM") to hold the Avala hotel, BJUK itself becoming registered owner of the land on which it stands.  Subsequently BJUK acquired a second luxury hotel, the Bianca, using the same ownership structure.   Both hotels were extensively refurbished; the overall cost of the acquisition and refurbishment being in the region of US$64m. [PoC § 2 and 41-43, Deuchrass 1 § 7-8, 22.1 and 24.3, Egorov § 23, Stewart 12-13]

19.  Mr. Becirovic subsequently fell out with Mr. Lazurenko and decided to contact Mr. Khan directly.  He then learned that Mr. Khan knew nothing of the project and had not authorised Mr. Lazurenko to do anything on his behalf.

20.  Mr. Becirovic also identified three other smaller property development projects in Montenegro (particularised in PoC § 45).  These had been purchased on the same basis as the hotels: funding was provided by Mr. Lazurenko, purportedly on behalf of Mr. Khan, local expertise was provided by Mr. Becirovic, the offshore vehicles used for the projects – Delaila, Centelux and Roychamp, were owned as to 75% by Mr. Lazurenko, purportedly on behalf of Mr. Khan, and as to 25% by Mr. Becirovic's company, Caldero [PoC § 44-47, Deuchrass 1 § 21, 22 and 24.4, Egorov § 24, Stewart § 19].

21.  In addition to the projects in which he was interested, Mr. Becirovic identified further plots of land purchased by Mr. Lazurenko through two additional offshore companies, Adelaide and Trockley [PoC § 47, Deuchrass 1 § 9 and 22.6].

22.  The total investment made by Mr. Lazurenko, taking into account a further US$2m expended on a failed project to operate a newspaper business, was in excess of US$78.5m [PoC § 41(j), Deuchrass 1 § 21 - 23].

23.  Investigations subsequently carried out by TNK-BP established that property in Moscow worth US$25m was registered in the names of his immediate family.  Some of that property had been offered by Mr. Lazurenko in the proposed settlement described above [PoC § 48-9, Deuchrass 1 § 18, 22.7 and 24.5, Egorov § 13 and 27].

24. Mr. Lazurenko's salary, over the whole period of his employment with Management dating back to 2003, was less than US$10m. Further, during the course of that employment he was required to make an annual declaration of his assets: none of the properties mentioned above was ever identified as owned by him [PoC § 54(a) and (e), Deuchrass 1 § 24.1].

25. Immediately after Mr. Becirovic's meeting with Mr. Khan, he was telephoned out of the blue by Mr. Scheklanov who claimed that in fact he was Mr. Becirovic's business partner, not Mr. Khan. Mr. Scheklanov subsequently sought to rely on what he claimed were agency agreements entered into by BJUK pursuant to which it held all its assets as nominee for a Nevis company, Lawson [PoC § 50; Deuchrass 1 § 25-26, Stewart § 24-28].

26. On 3 May 2012 Caldero issued a petition under s. 994 Companies Act 2006 ("the Caldero Proceedings") seeking an order for the compulsory purchase of its shares in BJUK, alternatively an order for its winding up. On the same day HHJ Birss QC appointed provisional liquidators over BJUK and granted injunctions against Liebson, Mr. Lazurenko and Mr. Telser (a director of BJUK), preventing them dissipating BJUK's assets pending the trial of the petition. The Caldero Proceedings, which have the effect of freezing the assets of BJUK and BJM, are fully supported by TNK-BP, which is funding Caldero and has provided an undertaking in damages [PoC § 51; Deuchrass 1 § 28-34].

27. The Caldero Proceedings, to which Liebson, Belinda, Mr. Lazurenko, Mr. Telser, Lawson and Mr. Scheklanov are parties, are ongoing. On 16 July 2012 an order was made by Newey J which *inter alia* recited that the Court was satisfied that it was just and equitable that BJUK be wound up and that the affairs of BJUK had been conducted in a manner unfairly prejudicial to the interests of Caldero, declared that the purported agency agreements Mr. Scheklanov and Lawson had relied on were null and void and ordered Liebson (the 70% shareholder of BJUK) to purchase Caldero's shares [Deuchrass 1 § 28-31, Stewart § 20-23].

28. The further developments in relation to the Caldero Proceedings are set out in [Deuchrass 1 § 51-71]. It will be seen, *inter alia*, that Mr. Telser has sought to frustrate and undermine the appointment of the provisional liquidators over BJUK.

29. Further, Mr. Lazurenko has sought to coerce TNK-BP into dropping its pursuit of him by threatening to disclose documents, illegally taken by him from TNK-BP, to third parties, which, he claimed, would be damaging to TNK-BP. TNK-BP subsequently obtained an injunction restraining Mr. Lazurenko from disclosing the documentation [Deuchrass 1 § 78-80].

30. Following the commencement of the Caldero Proceedings, an attempt was made to transfer the 75% interest that had been held in Roychamp by Mr. Lazurenko (purportedly for Mr. Khan) in the name of Prokurations-Anstalt to another previously unknown company, Maricio Investments Limited. That attempt was defeated by the requirement, under Arkansas law, that Caldero consent to the transfer (which it did

not) [Deuchrass 1 § 38-48].  In the course of challenging the transfer Caldero was supplied with what purported to be a statement of assets and liabilities for Roychamp which purported to show that Roychamp had invested US$10.6m in its Montenegrin subsidiary and learnt that a loan of some US$15.9m had purportedly been made by an unknown BVI company, Lubria Invest and Trade SA, pursuant to a loan agreement dated 7 October 2004, but, according to Mr. Becirovic, had never appeared in any previous financial statements of Roychamp [Deuchrass 1 § 49-50].

31.     It is Holding's case that Mr Lazurenko's actions over a number of years constituted a large scale fraudulent scheme to misappropriate funds by way of his agency agreement with Holding.  Those funds were systematically laundered into foreign assets with a view to concealing them from Holding.  Mr Lazurenko and those assisting him with the scheme, including the Respondent Offshore Companies of which he was (and is) a de facto director knowinlgy received the misappropriated funds or their product and, accordingly, are constructive trustees of those funds/assets and are liable to account to Holdings therefor.

32.     In its particulars of claim, Holding claims against the Defendants (i) accounts on the basis of constructive trusteeship, (ii) damages for conspiracy (iii) remedies in restitution and (iv) against Mr Lazurenko remedies pursuant to the Russian Civil Code

**Submissions**

*Freezing injunctions*

33.     To be entitled to a worldwide freezing injunction the Applicant must show that:

33.1    It has a good arguable case[1] against the Respondents; and

33.2    There is a real risk that judgment will go unsatisfied by reason of the disposal by the Respondents of their assets, unless they restrained by court order from disposing of them.

*Good arguable case*

34.     To justify obtaining a freezing injunction, an applicant has to show a good arguable case on the merits. In *Ninemia Maritime Corporation v Trave Schiffahrtsgesellschaft GmbH ('the Niedersachsen')* [1983] 2 Lloyd's 600 at 605 Mustill J (as he then was) described a good arguable case as 'one which is more than barely capable of serious argument, but not necessarily one which the judge considers would have a better than 50 per cent chance of success'.

*Mr. Lazurenko*

35.     It is submitted that the evidence plainly discloses a good arguable case against Mr. Lazurenko.   He clearly had the opportunity to corrupt the tender process for

---

[1] Per Lord Denning MR in *Rasu Martima SA v Perusahaan Pertambangan Minyakdangas Bumi Negara (Pertamina)* [1978] QB 644.

transportation contracts in the manner alleged; the allegations that he solicited payments comes from two separate sources, namely Transoil and Sovfracht; he lied to Mr. Becirovic about the involvement of Mr. Khan in relation to the Montenegrin projects carried out through BJUK, Delaila, Roychamp and Centelux. He admitted his misappropriation of funds, at least in relation to the Transoil payments. In addition, his earnings over the relevant period of less than US$10m [Deuchrass 1 § 24.1] could not possibly support the US$211,000,00 (£135,000,000) [Deuchrass 1 § 23] of investments he accrued over the same period.

*Mrs. Lazurenko*

36.     As set out in Deuchrass 1 § 26, it is to be inferred from Mrs. Lazurenko's directorships of Adelaide Montenegro and Trockley Montenegro and her involvement in the joint venture between Mr. Lazurenko and Mr. Becirovic that she knew (a) the provenance of monies she received directly or indirectly from Mr. Lazurenko and (b) the fact that she was in receipt of funds obtained through the fraudulent conduct of Mr. Lazurenko. It is submitted that there is a good arguable case against her on the basis of liability to account as constructive trustee on the basis of knowing receipt of fraudulently misappropriated funds.

*The Respondent Offshore Companies*

37.     The Respondent Offshore Companies were part of an obvious scheme to conceal misappropriated assets. It is inconceivable on the facts set out in Deuchrass 1 that the Respondent Offshore Companies were not creatures of Mr. Lazurenko. Mr. Lazurenko was a de facto director of those companies and, accordingly, each had knowledge of the conspiracy and the part it was playing in the fraudulent enterprise. Holding therefore has a good arguable case against each of them in conspiracy. Further, to the extent that the Respondent Offshore Companies hold assets representing misappropriated monies belonging to Holding they will be liable to account for such monies as constructive trustees. On that basis it is submitted that there is a good arguable case against each of the Respondent Offshore Companies.

*Risk of a judgment going unsatisfied as a result of dissipation*

38.     The rationale behind the jurisdiction to grant a freezing injunction is to prevent the defendants dissipating their assets or otherwise and rendering themselves unable to satisfy any judgment against them in the substantive proceedings; to 'hold the position until a judgment comes into existence' (per Lord Mustill in *Mercedes-Benz AG v Leiduck* [1996] 1 AC 284).

39.     In *Cogentra AV v Sixteen Thirteen Marine SA ('the Nicholas M')* [2008] 2 Lloyd's Rep 602 at paragraph 49 Flaux J set out the relevant legal principles for determining whether, for the purposes of granting a freezing injunction, the claimant has shown sufficient risk of dissipation of assets as being:

(i)     There is a real risk that a judgment or award will go unsatisfied, in the sense of a real risk that, unless restrained by injunction, the defendant will dissipate or dispose of his assets other than in the ordinary course of business: the Niedersachsen [1983] 2 Lloyd's Rep 401 at 406 (paragraphs 24-2 or

(ii)    That unless the defendant is restrained by injunction, assets are likely to be dealt with in such a way as to make enforcement of any award or judgment more difficult, unless those dealings can be justified for normal and proper business purposes: Stronghold Insurance v Overseas Union [1996] LRLR 13 at 18-19 per Potter J and Motorola Credit Corporation v Uzan (No 2) [2004] 1 WLR 113 at 153 (paragraphs 142-146) where the Court of Appeal was applying the same principle in the context of disclosure of assets by the defendant.

40.   Christopher Clarke J commented upon the risk of dissipation as follows in *TTMI Ltd v ASM Shipping Ltd* [2005] EWHC 2666 (Comm):

25.    The purpose of the Mareva jurisdiction is sometimes referred to as the prevention of the "dissipation of assets". Without explanation that phrase is itself obscure. As Colman J stated in Gangway Ltd v Caledonian Park Investments (Jersey) Ltd (2001) 2 Lloyd's Rep 715 the underlying purpose of the jurisdiction is not to provide a claimant with security for its claim but to restrain a defendant from evading justice by disposing of assets otherwise than in the ordinary course of business so as to make itself judgment proof with the result that any judgment or award in favour of the claimant goes unsatisfied. The purpose is not to provide security for the claimant in respect of his claim. It is well established that it is not necessary to establish that the defendant is likely to act with the object of putting his assets beyond reach. What has to be shown is that there is, absent an injunction, "a real risk that a judgment or award in favour of the plaintiffs would go unsatisfied ": The "Niedersachsen": [1983] 2 Lloyd's Rep 600. That formulation cannot, however, be regarded as a complete statement of the law. A defendant may be likely to make perfectly normal dispositions, such as the payment of ordinary trading debts, the effect of which may be that, when any award is made, it is, in whole or in part unsatisfied when, absent those payments, it might have been satisfied or satisfied to a greater extent. Something more than a real risk that the judgment will go unsatisfied is required.

26.    Thus in a case in the Court of Appeal of Ontario Chitel v Robart [1982] 39 O.R. (2d) 513, 532–3 the Court said: "The applicant must persuade the court by his material that the defendant is removing or there is a real risk that he is about to remove his assets from the jurisdiction to avoid the possibility of judgment, or that the defendant is otherwise dissipating or disposing of his assets, in a manner clearly distinct from his usual or ordinary course of business or living , so as to render the possibility of future tracing of the assets remote, if not impossible in fact or in law".

27.     To similar effect, in *Ketchum International Plc v Group Public Relations Holding (1997) 1 W.L.R. 4 Stuart Smith, L.J.* referred to the jurisdiction of the Court of Appeal to ensure that its judgments on appeal were not rendered valueless "by an unjustifiable disposal of assets".

*Evidence*

41.     There must be "solid evidence" of risk (per Peter Gibson LJ at paras 20-23 and 26 in *Thane Investments Ltd v Tomlinson* [2003] EWCA Civ 1272).  Where an applicant asks the Court to infer risk, the inference must be justified on the facts relied upon (*Thane*, paras 27-28).

42.     It is accepted that evidence of the suspicion of a third party as to the existence of risk is insufficient, without more, to fulfil the 'solid evidence' requirement (*Enercon GmbH v Wobben Properties GmbH* [2012] EWHC 689 (Comm)).

43.     Equally it is accepted that the existence of complex company structures is not, without more, evidence of a risk that judgment will go unsatisfied as a result of dissipation (*Komal v Litt Corporation Ltd* [2012] EWHC 1226 (Ch)) .

44.     However, the position is quite different where there is evidence that misappropriated assets are being moved into and through complex structures and various hassets in order to conceal them from their rightful owners as part of a fraudulent scheme.  In that case, it is submitted, a freezing order will be justified.

45.     The facts of this case amount to just such a fraudulent scheme.  It is submitted that the risk of judgment going unsatisfied is endemic in a scheme of this sort. The purpose of the structure is misappropriating and concealing (ie disposing of) assets – although the assets are those of the Claimants rather than of the Defendants. Accordingly, unless that disposal is restrained there is a substantial risk it will continue.

46.     Further, as outlined above, following the commencement of the Caldero Proceedings, an attempt was made to transfer the 75% interest that had been held in Roychamp by Mr. Lazurenko (purportedly for Mr. Khan) in the name of Prokurations-Anstalt to another previously unknown company, Maricio Investments Limited.  That attempt was defeated by the requirement, under Arkansas law, that Caldero consent to the transfer (which it did not) [Deuchrass 1 § 38-47].  In the course of challenging the transfer Caldero was supplied with what purported to be a statement of assets and liabilities for Roychamp which purported to show that Roychamp had invested US$10.6m in its Montenegrin subsidiary and learnt that a loan of some US$15.9m had purportedly been made by an unknown BVI company, Lubria Invest and Trade SA, pursuant to a loan agreement dated 7 October 2004, but, according to Mr. Becirovic, had never appeared in any previous financial statements of Roychamp.

47. No explanation of any sort has been provided for the attempted disposal, which appears to be designed to further obfuscate the position.

48. In addition, there has appeared in the financial statements for Roychamp an entry relating to a purported loan in excess of the amount invested, apparently made in 2004 by a BVI entity entirely unknown to Mr. Bericovic, which had not appeared in any previous financial statements (see Deuchrass 1§ 49-50).

49. The further developments in relation to the Caldero Proceedings set out in [Deuchrass 1 § 51-71] including Mr. Telser's attempts to frustrate and undermine the appointment of the provisional liquidators over BJUK provide further evidence of the risk of dissipation.

50. It is submitted that the evidence put forward in Deuchrass 1 readily satisfies the requirement of solid evidence of dissipation.

*Assets*

51. The Applicant must satisfy the Court of two points in respect of the Respondents' assets:

    49.1   There are no, or insufficient, assets in England and Wales to satisfy the Applicant's substantive claim; and

    49.2   There are assets outside the jurisdiction.

52. The sum sought to be recovered is at least US$211,000,000, being the value of assets purchased with the monies misappropriated in the course of the fraudulent scheme [PoC § 23 and 41(j)] of which the following payments, at the very least, have been identified: US$13,941,193 being US$7,941,193 (the Transoil Payments) [PoC §21], US$5 million (the Sovfracht Payments and the Transportation Payments) [PoC § 33]. See [Deuchrass 1 § 23].

53. Apart from the presence of BJUK in the jurisdiction there are no known assets of any significant value in England and Wales [Deuchrass 1 § 84]. Accordingly, there are insufficient assets in England and Wales to satisfy the Applicant's claim.

54. The Respondent Holding Companies hold shares in Montenegrin entities of the same name thought to be worth in the region of US$41 million [PoC § 45 and 47; Deuchras 1 §22].

*Promptness in applying*

55. Three recent authorities deal with the impact of promptness/delay in making an application for a freezing injunction.

56.    In *Fiona Trust v Privalov* [2007] EWHC 1217 (Comm) David Steel J stated at paras 69-70:

> 69 There is no doubt that the fact of the failure to make an earlier application against Mr. Skarga is a material consideration vis a vis the application against him. There are in this context two particular considerations: a) The delay clearly raises the question whether the Claimant really needs an injunction pending trial: in short the delay may give rise to the provisional conclusion that the risk of secretion had already accrued. b) Nonetheless, the applicant is entitled to take up time in making reasonable enquiries prior to launching an application, the more so where the nature of his case is based on fraudulent or dishonest activity (see Grupo Torras v Al-Sabah, C/A, 16 February 1994): the fact that thereafter the application is made inter partes is scarcely prejudicial to the respondent.

> 70 Furthermore it has to be borne in mind that the rationale for a freezing order is not so much the risk of dissipation as such, but the risk that a judgment in favour of Claimants would remain unsatisfied either because of dissipation or secretion or dispersal: see Mercedes Benz AG v. Leiduck [1996] AC 284. I accept that delay is potentially a significant discretionary consideration but much depends on the individual facts of each case.

57.    In *Antonio Gramsci Shipping Corporation v Recoletos Ltd* [2011] EWCH 2242 (Comm) Cooke J stated at paras 28-29:

> Up to now, therefore, Mr. Lembergs may have felt secure, in the absence of any proceedings against him in England, when such were being pursued against Mr. Stepanovs, and although alerted to the matters covered by the evidence of Messrs. Meroni, Kveps, Pedera and Stepanovs, there is nothing like the commencement of proceedings to bring home to an individual the risk of a judgment against him and the consequent potential loss of assets. It could be said that, in every case where there is a letter before action, the defendant is alerted to the possibility of a claim and the need for dissipation of assets if the defendant is minded so to do in order to make himself judgment-proof. However, time and again the courts have granted freezing orders on commencement of proceedings following exchanges of correspondence where the merits of the claim have been fully debated and the defendant thereby undoubtedly alerted.

> 29. In my judgment it is no answer for a defendant to come to the court to say that his horses have bolted before the gate is shut and then to put that forward as a reason for not shutting the gate. That would be to pray in aid his own efforts to make himself judgment proof - if that, indeed, is what has occurred - and to avoid the effect of any court order which the court might make. If he can show that there is no risk of dissipation on other grounds, that is one thing. If he can show that the claimants do not consider that there is such a risk by virtue of the delay in seeking the order, that again is a relevant factor. However, if the court is satisfied about those matters in favour of the claimant, there is no reason why the court should not shut the gate,

*however late the application, in the hope, if not the expectation, that some horses may still be in the field or, at the worst, a miniature pony.*

58.     In *Madoff Securities International Ltd v Raven* [2011] EWHC 3102 (Comm) Flaux J stated at paragraph 156:

*It seems to me that the following principles relevant to the present application can be discerned from those two cases:*

*(1) The mere fact of delay in bringing an application for a freezing injunction or that it has first been heard inter partes, does not, without more, mean there is no risk of dissipation. If the court is satisfied on other evidence that there is a risk of dissipation, the court should grant the order, despite the delay, even if only limited assets are ultimately frozen by it;*

*(3) Even if delay in bringing the application demonstrates that the claimant does not consider there is a risk of dissipation, that is only one factor to be weighed in the balance in considering whether or not to grant the injunction sought.*

59.     In the *Fiona Trust* case, the application for a freezing injunction was brought against the Defendants almost a year after they had been joined to the proceedings. They were granted relief nonetheless.  In the *Madoff Securities* case there was apparent delay but that was accounted for by the process of investigation required to be undertaken before action could be brought and relief was granted.

60.     It is submitted that there has been no delay in this case indicative of relief being no longer of any use or indicating that Holding believes there is no risk of dissipation. Following investigation of this complex matter, Holding has only recently become aware of the true position.

*Permission to seek 'mirror orders' abroad*

61.     In *Dadourian Group v Simms (Practice Note)* [2006] 1 WLR (CA) the Court of Appeal stated that the court has a discretion to grant an applicant permission to enforce a WFO abroad whenever it considers it just to do so. The court set out guidelines (the 'Dadourian Guidelines') for the matters to be considered in deciding whether to exercise its discretion as follows:

*Guideline 1: The principle applying to the grant of permission to enforce a WFO abroad is that the grant of that permission should be just and convenient for the purpose of ensuring the effectiveness of the WFO, and in addition that it is not oppressive to the parties to the English proceedings or to third parties who may be joined to the foreign proceedings.*

*Guideline 2: All the relevant circumstances and options need to be considered. In particular consideration should be given to granting relief on terms, for example terms as to the extension to third parties of the undertaking to compensate for costs*

14

*incurred as a result of the WFO and as to the type of proceedings that may be commenced abroad. Consideration should also be given to the proportionality of the steps proposed to be taken abroad, and in addition to the form of any order.*

*Guideline 3: The interests of the applicant should be balanced against the interests of the other parties to the proceedings and any new party likely to be joined to the foreign proceedings.*

*Guideline 4: Permission should not normally be given in terms that would enable the applicant to obtain relief in the foreign proceedings which is superior to the relief given by the WFO.*

*Guideline 5: The evidence in support of the application for permission should contain all the information (so far as it can reasonably be obtained in the time available) necessary to make the judge to reach an informed decision, including evidence as to the applicable law and practice in the foreign court, evidence as to the nature of the proposed proceedings to be commenced and evidence as to the assets believed to be located in the jurisdiction of the foreign court and the names of the parties by whom such assets are held.*

*Guideline 6: The standard of proof as to the existence of assets that are both within the WFO and within the jurisdiction of the foreign court is a real prospect, that is the applicant must show that there is a real prospect that such assets are located within the jurisdiction of the foreign court in question.*

*Guideline 7: There must be evidence of a risk of dissipation of the assets in question.*

*Guideline 8: Normally the application should be made on notice to the respondent, but in cases of urgency, where it is just to do so, the permission may be given without notice to the party against whom relief will be sought in the foreign proceedings but that party should have the earliest practicable opportunity of having the matter reconsidered by the court at a hearing of which he is given notice.*

62.  Holding seeks permission to enforce against Delaila, Roychamp, Centelux, Adelaide and Trockley in BVI, Nevis and/or the State of Arkansas, USA. It is submitted that an order would be of far greater effect if permission is given to seek mirror orders in those jurisdictions. As to the Dadourian Guidelines:

23.1   Guideline 1: It is submitted that it would not be oppressive of the Delaila, Roychamp, Centelux, Adelaide and Trockley to enforce in the jurisdictions where they are based. Permission to do so merely gives efficacy to the Court's order.

23.2   Guideline 2: It is submitted that mirror relief to the order sought in England would be the most just and convenient way to approach the matter. No question of extending the undertakings in the English order would arise as

15

appropriate safeguards could be provided by the local courts in granting relief.

23.3 Guideline 3: Similar relief will be sought in the other jurisdictions, the interests of third parties require no special consideration in an English order. It is not presently anticipated that any new parties will be joined to the foreign proceedings.

23.4 Guideline 5: Holding does not propose to seek relief in the foreign proceedings in any way superior to the relief sought in this Application. The practice and procedure in respect of freezing orders in similar in the BVI and Nevis. In Arkansas steps could be taken to enforce the English Court's order. Accordingly, it is intended to apply for "mirror" orders in those jurisdictions to replicate the effect of the English order sought [Deuchrass 1 § 92].

23.6 The evidence of assets in the BVI, Nevis and Arkansas required to satisfy guideline 6 is set out at paragraph [28] above

23.7 Guideline 7: It is submitted the same risks of dissipation apply, and the evidence of the risk is the same, as is before the Court on this Application.

23.8 Guideline 8: The same considerations in relation to notice apply to the permission application and the foreign proceedings as apply on this Application.

### *Proceedings in other jurisdictions and Service of the order*

63. It is intended to issue mirror proceedings in the Courts of the BVI and Nevis and to stay those proceedings in favour of the English proceedings once interlocutory relief has been granted.

64. Holding intends to move the English Court first, and then move the Courts the Courts of the BVI and Nevis as so as practicable thereafter. It is intended to serve all orders together on all Defendants following the hearings in BVI and Nevis.

### *Application without notice*

65. Applicants making their applications without notice to the respondent must demonstrate there are 'good reasons' for not giving notice.

66. CPR Part 25.3 makes provision for applications without notice (where there is good reason for not giving the notice required by CPR Part 23.4) CPR Part 25.3 provides:

*(1) The court may grant an interim remedy on an application made without notice if it appears to the court that there are good reasons for not giving notice.*

*(2) An application for an interim remedy must be supported by evidence, unless the court orders otherwise.*

*(3) If the applicant makes an application without giving notice, the evidence in support of the application must state the reasons why notice has not been given.*

67. Practice Direction 25A para 4.3 provides: '(3) Except in cases where secrecy is essential, the applicant should take steps to notify the respondent informally of the application'.

68. The applicant must demonstrate the need for secrecy. In *ND v PK* [2011] EWHC 457 (Fam) Mostyn J referred to the principle that no order should be made without notice unless there were a very good reason for doing so.  The Judge said this at paragraphs 10 and 12:

   10. *The second principle is this. As stated in the White Book at paragraph 25.3.5, as a matter of principle no order should be made in civil proceedings without notice to the other side unless there is very good reason for departing from the general rule that notice must be given, for example, where to give notice might defeat the ends of justice. To grant an interim remedy in the form of an injunction without notice "is to grant an exceptional remedy": the authority for that is Moat Housing Group-South Limited v. Harris [2006] QB 606.*
   ...
   12. *So there must be good reason, in my opinion, why a court should be moved ex parte and in reaffirming my own view, I am gratified to see that it is supported by the authority to which I have referred - Moat Housing, that an application for ex parte relief should only be made where there is positive evidence that to give notice would lead to irretrievable prejudice being caused to the applicant.*

69. Where an application for a freezing injunction is made without notice, practice direction CPD25A at 3.4 requires the affidavit in support of an application to state why notice was not given. The importance of this requirement is referred to by Peter Gibson LJ at para 25 in *Thane Investments Ltd v Tomlinson* [2003] EWCA Civ 1272)

70. Holding's case is that it has been systematically defrauded of large sums of money by Mr Lazurenko and his associates and associated entities. In circumstances where there has been widespread misappropriation, it is submitted that it is appropriate to infer a real risk that if notice is given, assets will be dealt with so as to defeat any judgment Holding may obtain before any order can be made. Accordingly, the Application is made without notice [Deuchrass 1 § 85-7].

*Duty of full and frank disclosure*

71. Matters going to the duty of full and frank disclosure are dealt with in Deuchrass 1 § 83-86.

**Provision of information**

72.   In *Madoff Securities International Ltd v Raven* [2011] EWHC 3102 (Comm) Flaux J stated at paragraph 156:

> *The rationale for a freezing injunction is the risk that a judgment will remain unsatisfied or be difficult to enforce by virtue of dissipation or disposal of assets (see further the citation from* **Congentra AG v Sixteen Thirteen Marine SA ("The Nicholas M")** *[2008] 2 Lloyd's Rep 602; [2008] EWHC 1615 (Comm) below). In that context, the order for disclosure of assets normally made as an adjunct to a freezing injunction is an important aspect of the relief sought, in determining whether assets have been dissipated, and, if so, what has become of them, aiding subsequent enforcement of any judgment*

73.   The standard wording in respect of provision of information is included in the draft order subject to one addition. There is a risk that the shareholders might seek to reconstitute the boards of the Respondent Offshore Companies so as to appoint directors prepared to do their bidding. While that risk cannot be entirely overcome, it can be alleviated if their identity or their shareholders is also disclosed.

**Undertakings**

74.   Holding is a company within the TNK BP Group ("TNK BP") [Deuchrass 1 § 5 and Deuchrass 2 § 10]. TNK BP's group company, TOC Investments Ltd, registered in the BVI, will give an undertaking in the standard form at Schedule C of the draft order.[Deuchrass 1 § 100]. TNK BP Group is a very well known and respected group of companies and it may be seen from the financial statements exhibited at CD1/164-182 that the TNK BP Group has the means to provide the said undertaking.

**Costs**

75.   The Court is asked to reserve the matter of costs until the return date.

**Conclusion**

76.   Accordingly, the Holding asks the Court to make the order in the terms sought.

STEPHEN MOVERLEY SMITH QC
SARAH BAYLISS
XXIV OLD BUILDINGS, LINCOLN'S INN
10 August 2012

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**Claim No: HC12B03162**
**BETWEEN:**

**OJSC TNK-BP HOLDING**

<u>**Claimant**</u>

**-and-**

| | |
|---|---|
| **(1)** | **BEPPLER & JACOBSON LIMITED** |
| | **(in provisional liquidation)** |
| **(2)** | **IGOR LAZURENKO** |
| **(3)** | **LEIBSON CORPORATION** |
| **(4)** | **BELINDA CAPITAL LIMITED** |
| **(5)** | **LAWSON TRADING LIMITED** |
| **(6)** | **SERGEY SCHEKLANOV** |
| **(7)** | **MARCEL TELSER** |
| **(8)** | **SVETLANA LAZURENKO** |
| **(9)** | **DELAILA INVESTMENT LIMITED** |
| **(10)** | **ROYCHAMP TRADING LLC** |
| **(11)** | **CENTELUX INC** |
| **(12)** | **ADELAIDE ENTERPRISES INC** |
| **(13)** | **TROCKLEY INVESTMENTS LIMITED** |

<u>**Defendants**</u>

<u>**CLAIMANT's/APPLICANT'S**</u>
<u>**SKELETON ARGUMENT**</u>

Bryan Cave
88 Wood Street
London EC2V 7AJ
Reference:              []
Telephone (General): +44 (0)207 1200
Telephone (Direct):    []
Telephone (Mobile):   []
Fax:                   + 44 (0)207 1881
E-mail:                rjstewart@BryanCave.com
Solicitors to the Claimant/Applicant

Claimant
C. Deuchrass
Affidavit
Exhibit "CD1"
August 2012

**Claim No HC12B03162**

**IN THE HIGH COURT OF JUSTICE**

**CHANCERY DIVISION**

**BETWEEN:**

**OJSC TNK-BP HOLDING**

<u>**Claimant**</u>

-and-

**(1) BEPPLER & JACOBSON LIMITED (in provisional liquidation)**

**(2) IGOR LAZURENKO**

**(3) LEIBSON CORPORATION**

**(4)   BELINDA CAPITAL LIMITED**

**(5)   LAWSON TRADING LIMITED**

**(6)   SERGEY SCHEKLANOV**

**(7)   MARCEL TELSER**

**(8)   SVETLANA LAZURENKO**

**(9)   DELAILA INVESTMENT LIMITED**

**(10)   ROYCHAMP TRADING LLC**

**(11)   CENTELUX INC**

**(12)   ADELAIDE ENTERPRISES INC**

**(13)   TROCKLEY INVESTMENTS LIMITED**

<u>**Defendants**</u>

---

**AFFIDAVIT OF CRAIG DEUCHRASS**

---

274029.1

EXHIBIT

B

PENGAD 800-631-6989

I, CRAIG DEUCHRASS of 88, Wood Street, London, EC2V 7AJ, MAKE OATH AND
SAY AS FOLLOWS:

1.    I am a Solicitor of the Senior Courts of England & Wales, and am employed as
      Counsel at the firm of Bryan Cave at the above address, the solicitors for the
      Claimant ("Holding") in this matter. I have the conduct of this matter under the
      supervision of a partner, Richard Stewart.

2.    The contents of this affidavit are true and are within my own knowledge except
      where I state otherwise, in which case the matters are made upon information
      which I believe to be true, and in respect of which I indicate the source of my
      information and belief. In the course of preparing this affidavit, I have relied on
      information provided to me on instructions by Mr. German Khan ("Mr. Khan"),
      the Executive Director of TNK-BP, by Mr. Vladislav Egorov ("Mr. Egorov"),
      the Vice-President Legal Affairs of TNK-BP and Mr. Boris Levin ("Mr. Levin"),
      the Vice-President Economic Security of TNK-BP, and from Mr. Zoran
      Becirovic ("Mr. Becirovic"), a Montenegrin businessman, who is the beneficial
      owner of Caldero Trading Limited ("Caldero"), the 25% plus one share
      minority shareholder of the First Defendant ("BJUK"). As will be seen below I
      have also been in communication and taken advice from an Arkansas lawyer,
      Mr. Kevin Crass of Friday, Eldredge & Clark LLP.

3.    I am making this affidavit in support of Holding's application for interim
      injunctive relief against the Second and Eighth to Thirteenth Defendants. If the
      injunctive relief is granted, it is contemplated, for the reasons I explain below,
      that Holdings will bring mirror proceedings in the BVI, Nevis and Arkansas.

4.    There is now produced to me a paginated bundle of copy documents entitled
      **"CD1"** which is attached to, and forms part of, this affidavit. References to
      numbers in square brackets are references to numbers in CD1, in that [1] is a
      reference to page 1 of CD1.

2

**Introduction and Background**

5.  Holding is a Russian company within the TNK-BP Group ("**TNK-BP**"). It holds the major assets of TNK-BP within the Russian Federation and, *inter alia*, enters into various contractual arrangements for the transportation of oil and oil products of TNK-BP (including those referred to in this affidavit below). TNK-BP is a large privately owned oil production company which was formed in 2003 as a result of the merger of BP's Russian oil and gas assets with the oil and gas assets of Alfa Access/Renova Group ("AAR"). BP and AAR each own 50% of TNK-BP.

6.  As explained below, the Second Defendant, Mr. Igor Lazurenko ("Mr. Lazurenko"), was a former employee of TNK-Management ("Management"), another company within TNK-BP. Mr. Lazurenko was responsible for negotiating on Holding's behalf, and controlling the tender process for, contracts for the transportation of oil. Over a number of years, in the course of carrying out that task, he fraudulently procured transport companies who wished to contract with Holding to make secret payments, amounting in value to many millions of dollars, to him or at his direction. It is to be inferred that the payments were made so that the contracts were entered into at a price significantly greater than Holding would otherwise have paid and that the money that Mr. Lazurenko directly or indirectly received was derived in whole or in part from the money Holding paid to the transport companies.

7.  BJUK was incorporated in England on 7 November 2001 [1] by Mr. Lazurenko. He subsequently used BJUK as the corporate vehicle for a business venture between himself and Mr. Becirovic, to invest in Montenegrin hotels and property. For reasons set out below, Holding believes that BJUK has in fact been used by Mr. Lazurenko as part of a complex structure to hide the money fraudulently misappropriated by Mr. Lazurenko from Holding.

8.  Holding has issued proceedings on the basis that most or all of the sums paid to

3

274029.1

and employed by BJUK derived from Mr. Lazurenko's fraudulent activities. As outlined below and in the Particulars of Claim, to which the Court is referred, Holding cannot envisage how Mr. Lazurenko, whose total income for the whole period he was employed by Management (2003- April 2012) was less than US$10 million, could have been able to employ sums in excess of US$100 million (to purchase property and investments in both Montenegro and Russia), unless that money was the fruit of his fraudulent activities, summarised above.

9.   A description of the other Defendants to these proceedings is set out at paragraphs 4 to 14 of the Particulars of Claim. Holding says that Mr. Lazurenko's long running fraud has also involved individuals including the Sixth Defendant ("Mr. Scheklanov"), the Seventh Defendant ("Mr. Telser") and the Eighth Defendant ("Mrs. Lazurenko"), together with a complex structure comprising BJUK and numerous entities connected with Mr. Lazurenko. In summary:

9.1   Mr. Telser, a Liechtenstein lawyer and fiduciary, is the sole de jure director of BJUK. He is a nominee director, having been appointed by Mr. Lazurenko on 15 October 2010 [2-3], and appears to have acted, and to be acting, under Mr. Lazurenko's direction.

9.2   The Third Defendant ("Leibson") is a BVI company [4] which currently holds 70% less one share of the issued shares of BJUK [15].

9.3   The Fourth Defendant ("Belinda") is a Nevis company [19] which currently holds 5% of the issued shares of BJUK [15].

9.4   The Fifth Defendant ("Lawson") is a Nevis company [20]. Mr. Scheklanov purports to be the beneficial owner of Lawson.

9.5   The Ninth Defendant ("Delaila") is a BVI company [21]. Mr. Telser and Ms. Angelika Moosleithner-Batliner ("Ms. Moosleithner-Batliner"), a Liechtenstein fiduciary, are directors of Delaila.

4

9.6   The Tenth Defendant ("Roychamp") is a company incorporated in Little Rock, Arkansas [22]. Whilst there have been important recent developments relating to Roychamp, to which I refer below, Prokurations-Anstalt, a Liechtenstein entity, is the current 75% shareholder of the company [23-24]. Mr. Telser is a director of Roychamp and the Operating Manager of the company is Ms. Moosleithner-Batliner. Roychamp is, in turn, the 100% owner of Roychamp Trading Montenegro D.O.O ("Roychamp Montenegro"), a Montenegrin company which is the registered owner of land in Montenegro. As explained below, the current value of the Montenegrin land beneficially owned by Roychamp is in excess of US$25 million.

9.7   The Eleventh Defendant ("Centulex") is a BVI company [25]. Both Mr. Telser and Ms. Moosleithner-Batliner are directors of Centelux.

9.8   The Twelfth Defendant ("Adelaide") is a Nevis company [26]. Adelaide is the 100% owner of a Montenegrin company, Adelaide Montenegro D.O.O ("Adelaide Montenegro"). Mrs. Lazurenko is a former director of Adelaide Montenegro.

9.9   The Thirteenth Defendant ("Trockley"), is a BVI company [27]. Trockley is the 100% owner of a Montenegrin company, Trockley Montenegro D.O.O ("Trockley Montenegro"). Mrs. Lazurenko is the executive director of Trockley Montenegro.

**Mr. Lazurenko's Employment With Management**

10.   The tenure and nature of Mr. Lazurenko's employment with Management are set out at paragraphs 15 to 19 of the Particulars of Claim. In summary, Mr. Lazurenko joined Management on 1 September 2003, having previously been employed by another company within TNK-BP. His duties involved negotiating contracts for the transportation of oil and oil products on behalf of Holding and other companies within TNK-BP. As explained below, Mr. Lazurenko's

5

employment with Management terminated on 27 April 2012.

**Evidence Of Mr. Lazurenko's Dishonesty and Fraudulent Behaviour**

11.     As set out at paragraphs 20 to 21 of the Particulars of Claim, in March 2012 the executive director of TNK-BP, Mr. Khan was approached by the senior management of the parent company of OOO TK Transoil ("Transoil"), a privately owned freight company with which TNK-BP, including Holding, had done business for some years. Transoil informed Mr. Khan that in early 2010 Mr. Lazurenko had approached Transoil claiming he was representing Mr. Khan, and demanded payments if the company was to do business with TNK-BP. Mr. Khan was informed that payments amounting to approximately US$8 million were made to Mr. Lazurenko, before that company's senior management became aware of this and approached Mr. Khan. These payments are described in the Particulars of Claim as "the Transoil Payments". I refer to paragraphs 10 to 16 of Mr. Egorov's witness statement which address the Transoil payments.

12.     As explained in paragraph 23 of the Particulars of Claim, because TNK-BP had no policy of restricting the persons with whom it did business, it is to be inferred that the payments were made to induce Mr. Lazurenko to cause Holding to contract with Transoil at an execessive and inflated price (as appears to have been the case in relation to other transport companies, as explained in paragraph 34 of the Particulars of Claim).

13.     As set out at paragraphs 32 to 40 of the Particulars of Claim, the allegations concerning the Transoil Payments reminded Mr. Khan of earlier allegations of Mr. Lazurenko's wrongdoing involving other transportation companies including Sovfracht.  The payments received by Mr. Lazurenko in this context are referred to in the Particulars of Claim as the "Sovfracht Payments".  I refer to paragraphs 17 to 20 of Mr. Egorov's witness statement in this regard.

14.     As further set out in paragraph 41 (and paragraph 50) of the Particulars of Claim, Mr. Khan also met with Mr. Becirovic in April 2012 who explained the

6

background of his relationship with Mr. Lazurenko which focused on the acquisition, refurbishment and operation of two hotels in Montenegro (the "BJUK Information"). I refer to paragraphs 21 to 23 of Mr. Egorov's witness statement in this regard.

15.   Mr. Becirovic explained that Mr. Lazurenko had held himself out as representing Mr. Khan. Mr. Khan instructs me, and I believe, that he had never heard of Mr. Becirovic or BJUK before TNK-BP was approached by Mr. Becirovic, and Mr. Khan had certainly not invested in any hotel projects in Montenegro with Mr. Becirovic.  Mr. Khan further instructs me that whilst he dealt with Mr. Lazurenko on a regular basis in the office, they had no contact outside work and Mr. Khan did not appoint Mr. Lazurenko as his agent in respect of his private financial affairs.

16.   As described at paragraph 26 of Particulars of Claim, following receipt of the information regarding the Transoil Payments, Mr. Khan ordered an internal investigation (the "Internal Investigation"). Upon having received the BJUK Information, Mr. Khan expanded the Internal Investigation to investigate both the Sovfracht Payments and the BJUK information.  Mr. Levin was placed in charge of this investigation.

17.   As set out in paragraphs 27 and 28 of the Particulars of Claim, during the course of the Internal Investigation, allegations concerning the Transoil Payments were put to Mr. Lazurenko and he admitted to Mr. Khan that he owed a debt to Holding worth US$8 million in respect of payments taken by him which ought to have been paid to Holding. A draft agreement was prepared on the basis of Mr. Lazurenko's admission and his offer to make recompense either by transferring two properties in Moscow held in the name of members of Mr. Lazurenko's family to Holding or paying over the proceeds of the sale of the properties. I refer to paragraphs 13 and 14 of Mr. Egorov's witness statement in this regard.

18.   As of early April 2012 the two properties in Moscow were supposedly worth

7

274029.1

around US$8 million. I am instructed by Mr. Levin, and believe, that this could be a realistic sum in view of the value of premium Moscow real estate. However, Holding was not prepared to accept the offer in full and final settlement of Mr. Lazurenko's potential liability and the draft agreement was not signed. In the event, Mr. Lazurenko has not made any transfer of properties to TNK-BP, nor has he paid TNK-BP US$8 million or any other sum.

19.     Instead, after his admission of fraudulent behaviour, Mr. Lazurenko submitted a request to Management on 26 March 2012 to take unpaid leave until 26 April 2012. The request was granted. On 2 May 2012 Management received Mr. Lazurenko's letter of resignation dated 26 April 2012. Because of the public holidays in Russia in the first week of May, the letter was not read until 10 May 2012. Mr. Khan and Mr. Egorov instruct me that Mr. Lazurenko has not to the best of their knowledge returned to Russia since his resignation and from my firm's dealings with Mr. Lazurenko's English solicitors my belief is that he is currently in London.

**Mr. Lazurenko's Dealings in Montenegro**

20.     As set out in paragraph 41 of the Particulars of Claim, following their acquisition, the two Montenegro hotels underwent substantial work and are now operating as luxury hotels. As further set out in paragraph 41 of the Particulars of Claim, in addition to the hotels, Mr. Lazurenko funded the purchase of various other plots of land in Montenegro, purportedly on behalf of Mr. Khan, and invested substantial sums of money in a newspaper business.

21.     In total, Mr. Lazurenko transferred sums in excess of US$78.5 million to finance these investments. Mr. Becirovic also told Mr. Levin that Mr. Lazurenko personally purchased additional properties in Montenegro without Mr. Becirovic's participation for a sum in excess of US$5 million. I refer to paragraphs 24 to 26 of Mr. Egorov's witness statement in this regard.

**Relevant Assets in Montenegro and Russia**

22.     I set out below a summary of the assets and investments (currently known to
        Holding), which Holding infers were acquired in large part from the money
        misappropriated by Mr. Lazurenko at Holding's expense:

      22.1     The acquisition, refurbishment and operation of the Avala and Bianca
             Hotels at a sum of approximately US$64 million, paid via BJUK.
             (Paragraph 41(j) of the Particulars of Claim). Indeed, as early as July
             2002 (8 months after BJUK was incorporated) UBS provided a letter 'to
             whom it may concern' stating that the beneficial owner of BJUK had
             maintained a relationship with UBS since 1996 and that the assets of the
             beneficial owner of BJUK with UBS 'exceed the amount of EUR
             25'000'000." [28] The current value of the hotels is estimated to be in
             excess of US$150 million. To the best of my knowledge and belief,
             BJUK has no significant assets in the jurisdiction.

      22.2     Plots of land purchased by Roychamp at a sum in excess of US$9
             million. (Paragraph 41(i) of the Particulars of Claim). The current value
             of the Roychamp plots of land is estimated to be in excess of US$25
             million. (Paragraph 45(c) of the Particulars of Claim).

      22.3     Plots of land purchased by Delaila at a sum in excess of US$800,000
             (Paragraph 41(i) of the Particulars of Claim). The current value of the
             Delaila plots of land is estimated to be in excess of US$5 million.
             (Paragraph 45(a) of the Particulars of Claim).

      22.4     Plots of land purchased by Centelux at a sum in excess of US$3 million
             (Paragraph 41(i) of the Particulars of Claim). The current value of the
             Centelux plots of land is estimated to be in excess of US$6 million.
             (Paragraph 45(b) of the Particulars of Claim).

      22.5     The acquisition of a now defunct Montenegrin newspaper through
             Hadiflake Limited, a BVI incorporated company, at a sum of

approximately US$2 million (Paragraph 41(i) of the Particulars of Claim).

22.6   Property purchased by Mr. Lazurenko in Montenegro through Adelaide and Trockley, including three houses in prestigious areas of the Bay of Kotor and Sveti Stefan Island. The current value of the Adelaide and Trockley properties is approximately US$5 million. (Paragraph 47 of the Particulars of Claim). Holding is also aware from Mr. Becirovic that Mr. Lazurenko owns a 17 meter-long sailing yacht moored at a landing place in the City of Kotor.

22.7   Properties purchased in Russia and owned by Mr. Lazurenko's family. The current value of the Russian properties is approximately US$25 million ("the Russian Properties"). (Paragraph 48 of the Particulars of Claim).

23.   In summary, the purchase price and funding of the assets in Montenegro compromise the following (i) the hotels purchased and refurbished thorough BJUK (US$ 64 million) (iii) the land or property acquired through Delaila, Roychamp, Centelux, (US$ 12.8 million) (iv) the value of land or property acquired through Adelaide and Trockley (US$ 5   million) and (iv) the newspapers business (US$ 2 million). The current value of the   Russian Properties (US$ 25 million). Thus, the total of these sums is US$ 108,800,000. The current value of the Montenegrin properties can be summarised as BJUK (US$150,000,000), Delaila, Roychamp, Centelux (US$31,000,000) Adelaide and Trockley (US$ 5   million) and the Russian Proprties (US$ 25,000,000), giving a total of US$ 211,000,000. The sterling equivalent of this amount is approximately £135,000,000.

10

**Inference Of Dishonest Origin Of Funds Provided by Mr. Lazurenko**

24.    As set at paragraph 54 of the Particulars of Claim, it is to be inferred that the monies provided by Mr. Lazurenko were dishonestly obtained from Holding and other TNK-BP companies.  The bases of such inference include:

   24.1    Mr. Lazurenko was a full time salaried employee of Management from 2003 until 27 April 2012. During that period, I am instructed by Mr. Egorov that Mr. Lazurenko's total income including bonuses and before tax was less than US$10 million;

   24.2    Mr. Lazurenko admitted the fraudulent behaviour in relation to the Transoil Payments and also admitted that he owed a debt to Holding worth US$8 million in respect of payments taken by him which ought to have been paid to Holding;

   24.3    The total cost of the Avala and Bianca Hotels with funds provided by Mr. Lazurenko was approximately US$64 million;

   24.4    The combined purchase price of the properties in Montenegro held by Mr. Lazurenko either jointly with Caldero or on his own sole account was in excess of US$17.5 million. Additionally, Mr. Lazurenko funded the purchase of the failed Montenegrin newspaper for a sum in excess of US$2 million;

   24.5    I am instructed by Mr. Levin that the value of the properties in Moscow which Mr. Lazurenko offered as recompense for the Transoil Payments and other properties held in the name of members of Mr. Lazurenko's family is in excess of US$25 million;

   24.6    Mr. Lazurenko falsely informed Mr. Becirovic that Mr. Khan was the ultimate source of funding for investments via BJUK and other offshore companies; and

11

24.7   Mr. Lazurenko's sudden resignation and departure from Russia in late April/early May 2012 after his wrongdoing was discovered.

**Mr. Scheklanov's Intervention**

25.   As set out at paragraph 50 of the Particulars of Claim, I am instructed by Mr. Becirovic that immediately after his meeting with Mr. Khan on 11 April 2012, he was called on his mobile phone by an individual whom he believes was Mr. Sergey Scheklanov.  Mr. Scheklanov subsequently claimed to be the true owner of the majority of shares in BJUK held in the name of Leibson and the source of the funds invested by BJUK.  I refer to paragraphs 30 of Mr. Egorov's witness statement in this regard.

26.   Mr. Scheklanov relied on a series of agency agreements allegedly entered into between BJUK and Lawson, of which he claims to be owner, to show that he is the ultimate owner of assets held by BJUK and BJM. Caldero asked that the agency agreements be forensically tested, which, as explained below, has been rejected by Mr. Scheklanov's English solicitors, Mishcon de Reya. However, also as explained below, in the winding up proceedings brought by Caldero, the effective respondents (Leibson, Belinda, Mr. Lazurenko and Mr. Telser) have conceded that the agency agreements are null and void.

**Mrs. Lazurenko**

27.   As set out at Paragraph 112 of the Particulars of Claim, Mr. Lazurenko consulted Mrs. Lazurenko in relation to decision making aspects of the joint venture between Mr. Lazurenko and Mr. Becirovic which was funded by Mr. Lazurenko. Further, Mrs. Lazurenko was a director of Adelaide Montenegro and is a director of Trockley Montenegro. [29-30] It is to be inferred from the level and nature of Mrs. Lazurenko's involvement in the corporate structure designed as a conduit of her husband's fraudulent misappropriation from Holdings that Mrs. Lazurenko knew (a) the provenance of monies she received directly or indirectly from Mr. Lazurenko and (b) the fact that she was in receipt of funds

12

obtained through the fraudulent conduct of Mr. Lazurenko. Mrs. Lazurenko therefore received the funds knowing that they comprised monies fraudulently misappropriated from Holdings and accordingly holds all such monies received by her and all property acquired with such monies on constructive trust for the benefit of Holdings.

**The Caldero Proceedings**

28.    As is evident from the above description, the business relationship between Mr. Lazurenko and Mr. Becirovic (to invest in the Montenegrin hotels and property) broke down, not least because Mr. Becirovic became increasingly suspicious of the source of the funds being used for the venture and feared that the business would be destroyed, or taken from him. Mr. Becirovic initially approached TNK-BP in the autumn of 2011 in order to raise the matter at a higher level and, as stated earlier, met with Mr. Khan in early April 2012.

29.    On 3 May 2012, Caldero issued proceedings under section 994 of the Companies Act 2006 ("the 994 petition") seeking an order for the compulsory purchase of its shareholding in BJUK or for the winding up of BJUK on just and equitable grounds. TNK-BP agreed to fund Caldero's claim in the 994 petition and to provide a cross-undertaking in damages. A copy of the petition is at [31-50].

30.    Also on 3 May 2012, H.H. Judge Birss Q.C. (sitting as a Judge of the High Court) granted an order appointing provisional liquidators over BJUK and injunctive relief against Leibson, Mr. Lazurenko and Mr. Telser to prevent dissipation of BJUKs assets pending trial of the petition. A copy of the relevant order is at [51-64].

31.    There have been various orders made in the 994 petition since 3 May 2012. The latest order was agreed by the parties and made by Mr. Justice Newey on 16 July 2012 [65-78]. Pursuant to the order dated 16 July 2012, it was declared that (i) by consent of the effective respondents (Leibson, Belinda, Mr. Lazurenko

13

274029.1

and Mr. Telser) the purported agency agreements between BJUK and Lawson were null and void and of no effect (ii) the affairs of BJUK had been conducted in a manner unfairly prejudicial to the interests of Caldero and (iii) it was just and equitable that BJUK be wound up.

32.    Leibson was ordered to purchase Caldero's shares in BJUK and the trial of the petition is now limited to the issue of valuing Caldero's shares in BJUK. This is described in the order as the "Investment Issue", which is whether the funds invested through BJUK were by way of capital or loans. Mr. Becirovic maintains that Caldero's shares in BJUK represented "sweat equity" and should be valued as 25% less one share of the net value of BJUK on the basis that BJUK's contributions should be ignored as they were not loans.

33.    However, as explained above, (and further detailed in the Particulars of Claim), Holding maintains that the hotels in Montenegro were bought and refurbished by BJUK with moneys dishonestly appropriated by Mr. Lazurenko. It therefore lays claim to the ownership of the hotels or in the event of BJUK's liquidation to the proceeds of sale.

34.    Accordingly, there are a number of competing claims to the ownership of the assets currently held by BJUK. It is Holding's intention, if leave is granted to serve the non-resident defendants out of the jurisdiction, to have its claims heard concurrently with the 994 petition. It is submitted that this course is the most expeditious and cost effective means of dealing with the competing claims over the ownership of the same assets.

**Holding's Application for Injunctive Relief**

35.    The appointment of provisional liquidators over BJUK and the injunctive relief granted by H.H. Judge Birss Q.C. on 3 May 2012 against Leibson, Mr. Lazurenko and Mr. Telser, subsists to protect any immediate dissipation of the assets of BJUK and BJM, namely, the Avala and Bianca Hotels.

36.    The order of 3 May 2012 in the 994 petition does not, however, extend to

prevent potential dissipation of land and property acquired in Montenegro, mainly by the offshore vehicles of Delaila, Roychamp, Centelux, Adelaide or Trockley (for the purposes of this witness statement I will hereinafter refer to the land or property acquired in Montenegro via Delaila, Roychamp, Centelux, Adelaide and Trockley in these proceedings as the "non-BJUK Assets").

37.     Similarly whilst the order of 3 May 2012 in the 994 petition provides injunctive relief against Leibson, Mr. Lazurenko and Mr. Telser (thus preventing any adverse dealing with BJUK's ownership in BJM or sums owed by BJM to BJUK), it does not prevent Mr. Lazurenko, (either personally or through the medium of Mr. Telser), Mrs. Lazurenko, Delaila, Roychamp, Centelux, Adelaide and/or Trockley, acting in a way to dissipate or deal adversely with the non-BJUK Assets. Nor does the order of 3 May 2012 extend to protect dissipation of property acquired by Mr. Lazurenko's family in Russia.

38.     The matters set out below have recently come to light which give rise to a risk that Mr. Lazurenko will take steps to dissipate the non-BJUK assets. In setting these matters out below, I wish to emphasise a pattern that has emerged very recently, namely, that Mr. Lazurenko (either personally or through the medium of Mr. Telser) is taking repeated prejudicial steps in relation to the property in Montenegro until legal action is either threatened and / or initiated, at which point a retreat is inevitably adopted. It is for this reason that injunctive relief in these proceedings is being sought, so as to ward off any potentially prejudicial action that might be taken by Mr Lazurenko (either personally or through the medium of Mr Telser), Mrs. Lazurenko, Delaila, Roychamp, Centelux, Adelaide and/or Trockley, to dissipate the non-BJUK assets (pending resolution of the claims in these proceedings). No notice of these proceedings has been given to the defendants as there is a fear that the assets will be dissipated.

    *(i) Attempt to move ownership of Roychamp and appoint unknown director of Roychamp*

39.     At all times, Mr. Becirovic understood from Mr. Lazurenko that Prokurations-

Anstalt was the 75% majority owner of Roychamp. This understanding was confirmed by a Certificate of Status provided to Caldero and dated 8 October 2007 [79]. Mr. Lazurenko further informed Mr. Becirovic that he, Mr. Lazurenko, was the beneficial owner of Prokurations-Anstalt. However, on 19 June 2012, Caldero received from Ms. Moosleithner-Batliner a notice which sought to call a members meeting of Roychamp on 21 June 2012 in Zurich [80-82]. The meeting had purportedly been called by *"Maricio Investments Limited the owner of 75% of the membership."* The purpose of the meeting was to approve the resignation of Ms. Moosleithner-Batliner as Operating Manager and the appointment of Mr. Patric Caduff as the new Operating Manager of the company.

40.     Mr. Becirovic / Caldero had never previously heard of Maricio Investments Limited ("Maricio"). On 20 June 2012, Holding's Arkansas lawyer, Mr. Crass, wrote to Ms. Moosleithner-Batliner and the registered agent of Roychamp, Mr. Hardin [83-84 and 85-88] advising that there had been a failure to provide Caldero with adequate notice of the member meeting and requested information about the purported transfer in the shareholding to Maricio.

41.     On 4 July 2012, Mr. Crass received an email from Mr. Caduff saying that the member meeting of Roychamp had been postponed to 23 August 2012 in Zurich [89]. No explanation was given as to the purported transfer of the ownership to Maricio. On 13 July 2012, Mr. Crass then received a further email from Mr. Caduff which, again, provided no explanation as to the identity of Maricio but said:

>        *"Due to the fact that the 23rd of August 2012 is not convenient for one of the Members, the Operating Manager has decided to move the Member Meeting forward and to have it on the 2nd of August 2012 in Prague instead of the 23rd of August 2012."* [90-91]

42.     Mr. Caduff's email attached a fresh notice from Ms. Moosleithner-Batliner for the proposed meeting on 2 August 2012 [92-93]. Again, the meeting was purportedly called by *"Maricio Investments Limited the owner of 75% of the*

16

274029.1

*membership."* However, the stated purpose of the meeting in the renewed Notice was said to be the resignation of Ms. Moosleithner-Batliner as Operating Manager and the appointment of a Mr. Luman Tungayev as the new Operating Manager of the company. Mr. Becirovic / Caldero had no knowledge of the identity or qualifications of Mr. Tungayev.

43.     On 16 July 2012, Mr. Crass wrote to Mr. Caduff asking again for documentation relating to the purported transfer of the 75% interest in Roychamp to Maricio [94]. No response was received from Mr. Caduff and so Mr. Crass wrote to Ms. Moosleithner-Batliner again on 25 July 2012 [95-96]. The letter, which was also emailed to Ms. Moosleithner-Batliner on the same day [97] said; *inter alia*:

> *"After initially receiving Notices of Member Meeting for June 21 and August 23, 2012, you more recently sent a Notice of Member Meeting calling for a meeting on August 2, 2012, in Prague. According to the Notice, the business at the meeting is to accept your resignation as Operating Manager and to appoint Luman Tungayev as the new Operating Manager of Roychamp Trading LLC. I am writing for several purposes. First, please respond to my previous request and provide me with a current Certificate of Status and any other documents reflecting the sale, assignment or transfer of 75% of Roychamp Trading LLC to Maricio Investments Limited. If we do not immediately receive this documentation, we will proceed with action in Arkansas courts to obtain that relief. As I am sure you know, Arkansas law requires that this information be provided to a member of an Arkansas LLC upon request.*
>
> *Second, please explain the reasons for your resignation as Operating Manager; the reason that Patric Caduff is not being appointed the new Operating Manager; and the reasons Luman Tungayev is being appointed as the Operating Manager.*
>
> *Finally, on behalf of Caldero Trading Limited, please be advised that under Arkansas law, in absence of contrary provisions in the Operating Agreement, an assignment of memberships in an Arkansas limited liability company does not entitle the assignee to participate in the management and affairs of the limited liability company, or to become or exercise any rights of a member until such time as the other members unanimously consent. See Ark. Code. Ann. § 4-32-704 and § 4-32-706. Until such time as the Notice of Member Meeting for June 21st was received, Caldero was not even aware of an alleged transfer or assignment from Prokurations-*

17

> *Anstalt to Maricio Investments Limited.   As such, Caldero has not consented to Maricio becoming a member of Roychamp Trading LLC and objects to Maricio participating in the management and affairs of Roychamp Trading LLC, including but not limited to, conducting the meeting on August 2, 2012."*

44.     On 26 July 2012, Mr. Crass received a voice message from a Mr. Max Riederer von Paar, who explained that he was a Washington DC lawyer instructed by Roychamp. Mr. Riederer von Paar said he would phone Mr. Crass back the following day.

45.     On 27 July 2012, Mr. Riederer von Paar, who, as it transpired, was from the firm of Rubin, Winston, Diercks, Harris & Cooke, LLP phoned Mr. Crass and informed him as follows:

45.1     He had looked at the Arkansas law and said that Mr. Crass was "absolutely correct" that consent was required for Maricio to become a member.  He confirmed that the 2 August 2012 meeting would be postponed and not re-scheduled.  He said that steps would be taken to rescind the sale agreement to Maricio and that such rescission would take place in the next two days.

45.2     He professed to be unaware of the complete background and said that Ms. Moosleithner-Batliner had been out that week and that she probably had more information about matters.  He said that he did not know who owned Maricio.  He was quite confident that Prokurations-Anstalt was not owned by Mr. Lazurenko.  He described Prokurations-Anstalt as a professional trust that served in a fiduciary capacity. When asked who owned Prokurations-Anstalt, Mr. Riederer von Paar said he believed it was a number of Liechtenstein family members. He said that Mr. Lazurenko, as a Russian, was not capable of owning Prokurations-Anstalt.  He said that Ms. Moosleithner-Batliner wanted to get out of this situation.

18

45.3    He pledged to get back to Mr. Crass early the following week and provide Mr. Crass with documentation regarding the transfer and the rescission. He was not aware of the background of Mr. Tungayev and why Maricio proposed him as the Operating Manager. Mr. Crass advised him that he had been instructed to file a lawsuit if he wasn't provided the information very quickly. Mr. Riederer von Paar stated that it was his desire to avoid the time and expense of a lawsuit because he recognized Caldero was entitled to the information it seeks.

46.    On the same day, 27 July 2012, Mr. Rierderer von Paar emailed Mr. Crass a Notice of cancellation of the proposed meeting on 2 August 2012 [98-99].

47.    On 1 August 2012, Mr. Rierderer von Paar emailed Mr. Crass an updated Certificate of Status for Roychamp, confirming that Prokurations-Anstalt was still the 75% majority shareholder of the company [100-101]. Mr. Rierderer von Paar's email also attached what purports to be a 'Statement of Assets and Liabilities' as at 31 December 2011 in respect of Roychamp [102-107]. The 'Statement of Assets and Liabilities' is, however, dated 9 July 2012 [104].

48.    No explanation has to date been provided as to the identity of Maricio or the reasons for the purported transfer of the 75% shareholding in Roychamp. By contrast, the 'Statement of Assets and Liabilities' shows a purported US$ 10.6 million investment by Roychamp in its Montenegro subsidiary and a US$ 15.9 million loan from an unknown BVI company, Luburia Invest and Trade SA ("Luburia"). In the subsequent sections of this witness statement I refer further to the recent appearance of Luburia. The notes of the purported 'Statement of Assets and Liabilities' show on page 4 that, from April 2007, yearly payments commenced to the First Advisory Group which is co-owned by Ms. Moosleithner-Batliner, according to the website www.thefirstadvisorygroup.li. [108].

(ii)    Appearance of unknown BVI entity in Roychamp's Accounts – 'Luburia Trade'

19

49.     As mentioned above, the purported 'Statement of Assets and Liabilities' for
        Roychamp as at 31 December 2011, sates that Luburia, a BVI entity, loaned
        Roychamp US$ 15.9 million. The loan agreement between Luburia and
        Roychamp is said to be dated 7 October 2004 (with Roychamp having been
        incorporated in Arkansas on 15 January 2004). Mr. Becirovic / Caldero have no
        knowledge of Luburia which has appeared, so far as Mr. Becirovic is aware, for
        the first time in the 'Statement of Assets and Liabilities' for Roychamp dated 9
        July 2012 (and provided to Mr. Crass on 1 August 2012).

50.     The very recent appearance of Luburia (as an entity which purportedly provided
        the funds for the purchase by Roychamp of plots of land in Montenegro) has a
        striking similarity to the manner in which Mr. Scheklanov and Lawson
        previously appeared in the 994 petition. In the case of Mr. Scheklanov and
        Lawson, the agency agreements were produced to explain the source of the
        funds used by BJUK to purchase the Avala and Bianca hotels in Montenegro. In
        the case of Luburia, the 'Statement of Assets and Liabilities' seeks to explain the
        source of funds used by Roychamp to purchase various plots of land in
        Montenegro.

        *(iii) The flouting of the 3 May 2012 order by Mr. Telser and his subsequent
        retreat*

51.     Notwithstanding the order of 3 May 2012 which appointed the provisional
        liquidators of BJUK, Mr. Telser has very recently continued to attempt to
        exercise control over BJUK and seek to exercise powers as a director of BJUK.
        He has done so despite the fact that provisional liquidators continue to be
        appointed in relation to BJUK.

52.     It is important to see Mr. Telser's recent actions in the context of both his role in
        the matters giving rise to the 994 petition and his reaction to the appointment of
        the provisional liquidators in those proceedings.

53.     Mr. Telser was instrumental in giving effect to the agency agreements which are

20

now admitted by the other effective respondents in the 994 petition to have been fraudulent. He approved on 24 March 2011 the abbreviated accounts for BJUK for the year ending 30 November 2009 [112], which purported to give effect to those agency agreements. He convened and presided over the Caldero shareholders' meeting dated 8 March 2012 purporting to approve those abbreviated accounts, despite Caldero's protests.

54.   Mr. Telser was also instrumental in implementing the arrangements whereby Mr. Becirovic was unfairly excluded from the joint venture, again a matter which is admitted by the other effective respondents.

55.   Although Mr. Telser's Amended Points of Defence in the 994 petition continue to deny any breach of fiduciary duty, the other effective respondents in the 994 petition admit Mr. Telser's breach of fiduciary duties. Notwithstanding Mr. Telser's denial of a breach of duty, his Amended Points of Defence in the 994 petition did not respond to the allegations of breaches (and he has failed to answer a request for further information) and at the trial of the petition, he indicated through a skeleton argument lodged on his behalf that he did not intend to take any active part in the trial.

56.   During the preceding course of the 994 petition, Mr. Telser was far from neutral.

57.   On 4 May 2012, immediately following service of the proceedings, he, together with Leibson and Mr. Lazurenko applied to 'stay' the appointment of the provisional liquidators.

58.   On 15 May 2012, he, together with Leibson, applied to strike out the petition and for the removal of the provisional liquidators. That application was not withdrawn but was rather adjourned until the trial, (when the appointment of the provisional liquidators was continued by the order of 16 July 2012).

59.   On 25 May 2012, he applied again to strike the petition out as against him. The application was pursued but was dismissed.

60.    Mr. Telser, together with Leibson, strenuously opposed an application of the provisional liquidators dated 1 June 2012 for directions to allow them to have their appointment recognised in Montenegro.

61.    The provisional liquidators themselves have had cause to complain of Mr. Telser's non-cooperation with them. I refer at [115-116] by way of example to Mr. Telser's resistance to the provisional liquidators to two emails sent by Mr. Telser to Mr. Shaw, one of the provisional liquidators of BJUK, following Mr. Shaw's visit to Montenegro. I suggest that these emails clearly illustrate Mr. Telser's lack of cooperation and lack of respect for the provisional liquidators.

62.    I also refer to a letter recently sent by the provisional liquidators' solicitors to Mr. Telser's solicitors dated 2 August 2012 in which complaint is made, among other things, that Mr. Telser had still not provided the provisional liquidators with the books and records of BJUK. A copy of this letter is at [117-119].

63.    On 30 July 2012, Mr. Becirovic received a document called "Direction" dated 26 July 2012 from Mr. Telser addressed to the three directors of BJM (the other two directors being Mr. Peskov and Mr. Golikov who act at Mr. Lazurenko's direction). The "Direction" was not copied to the provisional liquidators of BJUK. The document, a copy of which is at [120-121], purported to instruct the directors to stop providing information to the provisional liquidators '*in regard to due diligence purposes or any other third party*'. He asked the directors of BJM (including Mr. Becirovic) to provide to him certain reports and information (including asking that Mr. Becirovic provide a report in relation to the Avala's casino by 31 July 2012). He required Mr. Peskov '*To inform senior management of [BJM] about the organisational structure of [BJM] as it was set out in Direction Number 6 and the areas of responsibilities of directors of [BJM] in writing.*'. He purported to direct Mr. Golikov, Mr. Peskov and Mr. Becirovic to '*refrain from all public and internal statements that may damage the reputation of [BJM] or [BJUK].*' He purported to also direct changes to the discretionary guest list. In short, it is, I suggest, quite clear that Mr. Telser by

22

this letter attempted to assume authority on behalf of BJUK notwithstanding that the provisional liquidators continue to be in place. Further, he appears to have taken a deliberate decision not to inform the provisional liquidators that he was writing in these terms and, indeed, seems to be particularly keen to stop the provisional liquidators from receiving information.

64.    On 31 July 2012, Mr. Becirovic responded to Mr. Telser and stated his position that Mr. Telser had no capacity or authority to give directions or instructions to the directors of BJM, because of the appointment of the provisional liquidators until their appointment is discharged. Mr. Becirovic said that this position was not affected by any adjustment to the scope of their tasks by the Court. Mr. Becirovic further suggested that Mr. Telser should take up any queries with the provisional liquidators. On the same day Mr. Telser responded and repeated his unfounded demands. A copy of the correspondence is attached at [122-123].

65.    In the meantime, Mr. Golikov and Mr. Peskov started actively to assist Mr. Telser in his attempt to take control over BJM. On 30 July 2012, Mr. Golikov instructed one of BJM's lawyers, Mr. Vido Dakonovic not to provide any further information to Harrisons, Montenegrin lawyers acting on behalf of the provisional liquidators. A copy of the relevant email is at [124].

66.    On 31 July 2012, Mr. Peskov with the assistance of lawyers from a law firm Karanovic and Nikolic (lawyers engaged by Mr. Lazurenko's team before the appointment of the provisional liquidators) called a meeting of BJM management at Avala and instructed a major restructuring of BJM's business functions, dissolution of the major departments of BJM, and re-assignment of some of the important business functions of BJM to the Montenegrin branch of BJUK. The minutes of the meeting of 31 July 2012 purport to appoint Mr. Golikov as the representative of the Montenegrin branch of BJUK which is contrary to the directions of the provisional liquidators whereby all of Mr. Golikov, Mr. Peskov and Mr. Becirovic are to be representatives of the Montenegrin branch of BJUK. The minutes of the meeting and "direction 6"

23

referred to in those minutes are attached at [125-134]. Mr. Becirovic was informed by staff at Bianca that on 2 August 2012, a similar meeting took place at Bianca.

67.    The principal purpose of the meeting of BJM management on 31 July 2012 seems to have been to mislead the management of BJM into thinking that the provisional liquidators are no longer effectively in control of BJUK but rather that Mr. Telser, and Mr. Golikov and Mr. Peskov, are back running the companies. The minutes refer to a letter from '*an official director of the mother company [BJUK], Marcel Telcer* [sic]'. The minutes purport to state '*the Director of the mother company BJUK is superior to the Directors of BJM.*'. There is no reference in the minutes to the continuing appointment of the provisional liquidators. Rather the misleading impression is given that Mr. Telser is able to exercise the authority of BJUK.

68.    On 31 July 2012, Bryan Cave wrote to Mr. Telser's solicitors, Rooks Rider, referring to the fact that Mr. Telser had no authority in relation to BJUK or its subsidiary by reason of the continuing appointment of provisional liquidators and asked Rooks Rider to take urgent action to make this clear to Mr. Telser [135].

69.    On 2 August 2012, the provisional liquidators' solicitors wrote to Mr. Telser's solicitors also emphasising that their appointment had divested Mr. Telser of his powers as a director [117-119]. I note, in particular, that their letter indicates that the provisional liquidators had advised Mr. Telser to this effect at the very outset of their appointment. Also, Mr. Telser has been at all times and still is represented by solicitors, Rooks Rider. On the same date the provisional liquidators wrote to all the directors of BJM [136-138].

70.    Mr. Telser's actions in the above regard are a further example of the extraordinary lengths to which he is apparently prepared to go as a partisan of Mr. Lazurenko's and Leibson's interests.

274029.1

71.     Only when threatened with injunctive proceedings to prevent him from continuing to act in this manner, did Mr. Telser, through his solicitors Rooks Rider, perform an 'about face.' At 8:31pm on 6 August 2012, Bryan Cave received the attached correspondence from Rooks Rider in which Mr. Telser fully accepted that his actions had been inappropriate and he had no authority to act (or seek to act) in the business affairs of BJM during the continued appointment of the provisional liquidators [139-152].

*(iv) The threatened sacking of Mr. Lazurenko's English solicitors, Mishcon de Reya*

72.     I also refer to the witness statement of Mr. Igor Maydannik dated 7 August 2012 in support of the applications in these proceedings. Mr. Maydannik, Chief Legal Officer, Executive Vice-President for Legal Support at TNK-BP, explains a telephone conversation that he had with Mr. Alexander Dobrovinsky, a well-known Moscow lawyer, on 6 August 2012. Mr. Dobrovinsky claimed to be acting on behalf of Mr. Lazurenko and informed Mr. Maydannik that Mr. Lazurenko was intending to dismiss the lawyers currently representing him in English proceedings (Mishcon de Reya) to which he is already a party. Mr. Dobrovinsky further informed Mr. Maydannik that Mr. Lazurenko had decided to dismiss his English lawyers, because he wanted to make it more difficult for Holding to pursue Mr. Lazurenko in the English proceedings. In a subsequent communication between Mr. Dobrovinsky and Mr. Maydannik, Mr. Dobrovinsky sought to clarify that it was just Mr. Lazurenko's intention to dismiss Mishcon de Reya in relation to the injunction proceedings referred to below at paragraphs 79 and 80.

73.     I believe that such conduct is indicative of the volatility of Mr Lazurenko and a refusal to accept the consequences of his wrongdoing, including matters alleged in these proceedings, namely the admitted misappropriation of funds from Holding and use of those funds to invest in hotels and property in Montenegro and Russia.

*(v) Acceptance that Agency Agreements are null and void and refusal to provide Agency Agreements for forensic examination*

74.     As mentioned above, by order dated 16 July 2012, Mr. Lazurenko and the effective respondents in the 994 petition have admitted that the agency agreements were a fraud. The fraudulent attempt to use the agency agreements as a purported means to explain the funding of BJUK (to purchase, refurbish and maintain the Avala and Bianca hotels) is a further example of the lengths that Mr. Lazurenko, Mr. Scheklanov and Lawson have gone to in order to disguise the underlying fraud alleged in these proceedings by Holding.

75.     Additionally, I would add that despite repeated requests from Bryan Cave, Mr. Lazurenko's solicitors, Mishcon de Reya, have refused to make either the original or soft copies of the agency agreements available for forensic examination. Similarly, Mr Lazurenko's solicitors, Mishcon de Reya, have refused to disclose a draft management and operation agreement with the Hyatt, notwithstanding the fact that it has been asserted by their clients that ongoing negotiations were taking place with the Hyatt (by Mr. Golikov, on behalf of Mr. Lazurenko and Mr. Telser) for the transfer of the operation of the Avala and Bianca hotels to the Hyatt.

*(vi) Avoidance of disclosure by Messrs Lazurenko, Scheklanov and Lawson in the 994 petition*

76.     In keeping with the evasive conduct of Messrs Lazurenko, Scheklanov, and Lawson, extraordinary steps have also been taken in the 994 petition in order to avoid giving disclosure. Directions were given in the 994 petition on 19 June 2012 for an expedited trial with a seven-day estimate to be heard after 9 July 2012.

77.     The directions laid down by Mr. Justice Floyd required disclosure to be given on Friday, 29 June 2012. In the event, none of Mr. Lazurenko, Mr. Scheklanov nor Lawson made disclosure as required on 29 June 2012 and their solicitors, Mishcon de Reya, requested a delay until 6pm on Monday 2 July 2012.  At

274029.1

approximately 5.40pm on Monday 2 July, Mr. Richard Stewart of Bryan Cave received a telephone call from Mr. Masoud Zabeti, a partner at Mishcon de Reya. Mr. Zabeti explained to Mr. Stewart that his clients were still not in a position to make disclosure.

78. As a result, the 7 day trial to be held after 9 July 2012 was vacated. Caldero then made an application on 6 July 2012 for the winding up of BJUK and that a trial be held in October 2012 to determine all issues between the parties including the validity of the agency agreements and the Investment Issue. Mishcon de Reya's clients argued that any trial should be limited to the Investment Issue as the agency agreements were no longer relied upon. Caldero's application was set down to be heard before Mr. Justice Newey for 3 days beginning 13 July 2012, but the parties agreed the order of 16 July 2012 which provided a mechanism for Caldero's stake in BJUK to be bought out, and for a trial of the Investment Issue to take place later in 2012.

*(vii) Threats by Mr. Lazurenko to disclose confidential information*

79. In addition to the above mentioned tactics, Mr. Lazurenko has attempted to exert pressure on TNK-BP to drop its pursuit of him by threatening to reveal the contents of what he claims are documents damaging to TNK-BP to various regulatory and law enforcement agencies as well as to the media and to a third party in dispute with TNK-BP in an unrelated matter. The documents are the property of TNK-BP and were illegally taken by Mr. Lazurenko.

80. These matters are dealt with in the witness statement of Mr. Richard Stewart dated 10 August 2012 in support of Holding's application for leave to serve these proceedings out of the jurisdiction. I refer to Mr. Stewart's witness statement in this regard, which states the following:

80.1 The threats were first made to Mr. Maydannik by Mr. Alexander Dobrovinsky, who was claiming to be acting for Mr. Lazurenko.

27

80.2   The threats were repeated by Mr. Lazurenko at a meeting in London with Mr. Maydannik on 25 June 2012. As a result, Holding and Management obtained without notice on 17 July 2012 an injunction restraining Mr. Lazurenko from revealing the contents of the documents to any third parties other than various regulatory and law enforcement agencies.

80.3   At the return hearing on 24 July 2012, Mr. Justice Vos continued the injunction on the terms set out in the order at [153-160]. I was informed by Mr. Robert Dougans, an associate employed by my firm, prior to the hearing on 24 July, that Mr. Michael Armstrong a partner with Mishcon de Reya, acting for Mr. Lazurenko, pointed out to Mr. Dougans an individual at court whom Mr. Armstrong identified as a journalist.

80.4   Mr. Armstrong told Mr. Dougans that unless TNK-BP dropped the injunction and agreed to end its attempts to recover money from his client, the journalist would be in court to hear the injunction proceedings. It is to be inferred that the journalist was not in the court by chance, but had been invited by Mr. Lazurenko in the hope of putting pressure on TNK-BP not to pursue its claims against him and the other Defendants

81.   In the context of the injunction having been granted on 17 July 2012 and continued on 24 July 2012, Mischon de Reya, on behalf of Mr Lazurenko have subsequently confirmed that Mr Lazurenko does not now intend to disclose the contents of the documents to any third parties other than potentially to regulatory and/or law enforcement agencies and that Mr Lazurenko is willing to provide a permanent undertaking in this regard. However, again, this turn around in approach has only been adopted after a previously recalcitrant position was adopted by Mr Lazurenko, necessitating an injunction from the court.

274029.1

*(viii) The continued unknown whereabouts of Mr. Lazurenko.*

82.   Mr. Lazurenko, has left the Russian Federation and is believed to be currently resident in London at an address unknown to Holding.  By letter dated 5 July 2012 [161-162], Mishcon de Reya stated:

> *"Under the severe pressure to which we have referred, Mr. Lazurenko felt he had no alternative but to admit orally what had been alleged, even though he knew the allegations not to be true. He believed that it was likely that he would next come under pressure to admit the false admissions in writing. In the circumstances, he felt he had no alternative but to leave Russia before that happened.  In effect, therefore, Mr. Lazurenko was forced out of his job and out of Russia by TNK-BP."*

83.   On 6 July 2012, Bryan Cave responded to the above letter in the following terms [163]:

> *"The plain facts are that Mr. Lazurenko's fraud on his employer was discovered, he admitted his wrongdoing and offered to make recompense. However, it is now clear that this was merely to buy time to allow him to leave Russia in order to escape the consequences of his actions.*
>
> *Since his arrival in England Mr. Lazurenko has adopted a variety of stratagems in the hope of retaining property which he has stolen from his former employers.  These include reliance on forged documents, perjury and attempted blackmail. This story of a forced confession he has now concocted is yet another example of Mr. Lazurenko's dishonesty and will be conclusively rebutted at the appropriate time."*

**Assets in England and Wales**

84.   I refer to the most recent financial statements of BJUK for the year ended 30 November 2010 at [183 - 187]. It will be noted that the total assets (cash at bank and in hand) less current liabilities is £433,127. Holding has been unable to find other evidence and has no knowledge of any other assets in England and Wales that would enable a judgment to be satisfied. Accordingly, a worldwide injunction is required.

**Without Notice**

29

85.     It will be seen from the facts and matters set out above that there is cogent evidence that Mr. Lazurenko and his associates have engaged in a fraudulent scheme to misappropriate assets from Holding over a considerable period of time and on a large scale.

86.     The recent events described above including the attempt to move the ownership of Roychamp, the appearance of an unknown BVI entity in Roychamp's books purportedly giving rise to a US$ 15.9 million liability and the flouting of the Court's 3 May 2012 order by Mr. Telser all point strongly to a continuing risk of dissipation of assets by the Defendants such that any judgment by the Court in these proceedings would go unsatisfied.

87.     As set out above at paragraph 38, based on these events, Holding has taken the view that there is a need for secrecy in relation to its application for injunctive relief. As a result of the real and very present risk of dissipation if the Defendants were to know about the application, Holding does not intend to give the Defendants' notice prior to the hearing.

**"Mirror" Orders**

88.     Injunctive relief is sought against Mr. and Mrs. Lazurenko and against Delaila, Roychamp, Centelux, Adelaide and Trockley.

89.     Delaila, Centelux and Trockley are BVI companies, Roychamp is incorporated in Arkansas, USA and Adelaide is incorporated in Nevis.

90.     In order to give greater effectiveness to any injunctive relief granted in England, the Court is also asked to grant permission to Holding to apply for mirror orders in the BVI, Nevis and Arkansas.

91.     I understand that the Court will wish to be sure that the relief sought abroad will not be of greater effect than the relief granted in England.  For that reason it is intended to apply for orders mirroring any relief granted in England.

274029.1

92.     Holding has taken advice as to the procedure and effect in relation to such orders and has been advised as follows:

> 92.1     Mr. Michael Fay, Partner, Ogier, BVI, tells me that the practice and procedure and effect of such orders is broadly the same and follows the practice and procedure in England & Wales.

> 92.2     Hon. Mark A. G. Brantley, Partner, Daniel, Brantley & Associate, Nevis, tells me that the practice and procedure and effect of such orders is broadly the same and follows the practice and procedure in England & Wales

> 92.3     Mr. Kevin A. Crass, Partner, Friday Eldgredge & Clark, Little Rock, Arkansas, tells me a separate action would be filed in Arkansas to recognize and enforce a judgment or order from the English court, and he would likely rely on common law to do so: "The origins of our concept of due process of law are English". *Society of Lloyd's v. Ashenden*, 233 F.3d 473 (2000). The Restatement (Third) Foreign Relations Law includes recognition and enforcement of foreign judgments to determine interests in property as well as for payments of money. The Restatement (Second) on Conflict of Laws section 98 also says "A valid judgment rendered in a foreign nation after a fair trial in a contested proceeding will be recognized in the United States so far as the immediate parties and the underlying cause of action are concerned." Thus the freezing order will be recognised and enforced by the Arkansas court after the inter parties hearing.

93.     On the basis of that advice my understanding is that the relief sought in BVI, Nevis and Arkansas will be of similar effect to that of the order sought in England.

274029.1

94.     If the English Court grants the relief sought, it is intended to move the Courts in the BVI and Nevis on the following working day and then to serve all orders together upon the Respondents.

**Further Evidence**

95.     Evidence in these proceedings has been provided by Richard Stewart, Vladislav Egorov and Igor Maydannik.  That evidence is relevant to the matters before the Court hearing the application for injunctive relief.   It is anticipated that the Court will wish to consider some of the facts and matters set out in that evidence but, as the evidence has been given by witness statement, rather than affidavit, those statements cannot 'stand alone' in the context of an application for a freezing injunction.  Accordingly, those statements are put before the Court by way of exhibit to this affidavit.  Based on my knowledge of the case, I am in agreement with the contents of those statements, save where Mr. Egorov and Mr. Maydannik describe events which I did not personally attend, and therefore have no direct knowledge..

**Full and Frank Disclosure**

96.     Although it is impossible to foresee all of the Defendants' objections to these proceedings and their defences to the claims, some can be anticipated.

97.     At [161-162] will be found a copy of letter dated 5 July 2012 from Mishcon de Reya which sets out Mr. Lazurenko's position.  In summary, he says he was forced into the admission of wrongdoing he made as regards the Transoil Payments, because of his refusal to participate in certain "practices".  Mr. Lazurenko "was forced out of his job and out of Russia by TNK-BP." Holdings denies this version of events. At [163] will be found a copy of my firm's letter dated 6 July 2012 which refutes Mishcon's letter.  No reply has been received by my firm.

32

98.   Mr. Lazurenko has already raised in the context of injunction proceedings the exclusive jurisdiction clause in his employment contract in favour of the Russian courts. Given that Mr. Lazurenko has claimed via his solicitors that he cannot return to Russia because of fears for his safety, it might appear illogical for him to rely on the clause. If Mr. Lazurenko does place reliance on it in these proceedings, Holdings says it is irrelevant as its claims are not based on any breach of his terms of employment but rather on general provisions of the Russian Civil Code and the English tort of unlawful conspiracy.

99.   Insofar as Holding's claims are based on Russian law, I have taken Russian law advice and understand that it is open to Mr. Lazurenko to argue that some at least are time barred by reason of the three year limitation period under Russian law.  Holdings says that time starts to run from when an injured party knew or ought reasonably to have known of the wrongdoing on which a claim is based. Mr. Lazurenko's elaborate schemes and structures successfully hid his wrongdoing until very recently. In summary, this is a matter of fact to be determined at the trial of Holding's claims and cannot be determined at this stage.

**Cross Undertaking as to Damages**

100.  I refer to paragraph 32 of the witness statement of Mr. Egorov in which he confirms that the TOC Investments Ltd will fund any deposit or cross undertaking required by the Court in this matter. I attach at [164-182] the consolidated financial statements which form part of the most recent report of TNK-BP. As can be seen, these show that as of September 2010, TNK-BP had assets worth US$ 33,126,000,000, of which US$1,844,000,000 was in cash. I respectfully submit that TNK-BP's cross undertaking will be sufficient to meet any loss the Respondents are likely to suffer if the orders sought by the Claimant are set aside at the return date or after a final hearing.

33

274029.1

SWORN at

GQ EMPLOYMENT LAW LLP.

This 10th day of August 2012

Before me   SOPHIE VANKEGAN   SVankegan.

Solicitor   GQ   EMPLOYMENT LAW LLP.
88 WOOD STREET
LONDON
EC2V 7RS

34

ClaimNo: HC12B03162

## IN THE HIGH COURT OF JUSTICE
## CHANCERY DIVISION

BETWEEN:

OJSC TNK-BP Holding

<u>Claimant</u>

-and-

(1) **BEPPLER & JACOBSON LIMITED (in provisional liquidation)**
(2) **IGOR LAZURENKO**
(3) **LEIBSON CORPORATION**
(4) **BELINDA CAPITAL LIMITED**
(5) **LAWSON TRADING LIMITED**
(6) **SERGEY SCHEKLANOV**
(7) **MARCEL TELSER**
(8) **SVETLANA LAZURENKO**
(9) **DELAILA INVESTMENT LIMITED**
(10) **ROYCHAMP TRADING LLC**
(11) **CENTELUX INC**
(12) **ADELAIDE ENTERPRISES INC**
(13) **TROCKLEY INVESTMENTS LIMITED**

<u>Defendants</u>

---

**AFFIDAVIT OF CRAIG DEUCHRASS**

---

Bryan Cave
88, Wood Street
EC2V 7AJ
Tel: 020 3207 1100
Fax: 020 3207 1881

Ref: RS4/KU1/6P3/0337021

**Solicitors for the Claimant**

35

274029.1

# FILE COPY



# CERTIFICATE OF INCORPORATION

# OF A PRIVATE LIMITED COMPANY

## Company No.  4318805

The Registrar of Companies for England and Wales hereby certifies that

BEPPLER & JACOBSON LTD.

is this day incorporated under the Companies Act 1985 as a private company and that the company is limited.

Given at Companies House, Cardiff, the  7th November 2001



*N04318805G*



For The Registrar Of Companies

*C O M P A N I E S   H O U S E*

1



**Companies House**
— *for the record* —

# AP01 (ef)

## Appointment of Director



XNR9PO96

*Company Name:*   **BEPPLER & JACOBSON LTD.**

*Company Number:*   **04318805**

*Received for filing in Electronic Format on the:*   **15/10/2010**

---

## New <u>Appointment</u> Details

*Date of Appointment:*   **15/10/2010**

*Name:*   **MR. MARCEL  TELSER**

*Consented to Act:*   **YES**

*Service Address:*   **8 AM BACH**
**TRIESEN**
**LIECHTENSTEIN**
**LIECHTENSTEIN**
**LI-9495**

*Country/State Usually Resident:*   **LIECHTENSTEIN**

*Date of Birth:*   **06/06/1971**

*Nationality:*   **LIECHTENSTEIN**

*Occupation:*   **BUSINESSMAN**

---

*Former Names:*

---

## *Authorisation*

*Authenticated*

*This form was authorised by one of the following:*

Director, Secretary, Person Authorised, Administrator, Administrative Receiver, Receiver, Receiver Manager, Charity Commission Receiver and Manager, CIC Manager, Judicial Factor.

---




## TERRITORY OF THE BRITISH VIRGIN ISLANDS

### THE INTERNATIONAL BUSINESS COMPANIES ACT
#### (CAP. 291)

### CERTIFICATE OF INCORPORATION     (SECTIONS 14 AND 15)

No. 293421

*The  Registrar of Companies  of the British Virgin Islands* HEREBY CERTIFIES *pursuant to the International Business Companies Act, Cap. 291 that all the requirements of the Act in respect of incorporation having been satisfied,*

### LEIBSON CORPORATION

*is incorporated in the British Virgin Islands as an International Business Company this 4th day of September, 1998.*



Given under my hand and seal at

Road Town, in the Territory of the

British Virgin Islands



/S/ REGISTRAR OF COMPANIES

CRTI001DM



LOS403/40

In accordance with
Section 854 of the
Companies Act 2006

# AR01
## Annual Return
**(For returns made up to a date on or after 1 October 2011)**



**Companies House**

| | |
|---|---|
| A fee is payable with this form Please see 'How to pay' on the last page | You can use the WebFiling service to file this form online. Please go to www... |

| | | |
|---|---|---|
| ✓ **What this form is for** You may use this form to confirm that the company information is correct as at the date of this return. You must file an Annual Return at least once every year | ✗ **What this form** You cannot use... notice of chang... officers, registe... company type o... relating to the... | ...lease ...ov uk |

WEDNESDAY

A19   *A0ZUVG37*   04/01/2012   #183
COMPANIES HOUSE

## Part 1 — Company details

**The section must be completed by all companies.**

> **Filling in this form**
> Please complete in typescript or in bold black capitals.
>
> All fields are mandatory unless specified or indicated by *

### A1 — Company details

| Company number | 0 4 3 1 8 8 0 5 |
|---|---|
| Company name in full ● | BEPPLER & JACOBSON LTD. |

> ● **Company name change.**
> If your company has recently changed its name, please provide the company name as at the date of this return

### A2 — Return date

Please give the annual return made up date The return date must not be a future date. The annual return must be delivered within 28 days of the date given below

If you would like the company's made up date to be earlier than 1 October 2011, please complete the AR01 appropriate for earlier made up dates

| Date of this return ● | ᵈ0 ᵈ7 ᵐ1 ᵐ1 ʸ2 ʸ0 ʸ1 ʸ1 |
|---|---|

> ● **Date of this return**
> Your company's return date is usually the anniversary of incorporation or the anniversary of the last annual return filed at Companies House You may choose an earlier return date but it must not be a later date

### A3 — Principal business activity

Please show the trade classification code number(s) for the principal activity or activities. ●

| Classification code 1 | 9 6 0 9 0 |
|---|---|
| Classification code 2 | |
| Classification code 3 | |
| Classification code 4 | |

> ● **Principal business activity**
> You must provide a trade classification code (SIC code 2007) or a description of your company's main business in this section
>
> A full list of the trade classification codes are available on our website www.companieshouse.gov.uk

If you cannot determine a code, please give a brief description of your business activity below

| Principal activity description | |
|---|---|

## AR01
### Annual Return
**(For returns made up to a date on or after 1 October 2011)**

**A4** | **Company type** ❶

Please confirm your company type by ticking the appropriate box below (only one box must be ticked).

- ☐ Public limited company
- ☑ Private company limited by shares
- ☐ Private company limited by guarantee
- ☐ Private company limited by shares exempt under section 60
- ☐ Private company limited by guarantee exempt under section 60
- ☐ Private unlimited company with share capital
- ☐ Private unlimited company without share capital

❶ **Company type**
If you are unsure of your company type, please check your latest certificate of incorporation or our website www.companieshouse.gov.uk

**A5** | **Registered office address** ❶

| Building name/number | 48 |
| Street | QUEEN ANNE STREET |
| Post town | LONDON |
| County/Region | |
| Postcode | W 1 G 9 J J |

❶ **Change of registered office**
This must agree with the address that is held on the Companies House record at the date of this return.

If the registered office address has changed, you should complete form AD01 and submit it together with this annual return.

**A6** | **Single alternative inspection location (SAIL) of the company records (if applicable)** ❶

| Building name/number | |
| Street | |
| Post town | |
| County/Region | |
| Postcode | |

❶ **SAIL address**
This must agree with the address that is held on the Companies House record at the date of this return.

If the address has changed, you should complete form AD02 and submit it together with this annual return

**A7** | **Location of company records** ❶

Please tick the appropriate box to indicate which records are kept at the SAIL address in Section A6:

- ☐ Register of members.
- ☐ Register of directors.
- ☐ Directors' service contracts.
- ☐ Directors' indemnities.
- ☐ Register of secretaries.
- ☐ Records of resolutions etc.
- ☐ Contracts relating to purchase of own shares.
- ☐ Documents relating to redemption or purchase of own shares out of capital by private company.
- ☐ Register of debenture holders.
- ☐ Report to members of outcome of investigation by public company into interests in its shares
- ☐ Register of interests in shares disclosed to public company
- ☐ Instruments creating charges and register of charges: England and Wales or Northern Ireland
- ☐ Instruments creating charges and register of charges. Scotland

❶ **Location of company records**
If the company records are held at the registered office address, do not tick any of the boxes in this section

Certain records must be kept by every company while other records are only kept by certain company types where appropriate.

If the records are not kept at the SAIL address, they must be available at the registered office.

If any of the company records have moved from the registered office to the address in Section A6 since the last annual return, you must complete form AD03 and submit it together with this annual return

6

## AR01
Annual Return
(For returns made up to a date on or **after 1 October 2011**)

## Part 2 — Officers of the company

This section should include details of the company at the date to which this annual return is made up

→ For a secretary who is an individual, go to **Section B1**
→ For a corporate secretary, go to **Section C1**
→ For a director who is an individual, go to **Section D1**
→ For a corporate director, go to **Section E1.**

**Continuation pages**
Please use a continuation page if you need to enter more officer details.

### Secretary

**B1 — Secretary's details ❶**

Please use this section to list all the secretaries of the company
For a corporate secretary, complete Section C1-C4.

| | |
|---|---|
| Title* | MR |
| Full forename(s) | IWAN JOSEF |
| Surname | ACKERMANN |
| Former name(s) ❷ | |

**❶ Secretary appointments**
You may not use this form to appoint a secretary To do this, please complete form AP03 and submit it together with this annual return

**Corporate details**
Please use Section C1-C4 to enter corporate secretary details.

**Secretary details**
All details must agree with those previously notified to Companies House If you have made changes since the last annual return and have not notified us, please complete form CH03.

**❷ Former name(s)**
Please provide any previous names which have been used for business purposes during the period of this return Married women do not need to give former names unless previously used for business purposes

**B2 — Secretary's service address ❶**

| | |
|---|---|
| Building name/number | 24 |
| Street | AUBUNDT |
| | |
| Post town | VADUZ |
| County/Region | |
| Postcode | L I - 9 4 9 0 |
| Country | LIECHTENSTEIN |

**❶ Service address**
If you have previously notified Companies House that the service address is at 'The Company's Registered Office', please state 'The Company's Registered Office' in the address.

This information will appear on the public record

7

## AR01
### Annual Return
(For returns made up to a date on or **after 1 October 2011**)

## Corporate secretary

| C1 | Corporate secretary's details ❶ | |
|---|---|---|
| | Please use this section to list all the corporate secretaries of the company. | ❶**Corporate secretary appointments** You cannot use this form to appoint a corporate secretary To do this, please complete form AP04 and submit it together with this annual return. |
| Corporate body/firm name | | **Corporate secretary details** All details must agree with those previously notified to Companies House If you have made changes since the last annual return and have not notified us, please complete form CH04. |
| Building name/number | | |
| Street | | This information will appear on the public record. |
| Post town | | |
| County/Region | | |
| Postcode | | |
| Country | | |

| C2 | Location of the registry of the corporate body or firm | |
|---|---|---|
| | Is the corporate secretary registered within the European Economic Area (EEA)? → Yes  Complete **Section C3 only** → No   Complete **Section C4 only** | |

| C3 | EEA companies ❶ | |
|---|---|---|
| | Please give details of the register where the company file is kept (including the relevant state) and the registration number in that register. | ❶**EEA** A full list of countries of the EEA can be found in our guidance www.companieshouse gov uk |
| Where the company/ firm is registered ❶ | | ❶This is the register mentioned in Article 3 of the First Company Law Directive (68/151/EEC). |
| Registration number | | |

| C4 | Non-EEA companies | |
|---|---|---|
| | Please give details of the legal form of the corporate body or firm and the law by which it is governed. If applicable, please also give details of the register in which it is entered (including the state) and its registration number in that register | ❶**Non-EEA** Where you have provided details of the register (including state) where the company or firm is registered, you must also provide its number in that register |
| Legal form of the corporate body or firm | | |
| Governing law | | |
| If applicable, where the company/firm is registered ❶ | | |
| If applicable, the registration number | | |

8

## AR01

Annual Return
(For returns made up to a date on or **after 1 October 2011**)

**Director**

| D1 | Director's details ● |
|---|---|

Please use this section to list all the directors of the company
For a corporate director, complete Section E1-E4.

| | |
|---|---|
| Title* | MR |
| Full forename(s) | MARCEL |
| Surname | TELSER |
| Former name(s) ● | |
| Country/State of residence | LIECHTENSTEIN |
| Nationality | LIECHTENSTEIN |
| Date of birth | 0 6   0 6   1 9 7 1 |
| Business occupation (if any) | BUSINESSMAN |

**● Director appointments**
You cannot use this form to appoint a director To do this, please complete form AP01 and submit it together with this annual return

**Corporate details**
Please use Section E1-E4 to enter corporate director details.

**Director details**
All details must agree with those previously notified to Companies House. If you have made changes since the last annual return and have not notified us, please complete form CH01

**● Former name(s)**
Please provide any previous names which have been used for business purposes during the period of this return. Married women do not need to give former names unless previously used for business purposes.

| D2 | Director's service address ● |
|---|---|

| | |
|---|---|
| Building name/number | 8 |
| Street | AM BACH |
| Post town | TRIESEN |
| County/Region | |
| Postcode | L I - 9 4 9 5 |
| Country | LIECHTENSTEIN |

**● Service address**
If you have previously notified Companies House that the service address is at 'The Company's Registered Office', please state 'The Company's Registered Office' in the address.

This information will appear on the public record.

9

## AR01
Annual Return
(For returns made up to a date on or **after 1 October 2011**)

**Director**

| **D1** | **Director's details ❶** | |
|---|---|---|
| | Please use this section to list all the directors of the company | |
| | For a corporate director, complete Section E1-E4 | |
| Title* | | |
| Full forename(s) | | |
| Surname | | |
| Former name(s)❷ | | |
| Country/State of residence | | |
| Nationality | | |
| Date of birth | d  d     m  m     y  y  y  y | |
| Business occupation (if any) | | |

**❶ Director appointments**
You cannot use this form to appoint a director. To do this, please complete form AP01 and submit it together with this annual return.

**Corporate details**
Please use **Section E1-E4** to enter corporate director details.

**Director details**
All details must agree with those previously notified to Companies House. If you have made changes since the last annual return and have not notified us, please complete form CH01

**❷ Former name(s)**
Please provide any previous names which have been used for business purposes during the period of this return. Married women do not need to give former names unless previously used for business purposes.

| **D2** | **Director's service address❶** | |
|---|---|---|
| Building name/number | | |
| Street | | |
| Post town | | |
| County/Region | | |
| Postcode | | |
| Country | | |

**❶ Service address**
If you have previously notified Companies House that the service address is at 'The Company's Registered Office', please state 'The Company's Registered Office' in the address.

This information will appear on the public record.

10

## AR01
### Annual Return
(For returns made up to a date on or **after 1 October 2011**)

## Corporate director

| **E1** | **Corporate director's details ❶** | |
|---|---|---|
| | Please use this section to list all the corporate director's of the company | **❶ Corporate director appointments** You cannot use this form to appoint a corporate director To do this, please complete form AP02 and submit it together with this annual return |
| Corporate body/firm name | | **Corporate director details** All details must agree with those previously notified to Companies House If you have made changes since the last annual return and have not notified us, please complete form CH02 |
| Building name/number | | |
| Street | | This information will appear on the public record |
| Post town | | |
| County/Region | | |
| Postcode | | |
| Country | | |

| **E2** | **Location of the registry of the corporate body or firm** | |
|---|---|---|
| | Is the corporate director registered within the European Economic Area (EEA)? → Yes   Complete **Section E3 only** → No   Complete **Section E4 only** | |

| **E3** | **EEA companies ❶** | |
|---|---|---|
| | Please give details of the register where the company file is kept (including the relevant state) and the registration number in that register. | **❶ EEA** A full list of countries of the EEA can be found in our guidance ·www.companieshouse.gov uk |
| Where the company/ firm is registered ❶ | | **❶** This is the register mentioned in Article 3 of the First Company Law Directive (68/151/EEC) |
| Registration number | | |

| **E4** | **Non-EEA companies** | |
|---|---|---|
| | Please give details of the legal form of the corporate body or firm and the law by which it is governed. If applicable, please also give details of the register in which it is entered (including the state) and its registration number in that register | **❶ Non-EEA·** Where you have provided details of the register (including state) where the company or firm is registered, you must also provide its number in that register |
| Legal form of the corporate body or firm | | |
| Governing law | | |
| If applicable, where the company/firm is registered ❶ | | |
| If applicable, the registration number | | |

## AR01
### Annual Return
(For returns made up to a date on or **after 1 October 2011**)

---

**Part 3**     **Statement of capital ●**

| Does your company have share capital? | ● This should reflect the company's capital status at the made up date of this annual return. |
|---|---|
| → Yes   Complete the sections below and the following Part 4. | |
| → No   Go to Part 5 (Signature). | |

**F1**     Share capital in pound sterling (£)

Please complete the table below to show each class of shares held in pound sterling
If all your issued capital is in sterling, only complete Section F1 and then go to Section F4.

| Class of shares (E g Ordinary/Preference etc.) | Amount paid up on each share ● | Amount (if any) unpaid on each share ● | Number of shares ● | Aggregate nominal value ● |
|---|---|---|---|---|
| ORDINARY | 1 00 | 0 | 262499 | £ 262,499 00 |
| ORDINARY | 0 | 1.00 | 87501 | £ 87,501 00 |
| | | | | £ |
| | | | | £ |
| | | Totals | 350000 | £ 350,000 00 |

**F2**     Share capital in other currencies

Please complete the table below to show any class of shares held in other currencies.
Please complete a separate table for each currency

Currency

| Class of shares (E g Ordinary/Preference etc.) | Amount paid up on each share ● | Amount (if any) unpaid on each share ● | Number of shares ● | Aggregate nominal value ● |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | Totals | | |

Currency

| Class of shares (E g Ordinary/Preference etc.) | Amount paid up on each share ● | Amount (if any) unpaid on each share ● | Number of shares ● | Aggregate nominal value ● |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | Totals | | |

**F3**     **Totals**

| Please give the total number of shares and total aggregate nominal value of issued share capital | ● Total aggregate nominal value Please list total aggregate values in different currencies separately For, example £100 + €100 + $10 etc. |
|---|---|
| **Total number of shares** 350000 | |
| **Total aggregate nominal value ●** 350,000 00 pounds | |

● Including both the nominal value and any share premium

● Number of shares issued multiplied by nominal value of each share

● Total number of issued shares in this class.

**Continuation Pages**
Please use a Statement of Capital continuation page if necessary

12

## AR01
### Annual Return
(For returns made up to a date on or after 1 October 2011)

**F4**                     **Statement of capital** (Voting rights)

| | |
|---|---|
| | Please give the prescribed particulars of rights attached to shares for each class of share shown in the statement of capital share tables in **Sections F1 and F2** |
| **Class of share** | ORDINARY |
| **Voting rights** | Each share is entitled to one vote in any circumstances<br>Each share has equal rights to dividends<br>Each share is entitled to participate in a distribution arising from a winding up of the company. |
| **Class of share** | |
| **Voting rights** | |
| **Class of share** | |
| **Voting rights** | |
| **Class of share** | |
| **Voting rights** | |

## AR01
### Annual Return
(For returns made up to a date on or **after 1 October 2011**)

| Part 4 | Shareholders | |
|---|---|---|

**Does your company have share capital?**
→ **Yes**  go to **Section G1 'Companies with share capital'**
→ **No**  Go to **Part 5 (Signature)**.

| G1 | Companies with share capital | |
|---|---|---|

**Question 1**

Were any of the company's shares admitted to trading on a market at any time during this return period? Please tick the appropriate box below ❶
- [✓] **No**  go to **Section G2** 'Past and present shareholders'.
- [ ] **Yes**  go to **Question 2**.

**Question 2**

Please only refer to Question 2 below if you have answered 'Yes' to Question 1. If you answered 'No', please go to Section G2 'Past and present shareholders'.

Did the company, throughout the return period, have any shares admitted to trading on a relevant market and was it, throughout the return period, an issuer to which DTR5 applies? Please tick the appropriate box below. ❷

- [ ] **No**  go to **Section G4** 'Shareholders who hold at least 5% of any class of shares of the company as at the made up date of the return'
- [ ] **Yes**  go to **Part 5 'Signature'**

❶ A market is one established under the rules of a UK recognised investment exchange or any other regulated markets in or outside of the UK, or any other market outside of the UK. The current UK recognized investment exchanges and regulated markets can be found at www.fsa.gov.uk/register/exchanges.do

❷ DTR5 refers to the Vote Holder and Issuer Notification Rules contained in Chapter 5 of the Disclosure and Transparency Rules source book issued by the Financial Services Authority. Notification is required when the percentage acquisition of a shareholder in the company has reached a certain threshold (starting at 3%)

| G2 | List of past and present shareholders ❸ | |
|---|---|---|

The company is required to provide a full list of past and present shareholders if one was not included with either of the last two returns. Please tick the appropriate box below
- [ ] There were no shareholder changes in this period Go to Part 5 (Signature)
- [✓] A full list of shareholders is enclosed
- [ ] A list of shareholder changes is enclosed

How is the list of shareholders enclosed Please tick the appropriate box below
- [✓] The list of shareholders is enclosed on paper Go to Section G3 'List of past and present shareholders'
- [ ] The list of shareholders is enclosed in another format. Go to Part 5 (Signature).

❸ This section only applies to companies answering 'No' in Section G1.

14

## AR01
### Annual Return
(For returns made up to a date on or **after 1 October 2011**)

**G3** | **List of past and present shareholders** ❶

| Changes during this period to shareholders' particulars or details of the amount of stock or shares transferred must be completed each year | ❶ Please list the company shareholders in alphabetical order |
|---|---|
| You must provide a 'full list' of all company shareholders on<br>– The company's first annual return following incorporation,<br>– Every third annual return after a full list has been provided. | Joint shareholders should be listed consecutively<br><br>**Further shareholders**<br>Please use a 'List of past and present shareholders' continuation page if necessary<br><br>This section only applies to companies answering 'No' to Question 1 in Section G1 |

| Shareholder's Name (Address not required) | Class of share | Shares or stock currently held | Shares or stock transferred (if appropriate) | |
|---|---|---|---|---|
| | | Number of shares or amount of stock | Number of shares or amount of stock | Date of registration of transfer |
| CALDERO TRADING LTD | ORDINARY | 87501 shares | | / / |
| LEIBSON CORPORATION LIMITED | ORDINARY | 244999 shares | | / / |
| BELINDA CAPITAL LTD | ORDINARY | 17500 shares | | / / |
| | | | | / / |
| | | | | / / |
| | | | | / / |
| | | | | / / |
| | | | | / / |
| | | | | / / |
| | | | | / / |
| | | | | / / |
| | | | | / / |

CHFP000
10/11 Version 5 0

## AR01
### Annual Return
(For returns made up to a date on or **after 1 October 2011**)

**G4** | **Shareholders who hold at least 5% of any class of share(s) of the company as at the made up date of this return**

This section should show only the shareholders that hold at least 5% of any class of share(s) of the company at the date of this return

It should only be completed by companies that have answered 'Yes' to Question 1 in Section G1, and 'No' to Question 2 in Section G1

If there were no shareholders holding at least 5% of any class of share(s) at the date of this return, this section may be left blank.

→ **Go to Part 5 (Signature)**

This section only applies to companies answering 'No' to Question 2 in Section G1

Please list the company shareholders in alphabetical order.

Joint shareholders should be listed consecutively

**Further shareholders**
Please use a 'Shareholders who hold at least 5% of any class of share(s) of the company as at the made up date of this return' continuation page if necessary

| Shareholder's name | Shareholder's address | Shares or stock currently held | |
| --- | --- | --- | --- |
| | | Class of share | Number of shares or amount of stock |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## AR01
**Annual Return**
(For returns made up to a date on or **after 1 October 2011**)

| Part 5 | Signature | |
|---|---|---|

| | This must be completed by all companies. | **❶ Societas Europaea**<br>If the form is being filed on behalf of a Societas Europaea (SE) please delete 'director' and insert details of which organ of the SE the person signing has membership |
|---|---|---|
| | I am signing this form on behalf of the company | |
| Signature | Signature<br>X ~~MM~~  Hicas Teba, Director  X | **❷ Person authorised**<br>Under either section 270 or 274 of the Companies Act 2006 |
| | This form may be signed by,<br>Director ❶, Secretary, Person authorised ❷, Charity commission receiver and manager, CIC manager, Judicial factor | |

# AR01
## Annual Return
(For returns made up to a date on or **after 1 October 2011**)

### 👤 Presenter information

You do not have to give any contact information, but if you do it will help Companies House if there is a query on the form. The contact information you give will be visible to searchers of the public record.

| Contact name | |
|---|---|
| Company name | Investment & Tax International, Inc |
| Address | 48 Queen Anne Street, |
| | |
| | |
| Post town | London |
| County/Region | |
| Postcode | W 1 G 9 J J |
| Country | UK |
| DX | |
| Telephone | 020 7224 2887 |

### ✓ Checklist

We may return forms completed incorrectly or with information missing.

Please make sure you have remembered the following:
- ☐ That if the made up date of the return is any earlier than 1 October 2011, you must complete the appropriate form AR01
- ☐ The company name and number match the information held on the public Register
- ☐ You have completed your principal business activity.
- ☐ You have not used this form to make changes to the registered office address.
- ☐ You have not used this form to make changes to secretary and director details.
- ☐ You have fully completed the Statement of capital (if applicable).
- ☐ You have signed the form.
- ☐ You have enclosed the correct fee.

### ❗ Important information

Please note that all information on this form will appear on the public record.

### 💷 How to pay

A fee of £40 is payable to Companies House in respect of an Annual Return

Make cheques or postal orders payable to 'Companies House.'

### ✉ Where to send

You may return this form to any Companies House address, however for expediency we advise you to return it to the appropriate address below:

**For companies registered in England and Wales:**
The Registrar of Companies, Companies House, Crown Way, Cardiff, Wales, CF14 3UZ
DX 33050 Cardiff.

**For companies registered in Scotland:**
The Registrar of Companies, Companies House, Fourth floor, Edinburgh Quay 2, 139 Fountainbridge, Edinburgh, Scotland, EH3 9FF.
DX ED235 Edinburgh 1
or LP - 4 Edinburgh 2 (Legal Post).

**For companies registered in Northern Ireland:**
The Registrar of Companies, Companies House, Second Floor, The Linenhall, 32-38 Linenhall Street, Belfast, Northern Ireland, BT2 8BG
DX 481 N.R Belfast 1.

### ℹ Further information

For further information, please see the guidance notes on the website at www.companieshouse.gov.uk or email enquiries@companieshouse.gov.uk

This form is available in an alternative format. Please visit the forms page on the website at www.companieshouse.gov.uk

This form has been provided free of charge by Companies House.

CHFP000
10/11 Version 5 0

18

# ISLAND OF NEVIS
## OFFICE OF THE REGISTRAR OF COMPANIES

### *CERTIFICATE OF INCORPORATION*

**I HEREBY CERTIFY that**

## *BELINDA CAPITAL LTD*

is duly incorporated and has filed articles of incorporation under the provisions of the Nevis Business Corporation Ordinance 1984, as amended, on

### *1st February, 2010*

Given under my Hand & Seal at Charlestown
This *1st* day of *February, 2010*

_____
**Registrar of Companies**

RfybUUKK

No. C 36776

# ISLAND OF NEVIS
## OFFICE OF THE REGISTRAR OF COMPANIES

### *CERTIFICATE OF INCORPORATION*

I HEREBY CERTIFY that

## *LAWSON TRADING LTD.*

is duly incorporated and has filed articles of incorporation under the provisions of the Nevis Business Corporation Ordinance 1984, as amended, on

### *10th November, 2000*

Given under my Hand & Seal at Charlestown
This *26th day of May, 2009*

_____
Registrar of Companies

ZaWItepV                No.  C 18702




**TERRITORY OF THE BRITISH VIRGIN ISLANDS**

**THE INTERNATIONAL BUSINESS COMPANIES ACT**
**(CAP. 291)**

**CERTIFICATE OF INCORPORATION**          **(SECTIONS 14 AND 15)**

No. 624564

*The  Registrar of Companies  of the British Virgin Islands* HEREBY CERTIFIES

*pursuant to the International Business Companies Act, Cap. 291 that all*

*the requirements of the Act in respect of incorporation having been satisfied,*

**DELAILA INVESTMENT LTD**

is incorporated in the British Virgin Islands as an International Business

Company this 15th day of November, 2004.



Given under my hand and seal at

Road Town, in the Territory of the

British Virgin Islands



CRTI001E                    REGISTRAR OF COMPANIES




Certificate No. __3__  For __25 %__ Interest
Issued to __CALDERO TRADING LIMITED__

Dated _____ February 11, 2005 _____

Company Name:
   ROYCHAMP TRADING LLC

Signed By:

Authorised Signatory

---

## CERTIFICATE OF OWNERSHIP
## Roychamp Trading LLC

CERTIFICATE No. ___3___              PERCENTAGE HOLDING __25 %__

Formed under the laws
of the State of Arkansas

This is to certify that _Caldero Trading Limited___ of _Fortuna Court Block B, 2nd Floor, P.C. 3105, Limassol, Cyprus_ is the owner of 25 % equity interest of **ROYCHAMP TRADING LLC**, an Arkansas Limited Liability Company. This Certificate or the interest it represents, may not be sold, transferred, assigned or otherwise disposed of or encumbered in any manner whatsoever except in compliance with all applicable securities laws. The Interests are also subject to certain restrictions on their transfer under the Companies Operating Agreement . The Company Interest is transferable only on the books of the Company.

In witness whereof, the Company has caused this Certificate to be signed by an Authorised person on February 11, 2005.

_____            **ORLANDO BARRIA FRAGO**

22

ROYCHAMP TRADING LLC
CERTIFICATE OF STATUS

I HEREBY CERTIFY to the best of my knowledge and belief and according to my records that
ROYCHAMP TRADING LLC was organized in Arkansas on the 15th day of January, 2004 with
official number 800025276.

I FURTHER CERTIFY to the best of my knowledge and belief and according to my records:

    **(a)**    **Operating Manager**
             **President/Secretary/Treasurer:**

| | |
|---|---|
| Name: | Angelika Iris Moosleithner |
| Citizenship: | Liechtenstein |
| Date of Birth: | July 12, 1957 |
| Appointed on: | March 10, 2006 |

    **(b)**    **Members:**

           **(1)**  CALDERO TRADING LIMITED
                Owning 25% of the interest in the capital of the Company
                Certificate of Ownership No. 3 issued on February 11, 2005

           **(2)**  PROKURATIONS-ANSTALT
                Owning 75% of the interest in the capital of the Company
                Certificate of Ownership No. 7 issued on March 24, 2006

    **(c)**    **Registered Office:**    500 Main Street, Suite A
                                        North Little Rock, AR 72114

    **(d)**    The Manager of the limited liability company is empowered to authorize
          third persons to execute business for and on behalf of this limited liability
          company.

Given the 31st day of July, 2012

_____
Angelika Moosleithner-Batliner
Operating Manager

Die Echtheit der Unterschrift der
Frau Angelika MOOSLEITHNER-BATLINER
FL-9490 Vaduz,
wird amtlich bestätigt.

_____
Beatrix Walser
Urkundsperson

3 1. Juli 2012

23

## APOSTILLE

(Convention de La Haye du 5 octobre 1961)

1. Land: Fürstentum Liechtenstein

   Diese öffentliche Urkunde

2. ist unterschrieben von Frau Beatrix Walser

3. in ihrer Eigenschaft als Beglaubigungsperson

4. sie ist versehen mit dem Siegel/Stempel der
   Fürstl. Liecht. Landgerichtskanzlei

Bestätigt

5. in 9490 Vaduz     6. am .......... 3 1. Juli 2012

7. durch Regierungskanzlei Vaduz

8. unter Nr. 12.08032-

9. Siegel/Stempel          10. Unterschrift

C. Sc.

Christoph Scherzer
Verwaltungs-Angestellter

24




**TERRITORY OF THE BRITISH VIRGIN ISLANDS**

**THE INTERNATIONAL BUSINESS COMPANIES ACT**
**(CAP. 291)**

**CERTIFICATE OF INCORPORATION     (SECTIONS 14 AND 15)**

No. 643275

*The  Registrar of Corporate Affairs  of the British Virgin Islands* **HEREBY CERTIFIES**
*pursuant to the International Business Companies Act, Cap. 291 that all*
*the requirements of the Act in respect of incorporation having been satisfied,*

CENTELUX, INC.

is incorporated in the British Virgin Islands as an International Business
Company this 22nd day of February, 2005.



Given under my hand and seal at

Road Town, in the Territory of the

British Virgin Islands



CRTI001X          REGISTRAR OF CORPORATE AFFAIRS




# ISLAND OF NEVIS
## OFFICE OF THE REGISTRAR OF COMPANIES

### *CERTIFICATE OF INCORPORATION*

**I HEREBY CERTIFY that**

## *ADELAIDE ENTERPRISES INC.*

**is duly incorporated and has filed articles of incorporation under the provisions of the Nevis Business Corporation Ordinance 1984, as amended, on**

### *10th November, 2000*

**Given under my Hand & Seal at Charlestown**
**This *10th* day of *November, 2000***

_____
**Registrar of Companies**

**IBC1M0**                                    No.  C  18699




## TERRITORY OF THE BRITISH VIRGIN ISLANDS

## THE INTERNATIONAL BUSINESS COMPANIES ACT
### (CAP. 291)

### CERTIFICATE OF INCORPORATION        (SECTIONS 14 AND 15)

No. 546281

*The  Registrar of Companies  of the British Virgin Islands* HEREBY CERTIFIES

*pursuant to the International Business Companies Act, Cap. 291 that all*

*the requirements of the Act in respect of incorporation having been satisfied,*

### TROCKLEY INVESTMENTS, LTD.

is incorporated in the British Virgin Islands as an International Business

Company this 27th day of May, 2003.



Given under my hand and seal at

Road Town, in the Territory of the

British Virgin Islands



REGISTRAR OF COMPANIES

CRTI001S




 **UBS**

UBS AG
P.O. Box. 8098 Zurich
Tel. +41-1-238 11 11

CD Eastern Europe

Dr. Ekaterina Kantardjieva
Paradeplatz 6
8098 Zürich
Tel. +41-1-237'65'01
Fax +41-1-237'41'16
ekaterina.kantardjieva@ubs.c
om

www.ubs.com

To whom it may concern

July 26th, 2002
Your ref:
Our ref: ASU6-KAF

Dear Sirs,

We herewith confirm that the beneficial owner of our client

**BEPPLER & JACOBSON LTD.**

has maintained with us an account relationship since 27.02.1996. The assets of the beneficial owner of Beppler & Jacobson Ltd. with our institution exceed the amount of EUR 25'000'000.

Our business relationship has always been satisfactory and nothing unfavourable about the client has come to our attention.

This confirmation is purely informative.

Yours sincerely,

UBS AG
TALSTRAS.   65
CH-8098 ZURICH

UBS AG

I. Eschmann                         E. Kantardjieva
Director                           Associate Director

28

PODACI O DRUŠTVU

**Nazad na pretragu**

Osnovni podaci    Lica u društvu    Finansijski izvještaji    Pregled upload-ovanih dokumenata

<u>Ovlašćeni zastupnik</u>
Ime :                          SVETLANA
Prezime :                      LAZURENKO
Broj pasoša :                  62NO4253055
Odgovornost :                  POJEDINAČNO

<u>Izvršni direktor</u>
Ime :                          SVETLANA
Prezime :                      LAZURENKO
Broj pasoša :                  62NO4253055

<u>Osnivač</u>
Ime :                          ADELAIDE ENTERPRISES INC. - OSTRVO NEVIS
JMBG :                         - 18699
Broj pasoša :                  - 18699

Developed by Montora software
www.montora.com

29

Case 4:12-cv-00512-KGB   Document 2   Filed 08/15/12   Page 88 of 197

PODACI O DRUŠTVU

| | Nazad na pretragu |

**Osnovni podaci   Lica u društvu   Finansijski izvještaji   Pregled upload-ovanih dokumenata**

<u>Ovlašćeni zastupnik</u>
Ime :                        SVETLANA
Prezime :                    LAZURENKO
Broj pasoša :                51 NO903691
Odgovornost :                POJEDINAČNO

<u>Izvršni direktor</u>
Ime :                        SVETLANA
Prezime :                    LAZURENKO
Broj pasoša :                51 NO903691

<u>Osnivač</u>
Ime :                        TROCKLEY INVESTMENT .LTD
JMBG :                       · 546281
Broj pasoša :                · 546281
Udio u društvu :             100 %

3680

No.        of 2012

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

COMPANIES COURT

IN THE MATTER OF BEPPLER & JACOBSON LIMITED
AND IN THE MATTER OF THE COMPANIES ACT 2006
AND IN THE MATTER OF THE INSOLVENCY ACT 1986

BETWEEN:



### CALDERO TRADING LIMITED

**Petitioner**

-and-

### (1) BEPPLER & JACOBSON LIMITED
### (2) BEPPLER & JACOBSON MONTENEGRO D.O.O.
### (3) LEIBSON CORPORATION LIMITED
### (4) BELINDA CAPITAL LIMITED
### (5) IGOR LAZURENKO
### (6) MARCEL TELSER

**Respondents**

---

### PETITION

---

**Parties**

*Beppler & Jacobson Limited*

1.  Beppler & Jacobson Limited ('BJUK') was incorporated on 7 November 2001 under the Companies Act 1985.

2.   The registered office of BJUK is at 48 Queen Anne Street, London, W1G 9JJ and its registered number is 04318805.

3.  The authorised capital of BJUK is £350,000 divided into 350,000 ordinary shares of £1 each. The amount of such capital paid up or credited as paid up is recorded as £262,499, although this may be in doubt.

270507.1

31

4. The principal objects for which BJUK was established are to carry on business as a general commercial company and other objects more particularly set out in the Memorandum of Association of BJUK.

5. The company is not an insurance undertaking, a credit institution, or investment undertaking providing services involving the holding of funds or securities for third parties; or a collective investment undertaking as referred to in Article 1.2 of the EC Regulation.

6. For the reasons stated in the evidence accompanying this petition filed in support hereof it is considered that the EC Regulation will apply and that these proceedings will be main proceedings as defined in Article 3 EC Regulation.

*The Petitioner*

7. The Petitioner, Caldero Trading Limited ('Caldero') is the holder of 87,501 shares in the capital of BJUK and has been so registered for in excess of six months preceding the date of presentation of this petition. 87,501 shares equates to an interest of 25% plus one share of the authorised capital of BJUK.

8. Caldero is a company registered in Cyprus, whose registered address is Arch. Makariou III, 284, Fortuna Court Block, 2nd floor, PC 3105 Limassol, Cyprus. All of the shares in Caldero are owned by Mr Zoran Becirovic ('Mr Becirovic'), a Montenegrin businessman. References to Mr Becirovic in the below are to be taken to include a reference to the Caldero where appropriate.

*Beppler & Jacobson Montenegro d.o.o.*

9. Beppler & Jacobson Montenegro d.o.o. is a company incorporated under the laws of the Republic of Montenegro whose registered address is at Avala Hotel, Mediteranska br. 2, Budva, Montenegro.

*Leibson Corporation Limited*

10. Leibson Corporation Limited ('Leibson') is the holder of 244,999 shares in BJUK. 244,999 shares equates to an interest of 70% less one share of the authorised capital of BJUK.

270507.1270507.1

11. Leibson is a company registered in the British Virgin Islands whose registered address is at PO Box 116, Sea Meadow House, Blackburne Highway, Road Town, Tortola, British Virgin Islands.

12. Mr Becirovic believes that the ultimate beneficial owner of Leibson is Mr Igor Lazurenko ('Mr Lazurenko').

### Belinda Capital Limited

13. Belinda Capital Limited ('Belinda') is the holder of 17,500 shares in BJUK. 17,500 shares equates to an interest of 5% of the authorised capital of BJUK.

14. Belinda is a company registered in a jurisdiction which is presently unknown to Mr Becirovic and whose registered address is presently unknown to Mr Becirovic.

15. Mr Becirovic believes that the ultimate beneficial owner of Belinda is Mr Lazurenko.

### Mr Lazurenko

16. Mr Igor Lazurenko is a Russian individual and has, at all material times been an employee of TNK (a large Russian oil company) and, then, TNK-BP (a large Anglo-Russian oil company).

### Mr Telser

17. Mr Marcel Telser is and was at all material times since 15/10/10 a director of BJUK.

### History

18. Mr Becirovic is a Montenegrin businessman.

### Mr Becirovic and Mr Lazurenko's agreement as to a joint business venture (late 2001 to early 2002)

19. In late 2001, Mr Becirovic was introduced to Mr Lazurenko. At the time, Mr Becirovic had business interests in Russia and spent a lot of time in Russia. Mr Lazurenko was introduced to Mr Becirovic as someone who was interested in investing in Montenegro.

20. In or around spring 2002, Mr Lazurenko and Mr Becirovic agreed to join efforts in relation to a business project in Montenegro. Mr Becirovic became aware of a business opportunity relating to the privatization of a prestigious seaside state-owned hotel, the Hotel Avala Resort and Villas in Budva, Montenegro ('Avala').

21. Mr Becirovic and Mr Lazurenko discussed the possibility of participating in this tender. Mr Lazurenko told Mr Becirovic that he had the backing of Mr German Khan, a well-known Russian businessman and an owner of TNK, a large Russian oil company (and known as such to Mr Becirovic). At this stage, Mr Becirovic did not know that Mr Lazurenko was an employee of TNK but Mr Lazurenko told him this shortly thereafter. Mr Lazurenko told Mr Becirovic that Mr Khan would provide the financing for the project. Mr Lazurenko told Mr Becirovic that he would act as Mr Khan's representative in providing the finance for the project. In turn he would obtain for himself a 10% interest in the project.

22. Mr Lazurenko and Mr Becirovic agreed that Mr Becirovic would have a clear 20% interest in the project (this being an interest in capital and profit, and not subject to repayment of the investment made by Mr Khan). Mr Becirovic understood that subject to Mr Lazurenko's own interest of 10%, the remaining interest in the project was Mr Khan's. It was agreed that all business and other substantive decisions concerning the joint venture would be taken by consensus between Mr Lazurenko and Mr Becirovic.

### BJUK as a vehicle for the joint business venture

23. It was agreed to use BJUK as a corporate vehicle for the venture, an already incorporated company which Mr Lazurenko provided for this use.

24. On 3/4/02, the authorised share capital of BJUK was increased to 350,000 from 1,000. Mr Becirovic was allotted 70,000 shares (equating to a 20% interest). Leibson had transferred to it 2 shares and was allotted 279,998 shares (equating to an 80% interest).

25. The director of BJUK was and continued to be Sarah Petre-Mears and the secretary was and continued to be Edward Petre-Mears. They, however, acted as nominees and acted on the directions of Mr Lazurenko, who was a *de facto* director or a shadow director of BJUK.

26. On 31/5/02, at Mr Becirovic's request, a shareholders' resolution of BJUK was passed, stating that "*increasing of the share capital cannot be done without written approval of the existing*

270507.1270507.1

34

*shareholders*" executed by Leibson, as the 80% shareholder of BJUK (with Mr Lazurenko signing on Leibson's behalf). This was registered with Companies House on 13/6/02.

### Acquisition by BJUK of Avala (June 2002 to 16/1/04)

27. On 19/6/02, BJUK filed tender documentation for the acquisition of Avala (Mr Becirovic having arranged for the preparation of tender and having attended numerous meetings in relation thereto). BJUK's tender was awarded second place (4 or 5 other companies having submitted tenders). The winner of the tender failed to formalise the contract and provide the required deposit. BJUK should have automatically been entitled to the contract, but the Privatization Council declared the tender invalid.

28. By proceedings issued 18/10/02, BJUK successfully challenged the decision of the Privatization Council by legal proceedings. The final decision of the Supreme Court of Montenegro was made on 3/4/03 and handed down in May 2003. There followed over 8 months over further negotiations in relation to the text of the Purchase and Investment Agreement which was finally signed on 16/1/04. In accordance with the arrangements between Mr Becirovic and Mr Lazurenko, the major part of managing the conduct of the litigation and the subsequent negotiations was undertaken by Mr Becirovic. The purchase price of Avala was EUR 3,200,000 which was paid by BJUK. In addition, BJUK paid a further EUR 9,032,000 in relation to a performance bond for the refurbishment of Avala.

### Acquisition of Bianca (14/10/03)

29. In the meantime on 14/10/03, BJUK completed the purchase of another hotel, the Bjelasica Hotel in Kolasin, now the Bianca Resort and Spa ('Bianca'). Again, the opportunity and the acquisition were attributable in major part to the efforts of Mr Becirovic. The purchase price was EUR 1,560,000 which was paid by BJUK.

### Incorporation of BJM (14/10/03)

30. On 14/10/03, a Montenegrin company, Beppler & Jacobson Montenegro d.o.o. ('BJM') was incorporated in order to operate both Avala and Bianca (which could not be operated by a UK company due to restrictions under Montenegrin law). BJM was incorporated as a wholly-owned subsidiary of BJUK. BJUK remained, at Mr Lazurenko's insistence, the registered owner Avala and Bianca (both as to the land and the buildings) until, pursuant to a resolution

270507.1270507.1

of BJUK dated 26/12/05, title to the buildings was transferred to BJM (with title to the land remaining with BJUK).

31. BJM had a single director and authorized signatory from its incorporation until 23/11/07 who was accustomed to act on the joint directions of Mr Lazurenko and Mr Becirovic (occasionally, in relation to minor decisions, on the direction of either of them). On 23/11/07, in order to formalize the requirement for decisions to be made by consensus, Mr Lazurenko and Mr Becirovic agreed that BJM's articles were changed such that BJM had two authorized signatories (a Finance Director nominated by Mr Lazurenko and an Executive Director nominated by Mr Becirovic), each of whose signatures were required in relation to documents to be executed by BJM. This arrangement continued until 3/8/11 and was a key element in giving effect to the overriding agreement between Mr Becirovic and Mr Lazurenko whereby business decisions would be taken by consensus between them. The changes which were made on 3/8/11 are described in the below.

### Shareholders' Agreement (in around September 2004)

32. In and before September 2004, or thereabouts, Mr Becirovic and Mr Lazurenko discussed a draft shareholders' agreement, which would have required the consent of all shareholders to certain matters including any change in the share capital and any payment of dividends. Mr Becirovic does not recall whether he signed any such agreement, but believes it is possible that he did sign such an agreement and Mr Lazurenko took the agreement for signing by Leibson and BJUK.

### Increase in Mr. Becirovic's shareholding in BJUK from 20% to 25% plus 1 (4/10/04)

33. During the course of the litigation in relation to Avala and thereafter, Mr Becirovic pressed Mr Lazurenko for an increased share in the business venture (and, therefore in BJUK) given that the burden on Mr Becirovic was greater than had been anticipated, particularly given the litigation. Mr Becirovic sought an interest sufficient to give him a blocking right in relation to major decisions of BJUK, namely an interest of 25% plus 1 share in BJUK. Mr Lazurenko told Mr Becirovic that he would have to discuss this with Mr Khan, but he eventually agreed to this. Accordingly, a transfer of shares representing 5% plus 1 share from Leibson to Mr Becirovic was registered on 4/10/04.

### *The progress of the joint business (2003 to 2011)*

34. Mr Becirovic focussed his efforts on the operational aspects of Avala and Bianca, in particular, arranging the construction and refurbishment and generally managing the project. Refurbishment of Bianca was completed in July 2004 and the hotel re-opened on 13/7/04. The refurbishment of Avala commenced in 2005 but was not completed until June 2011, but Avala remained open during the course of the refurbishment.

35. Mr Becirovic and Mr Lazurenko agreed to purchase other land plots in Montenegro pursuant to the same arrangement. From 2005 onwards, plots purchased through the use of offshore companies: Roychamp Trading LLC ('Roychamp') (incorporated in Arkansas), Delaila Investment Ltd ('Delaila') (incorporated in the British Virgin Islands) and Centelux Inc. ('Centelux') (incorporated in the British Virgin Islands).

### *Financing of joint business by BJUK (2003 to 2011)*

36. Mr Lazurenko provided the financing for the project. Mr Lazurenko arranged that BJUK advanced no less than EUR 46,375,427.47 to BJM (in addition to the sums mentioned above in relation to the acquisition costs and the performance bond). These sums were advanced by BJUK to BJM pursuant to (or purportedly pursuant to) revolving credit facilities between BJUK and BJM. These sums were characterised as loans by BJUK to BJM (and are reflected as such in the accounts of BJM but were not reflected as such in the accounts of BJUK).

### *Mr Becirovic's realisation of Mr Lazurenko's deception*

37. During the course of the business venture, Mr Becirovic came to suspect that Mr Lazurenko had deceived him in relation to the source of the funding for the project. By way of summary, up until 2008, Mr Becirovic had vague but increasing suspicions that perhaps the financing of the Montenegro business did not come from Mr Khan. By 2008, the suspicions were such that Mr Becirovic was clear in his mind that the money was not coming from Mr Khan although he had no proof of this.

### *A temporary falling-out between Mr Becirovic and Mr Lazurenko (August 2010)*

38. In and around August 2010, Mr Becirovic and Mr Lazurenko had a falling out in relation to an order of beach loungers. Mr Becirovic had placed an order for beach loungers which combined an order for a beach which was part of Avala and another beach which Mr

Becirovic himself owned. Mr Lazurenko wrongly accused Mr Becirovic of stealing some of the beach loungers. Not only was the accusation unfounded but the value of the beach loungers was tiny in comparison with the value of the joint business. Moreover, Mr Becirovic was incensed that Mr Lazurenko should accuse him of dishonesty when Mr Becirovic was clear in his mind that Mr Lazurenko had deceived Mr Becirovic as to the source of the funds for the joint business and Mr Becirovic believed that Mr Lazurenko had misappropriated these funds. Accordingly, by emails dated 3/8/10, Mr Becirovic indicated to Mr Lazurenko that he would arrange a meeting with Mr Khan.

39. Following this email and a partially conciliatory reply from Mr Lazurenko on 3/8/10, communications between Mr Lazurenko and Mr Becirovic more or less stopped for a period of approximately 2 months.

### Transfer of 5% interest in BJUK from Leibson to Belinda (1/10/10)

40. In the meantime, Mr Lazurenko, without consulting or informing Mr Becirovic, arranged for the transfer on 1/10/10 of 5% of the shares in BJUK from Leibson to Belinda. Mr Becirovic now infers that this was precipitated by Mr Lazurenko's fears that Mr Becirovic would approach Mr Khan: the intention apparently being to be in a position to create the impression that Mr Lazurenko's interest in BJUK was only a 5% interest, in order to create the impression that the remaining 70% less 1 share still owned by Leibson belonged to some unknown financial backer.

### Meeting 5/10/10

41. At Mr Lazurenko's suggestion, Mr Lazurenko and Mr Becirovic met in Moscow on 5/10/10 and discussed both BJUK and the three offshore companies, Roychamp, Delaila and Centelux Inc.

### Change of directors of BJUK – appointment of Mr Telser (15/10/10)

42. On 15/10/10, Mr Lazurenko, again without consulting or informing Mr Becirovic, arranged for the replacement of the director and secretary of BJUK by a new director, Mr Telser, and a new secretary, Mr Iwan Josef Ackermann. Mr Becirovic now infers that this was again precipitated by Mr Lazurenko's fears that Mr Becirovic would approach Mr Khan and/or

was a preliminary step by Mr Lazurenko to prepare for the exclusion of Mr Becirovic from the business.

### Meeting 16/11/10

43. On 16/11/10, Mr Lazurenko and Mr Becirovic again met. Mr Lazurenko informed Mr Becirovic of the transfer of 5% of Leibson's shares in BJUK to Belinda (although indicating that he did not feel that he was obliged to). Mr. Lazurenko said that this transfer reflected his entitlement under his agreement with Mr. Khan, although it was only a 5% interest and not the 10% he had initially mentioned.

44. Mr Lazurenko and Mr Becirovic also discussed entering into a shareholders' agreement to confirm the existing principles of the relationship, namely that Mr Becirovic had carried out all the work and Mr Lazurenko had provided all of the financing, and that all decisions relating to the business were made by consensus. It was also intended that the agreement would also set out the proportions in which the business should be split: 75% minus 1 share to Mr Lazurenko and 25% plus 1 share by me, and, as before, without Mr Lazurenko's financial injections being repaid first. A draft of such an agreement was prepared shortly after the meeting but was not executed.

45. Mr Lazurenko did not inform Mr Becirovic of the change in the directors of BJUK which had been effected on 15/10/10.

### Purported cancellation of shareholders' resolution 31/5/02 (registered 27/11/10)

46. Shortly before 27/11/10, Mr Lazurenko arranged for a purported shareholders' resolution of BJUK signed by him on behalf of Leibson purportedly dated 1/6/02 to be filed at Companies House (marked received by Companies House on 27/11/10). This purported resolution of BJUK purported to cancel the resolution dated 31/5/02 preventing dilution of share capital. Mr Becirovic believes that this purported shareholders' resolution came into existence only in or around November 2010 and that Mr Lazurenko created this as a preliminary step by Mr Lazurenko to prepare for the exclusion of Mr Becirovic from the business.

### *Exclusion of Mr Becirovic from the joint business by alteration of articles of BJM (registered 3/8/11)*

47. On 3/8/11, a change to BJM's articles of association was registered at the Central Register of the Commercial Court in Podorica. The effect of the change was to appoint a third director and authorised signatory of BJM, with the power to execute documents and make bank payments (among other things). remaining as only requiring two authorised signatures. A third director and authorised signatory was appointed, Mr Golikov, to the post of Administrative Director. These changes were effected by BJUK acting through Mr Telser at, Mr Becirovic infers, Mr Lazurenko's instigation without the knowledge or approval of Mr Becirovic.

48. Mr Kopyltsev, the head of BJUK Montenegrin branch, wrote to Mr Becirovic on 18/8/11 informing him of the changes after the event.

49. After these changes, two of the authorised signatories were, in effect, appointees of Mr Lazurenko and accustomed to act on his instructions. Mr Becirovic was, at the time, the third authorised signatory. Thus, the executive power of BJM became exercisable by Mr Lazurenko's appointees together (without requiring Mr Becirovic's consent) but not by Mr Becirovic. This practical effect was to put BJM entirely under the control of Mr Lazurenko (and/or the finance director and administrative director of BJM) and out of the control of Mr Becirovic.

### *Letter 18/8/11 from Mr Kopyltsov (BJM) to Mr Becirovic*

50. By letter dated 18/8/11, Mr Kopyltsov informed Mr Becirovic of the alteration of the articles of BJM by enclosing (i) a letter dated 16/8/11 from Mr Telser referring to the change in the articles; and (ii) a copy of the amended articles.

### *Mr Lazurenko's exit (or purported exit) from the affairs of BJUK and BJM (August 2011)*

51. On 17/8/11, Mr Lazurenko wrote by email to Mr Becirovic in the following terms:

*'I would like to inform you that, in accordance to new shareholders' decision, I will not more be involved in operational management of the projects related to Montenegro. All further management will be built on the base of bylaws of relevant mother and daughter companies through their directors. Thank you for good collaboration.'*

52. On 1/9/11, Mr Becirovic wrote to Mr Lazurenko asking, among other things, for contact details of the directors of BJUK. Mr Lazurenko replied on 2/9/11 giving contact details of Roychamp, Delaila and Centelux but not BJUK.

### Mr Becirovic's communications with TNK-BP (October 2011 and following)

53. From October 2011 onwards, Mr Becirovic has had discussions with TNK-BP and has discussed the matter with Mr Khan. These discussions appeared to confirm that Mr Lazurenko had deceived Mr Becirovic as to the source of the funds: that is, Mr Lazurenko had been acting as Mr Khan's agent in providing the funds, but rather the likelihood was that Mr Lazurenko had misappropriated funds from TNK-BP in some manner.

### Communications with Mr Telser and Shareholders Meeting of BJUK on 8/3/12

54. On 30/8/11, Caldero requested, through its lawyer, that Mr Telser call a general meeting of BJUK. By letter dated 15/1/11, Caldero repeated its request setting out a number of proposed agenda items, including resolutions for the removal of Mr Telser. A meeting was eventually called and notice was given by Mr Telser on 8/2/12 of a meeting to be held on 8/3/12. In that letter, an agenda was set out which included items proposed by Leibson, including, items relating to the approval of draft accounts for BJUK for the years ending 30/11/09 and 30/11/10 (to which further reference is made below). Those resolutions were passed with Leibson (acting through a representative whose identity is unknown to Mr Becirovic) and Belinda (acting through Mr Lazurenko) voting in favour, and Caldero voting against.

55. Following the meeting, there was discussion between Mr Becirovic and Mr Lazurenko in relation to executing a shareholders' agreement as discussed at the meeting 16/11/10 (see paragraphs 43 to 44 above). Mr Lazurenko and the Leibson representative took away a copy of the shareholders' agreement, Mr Lazurenko indicating that a further shareholders' meeting should be convened in relation to thereto.

56. On 14/3/12, Caldero wrote twice to BJUK (i) requiring BJUK to call a further general meeting to enter into the shareholders' agreement; and (ii) requesting copies of the minutes of the meeting 8/3/12 and referring again to its disapproval of the accounts for the years ending 30/11/09 and 30/11/10, as further detailed below.

*Divestment from BJUK of its interest in BJM and/or the hotel land plots (or an attempt at this)*

57. At some date which is unknown to Mr Becirovic, Mr Lazurenko and Mr Telser have sought to divest BJUK of its interest in BJM and/or the hotel land plots (or to attempt to do this or to create the misleading impression that BJUK has no interest in BJM and/or the hotel land plots).

58. In particular, while the filed accounts for BJUK for the years up to including the year ending 30/11/08 showed BJM as a subsidiary of BJUK and appeared to reflect BJUK's interest in BJM by an entry in the balance sheet in the sum of £1,732,616. However, the filed accounts for BJUK on 30/11/09 show a nil balance in the balance sheet and do not reflect BJUK's ownership of BJM or the land plots. A note to the accounts reads '*[BJUK] kept the investments as an Agent for the Principal based on the agency agreement dd 03 03 2003 with Lawson Trading Ltd. The investments were transferred to the Principal.*'. Caldero knows of no such agency agreement nor does it know of any entity Lawson Trading Ltd. Any such alleged agreement is incompatible with the agreement between Mr Lazurenko and Mr Becirovic.

59. The filed accounts for BJUK for the year ending 30/11/10 also show a nil balance on the balance sheet and do not reflect BJUK's ownership of BJM or the land plots.

**Quasi-Partnership – relationship of trust and confidence**

60. BJUK has at all material times since 3 April 2002 been founded upon the basis of a personal relationship of trust and confidence between Mr Lazurenko and Mr Becirovic and there existed at all material times an agreement or understanding ('the Fundamental Understanding') between them to the following effect, namely:

    60.1.    That decisions affecting their joint business would be reached by consensus; and

    60.2.    That they would keep each other informed as to matters affecting their joint business; and

    60.3.    That they would deal with each other in good faith.

61. The Fundamental Understanding is evidenced by, among other things:

61.1.     the circumstances in which Mr Lazurenko and Mr Becirovic came to be involved in BJUK and the joint business;

61.2.     the efforts of Mr Becirovic in relation to the joint business;

61.3.     the above-mentioned allocation of shares;

61.4.     the terms of the shareholders' agreement and/or the draft shareholders' agreement or agreements;

61.5.     the fact that decisions affecting the joint business were in fact undertaken by Mr Lazurenko and Mr Becirovic by consensus (subject to what is said elsewhere in this Petition); and

61.6.     numerous communications evidencing the requirement of consensus between Mr Lazurenko and Mr Becorvic in relation to decisions affecting the joint business;

61.7.     the executive structure of BJM: in particular, that while there was a single director and signatory of BJM, that director and signatory would act on the joint instructions of Mr Lazurenko and Mr Becirovic; and that, subsequently, the articles required the joint signatures of an appointee of Mr Lazurenko and an appointee of Mr Becirovic; and

61.8.     the fact that Mr Lazurenko and Mr Becirovic referred to themselves together as 'Head Office' (or 'HO') in their dealings with others (in particular, officers and employees of BJM).

**Directors' Duties**

*Mr Telser*

62. Mr Telser owed the following duties as a director of BJUK for the period 15/10/10 to the present date:

62.1.     To exercise his powers in accordance with the constitution of BJUK and within the authority conferred on him under that constitution (as provided by s. 171(1) Companies Act 2006 ('CA 2006');

62.2.     To promote the success of BJUK (as provided by s. 172 CA 2006);

62.3.     To act with reasonable skill and care (as provided by s. 174 CA 2006);

62.4.     To exercise his powers for proper purposes (as provided by s. 171(2) CA 2006);

62.5.     To avoid a situation where he has, or can have, a direct or indirect interest that conflicts, or possibly may conflict, with the interests of TLC (section 174 CA 2006);

62.6.     Not to use for his personal benefit any asset or business opportunity belonging to TLC (section 174 CA 2006); and

62.7.     To exercise his own independent judgment (as provided by s. 173 CA 2006).

### *Mr Lazurenko*

63. Mr Lazurenko owed the same duties as a *de facto* director of BJUK for the period 3/4/02 to the present date. Alternatively, he owed the same duties as a shadow director for the period of 3/4/02 or by reason of being a person who was in a fiduciary position in relation to the company.

### Breakdown in relationship of trust and confidence

64. By reason of the matters stated above, the relationship of trust and confidence between Mr Becirovic and Mr Lazurenko (and correspondingly between Caldero, on the one hand, and Leibson and Belinda, on the other hand) has broken down. In particular:

64.1.     Mr Lazurenko deceived Mr Becirovic as to the source of the funds invested in BJUK;

64.2.     Mr Lazurenko has divested or attempted to divest BJUK of the entirety of its interest in the joint business (or sought to give the appearance that this has taken place);

64.3.     Mr Lazurenko has taken steps to exclude Mr Becirovic from participating in the joint business, which steps have been effective to do so;

64.4.     Mr Lazurenko has refused to abide by the agreement that decisions in relation to the joint business be undertaken by consensus;

64.5.     Mr Lazurenko has purported to exit from the joint business.

**Breach of the fundamental understanding**

65. By reason of the same matters and in the premises, Mr Lazurenko has breached the Fundamental Understanding.

**Breach of duty**

66. In breach of their duties as directors of BJUK (whether *de iure, de facto* or shadow) Mr Lazurenko and Mr Telser have procured or permitted the apparent divestment from BJUK of its interest in BJM and/or land plots in Montenegro.

<u>PARTICULARS OF BREACH OF DUTY</u>

1        At all material times from 14/10/03 until the events described below, BJUK owned the entirety of the issued share capital of Beppler & Jacobson Montenegro d.o.o. ('BJM'). BJM in turn owned two hotels in Montenegro, the Hotel Avala ('Avala') and the Hotel Bianca ('Bianca'). BJUK additionally owned the plots of land on which Avala and Bianca were situate. Further, BJUK advanced monies totalling no less than EUR 46,375,427.47 of which no less than EUR 44,328,701.47 has not been repaid by BJM.

2        In breach of their duties, Mr Telser and/or Mr Lazurenko have at some date which is unknown to Caldero procured that BJUK has divested itself of its interest in BJM and/or the land plots. In particular, while the filed accounts for BJUK for the years up to including the year ending 30/11/08 showed BJM as a subsidiary of BJUK and appeared to reflect BJUK's interest in BJM by an entry in the balance sheet in the sum of £1,732,616, the filed accounts for BJUK on 30/11/09 show a nil balance in the balance sheet. A note to the accounts reads '*[BJUK] kept the investments as an Agent for the Principal based on the agency agreement dd 03 03 2003 with Lawson Trading Ltd. The*

*investments were transferred to the Principal.'*. Caldero knows of no such agency agreement nor does it know of any entity Lawson Trading Ltd.

3      Further and in the alternative, Mr Telser and Mr Lazurenko are liable to account for all profits made or benefits received by reason of the above-mentioned breach of duty. Further and in the alternative, BJUK has suffered loss and damage and Mr Telser and Mr Lazurenko is liable to compensate BJUK for the same. Further and in the alternative, Mr Telser and Mr Lazurenko are liable to account to BJUK as constructive trustees.

**Conclusions**

67. In the premises, it is just and equitable that BJUK be wound up. Further, Caldero applies for the appointment of a provisional liquidator.

68. In the alternative, in the premises, the affairs of BJUK are being or have been conducted in a manner which is unfairly prejudicial to the interests of the members generally or some part of its members (including the Petitioner) and/or the facts and matters set out hereinabove are so prejudicial.

69. In a winding-up of BJUK there would be a substantial surplus for contributories.

70. Interest is claimed on all monies found due or owing, in equity, alternatively pursuant to section 35A of the Supreme Court Act 1981.

THE PETITIONER THEREFORE PRAYS AS FOLLOWS:

(1)      That the First Respondent be wound up by the Court pursuant to the provisions of the Insolvency Act 1986.

270507.1270507.1

(2)     The appointment of a provisional liquidator in relation to the First Respondent pending the order for the winding-up of the First Respondent.

(3)     Alternatively, that the Third  Fourth and Fifth Respondents do purchase the Petitioner's shares in the First Respondent as a result of the matters of unfair prejudice pleaded herein and with interest.

(4)     Alternatively, that the Third Fourth and Fifth Respondents do purchase the Petitioner's shares in the First Respondent at a fair value to be determined by this court or an independent valuer with no discount for a minority shareholder, with a premium to reflect the loss suffered by the First Respondent as a result of the matters of unfair prejudice pleaded herein, and with interest.

(5)     Alternatively, that the Third Fourth and Fifth Respondents do sell their shares in BJUK to the Petitioner at a fair value to be determined by this Court with a discount to reflect the loss suffered by BJUK as a result of the matters of unfair prejudice pleaded herein.

(6)     If required, permission to bring the derivative action particularised above, claiming on behalf of the First Respondent against the Third, Fifth and Sixth Respondents, among other things: (i) an account of profits and (ii) damages and/or equitable compensation

(7)     Such further or other orders accounts and directions as may be necessary.

(8)     An injunction restraining any dealing with or other disposal of the assets of the Second, Third, Fifth and Sixth Respondents.

(9)     Interest

(10)    Further or other relief

(11)    Costs.

ROBIN HOLLINGTON, Q. C.

ADRIAN PAY

Dated

270507.1270507.1

47

**Service**

It is intended to serve this Petition as set out below, save that the Petitioner is applying for permission to dispense with service on the Fourth Respondent:

(1)     BEPPLER & JACOBSON LIMITED at its registered office at 48 Queen Anne Street, London, W1G 9JJ

(2)     BEPPLER & JACOBSON MONTENEGRO D.O.O. at its registered office Avala Hotel, Mediteranska br. 2, Budva, Montenegro

(3)     LEIBSON CORPORATION LIMITED at its registered office at PO Box 116, Sea Meadow House, Blackburne Highway, Road Town, Tortola, British Virgin Islands.

(4)     BELINDA CAPITAL LIMITED (service is intended to be dispensed with)

(5)     MR MARCEL TELSER at 8 Am Bach, Triesen, LI-9495, Liechtenstein

(6)     MR IGOR LAZURENKO at such address and by such method as the Court orders upon the Petitioner's application

**Section 127 Insolvency Act 1986**

The Petitioner objects to an order under section 127 of the Insolvency Act 1986 in the standard form for the reasons set forth in the affidavit of Mr Becirovic dated 2 May 2012.

**Endorsement**

This petition having been presented to the court on ~~3|5|2012~~ let all parties attend before the Registrar in Chambers on:

Date            31/7/2012

Time            11.30

Place           Companies Court
                The Rolls Bulding
                7 Rolls Building
                Fetter Lane
                London
For directions to be given   EC4A 1NL

The Solicitor to the Petitioner is:

270507.1270507.1

Bryan Cave, 88 Wood Street, London EC2V 7AJ

Telephone:      020 3207 1100
Fax:            020 3207 1881
Reference:      RS4 / KU1 / A38

Robert James Dogan

Associate

No.     of 2012

**IN THE HIGH COURT OF JUSTICE**

**CHANCERY DIVISION**

**COMPANIES COURT**

**IN THE MATTER OF BEPPLER &
JACOBSON LIMITED
AND IN THE MATTER OF THE
COMPANIES ACT 2006
AND IN THE MATTER OF THE
INSOLVENCY ACT 1986**

**BETWEEN:**

**CALDERO TRADING LIMITED**
<b><u>Petitioner</u></b>

-and-

**(1) BEPPLER & JACOBSON LIMITED
(2) BEPPLER & JACOBSON
MONTENEGRO D.O.O.
(3) LEIBSON CORPORATION LIMITED
(4) BELINDA CAPITAL LIMITED
(5) IGOR LAZURENKO
(6) MARCEL TELSER**
<b><u>Respondents</u></b>

---

**PETITION**

---

Bryan Cave
88, Wood Street
London
EC2V 7AJ

Tel: 020 3207 1100
Fax: 020 3207 1881

Ref: RS4/KU1/A38

Solicitors for the Petitioner

270507.1270507.1

50

IN THE HIGH COURT OF JUSTICE                      No. 3680 of 2012

CHANCERY DIVISION

COMPANIES COURT

BEFORE HIS HONOUR JUDGE BIRSS Q.C.
(sitting as a judge of the High Court)

IN THE MATTER OF BEPPLER & JACOBSON LIMITED

AND IN THE MATTER OF THE COMPANIES ACT 2006

AND IN THE MATTER OF THE INSOLVENCY ACT 1986


BETWEEN



                    CALDERO TRADING LIMITED            Petitioner


                              and

                    (1) BEPPLER & JACOBSON LIMITED     Respondents
                      (2) BEPPLER & JACOBSON
                         MONTENEGRO D.O.O.
                      (3) LEIBSON CORPORATION
                            LIMITED
                      (4) BELINDA CAPITAL LIMITED
                      (5) MR IGOR LAZURENKO
                      (6) MR MARCEL TELSER


---

ORDER FOR APPOINTMENT OF A PROVISIONAL LIQUIDATOR
AND INTERIM INJUNCTIONS (AND OTHER RELIEF)

---


<u>PENAL NOTICE</u>

IF YOU, EACH OF <u>LEIBSON CORPORATION LIMITED</u>, <u>MR IGOR LAZURENKO</u>
AND <u>MR MARCEL TELSER</u> DISOBEY THIS ORDER YOU MAY BE HELD TO BE
IN CONTEMPT OF COURT AND YOU MAY BE FINED, HAVE YOUR ASSETS
SEIZED, AND/OR BE IMPRISONED.


51

**ANY OTHER PERSON WHO KNOWS OF THIS ORDER AND DOES ANYTHING WHICH HELPS OR PERMITS ANY OF <u>LEIBSON CORPORATION LIMITED</u>, <u>MR IGOR LAZURENKO</u> AND <u>MR MARCEL TELSER</u> TO BREACH THE TERMS OF THIS ORDER, MAY ALSO BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED AND/OR HAVE THEIR RESPECTIVE ASSETS SEIZED.**

## THIS ORDER

1. This is an order for:

    1.1. The appointment of joint provisional liquidators of Beppler & Jacobson Limited, the First Respondent; and

    1.2. Interim injunctive relief against, Leibson Corporation Limited, Mr Igor Lazurenko and Mr Marcel Telser (the Third, Fifth and Sixth Respondents).

    made on 3 May 2012 by His Honour Judge Birss QC on the application of Caldero Trading Limited ('the Applicant'). The Judge read the Affidavits listed in Schedule A and accepted the undertakings set out in Schedule B at the end of this Order.

2. This order was made at a hearing without notice to the Respondents. The Respondents have a right to apply to the court to vary or discharge the order – see paragraph 24 below.

3. There will be a further hearing in respect of this order on 17 May 2012 ('the return date').

4. If there is more than one Respondent –

    (a) unless otherwise stated, references in this order to 'the Respondent' mean both or all of them; and

    (b) this order is effective against any Respondent on whom it is served or who is given notice of it.

## APPOINTMENT OF PROVISIONAL LIQUIDATOR

5. The Court:

    5.1. Read the petition herein;

    5.2. Was satisfied on the evidence before it that the EC Regulation on Insolvency Proceedings (No. 1346/2000) ("the EC Regulation") applies and that the proceedings are main proceedings as defined in Article 3 of the EC Regulation

6. The following persons are appointed joint provisional liquidators of the First Respondent:

   6.1. Mr Mark Shaw, licensed insolvency practitioner, of 55 Baker Street, London W1U 7EU (telephone number 020 7486 5888; fax: 020 7487 3686); and

   6.2. Mr Malcolm Cohen, licensed insolvency practitioner, of 55 Baker Street, London W1U 7EU (telephone number 020 7486 5888; fax: 020 7487 3686).

7. The provisional liquidators' functions, duties and powers shall extend to the following:

   7.1. to locate, protect, secure, take possession of, collect and get in all property or assets (of whatever nature) to which the First Respondent is or appears to be entitled, such assets and property not to be distributed or parted with by the provisional liquidator until further order except pursuant to the functions hereby conferred;

   7.2. to locate, protect, secure, take possession of, collect and get in the books, papers and records of the First Respondent including the accounting and statutory records (in whatever form);

   7.3. to investigate the affairs of the First Respondent;

   7.4. to take such steps as they may consider necessary or expedient in order to ensure the good management and security of the assets and undertaking of the Second Respondent, including, without prejudice to the generality of the foregoing, appointing or removing the officers of the Second Respondent, and instructing lawyers, accountants and other professional persons, whether in this country or abroad;

   7.5. to do all such things as may be necessary or expedient for the protection of the First Respondent's property or assets;

   7.6. without prejudice to the generality of the foregoing, to bring or defend or proceed with any action or other legal proceedings on behalf of the First Respondent and in its name or his name as appropriate for the purpose of exercising the above functions, and if so advised to compromise such proceedings;

   7.7. to make applications to foreign courts, including the court in Montenegro, in furtherance of the above powers; and

   7.8. to do all things necessary or incidental to the foregoing functions, duties and powers.

8. Notice of this Order be given to the First Respondent forthwith and the First Respondent is at liberty to apply to discharge the appointment of the Provisional Liquidator on 48 hours' notice to the Applicant.

9. The remuneration of the joint provisional liquidators shall be payable upon application from time to time by reference to the time spent by them and their staff on the basis of their usual time costs for the type of work involved, together with any expenses incurred in acting as joint provisional liquidators.

10. The joint provisional liquidators shall be at liberty to apply to the Court to vary or discharge this order.

11. The duration of the appointment of the appointment of the joint provisional liquidators is until further order of the Court.

---

**NOTICE TO OFFICERS OF COMPANY**

You are required by Section 235 of the Insolvency Act 1986 to give the Provisional Liquidator all the information as he may reasonably require relating to the Company's property and affairs and to attend upon him at such times as he may reasonably require.

---

## INJUNCTIONS

### Injunction against the Third, Fifth and Sixth Respondents

*Hotels*

12. Until the return date or further order of the court, the Third, Fifth and Sixth Respondents must not, save with the prior consent in writing of the Petitioner's solicitors:

12.1.    in any way deal with, charge, encumber, or diminish the value of any of the following assets (whether by themselves or by causing or procuring any other person, including, in particular, the Second Respondent, to do so and must not do so through others acting on his behalf or on his instructions or with his instructions or by his employees or agents):

| Description | Land Certificate No. | Land Register Area | Lot No. |
|---|---|---|---|
| Avala | 2898 | Budva | 2434 |
| | | | 2435 |
| | | | 2468 |
| | | | 2663 |
| | | | 2664 |
| | | | 2665/2 |

54

| Bianca | 1099 | Kolasin | 278 |
| | | | 280/2 |
| | | | 280/3 |
| | | | 280/4 |
| Motel Babljak | 97 | Babljak | 250/1 |
| | | | 250/2 |
| Medjurijecje Restaurant | 272 | Medjurije cje | 2713 |
| | | | 2714/1 |
| | | | 2761 |
| Crkvine Restaurant | 103 | Zirci | 888 |
| | | | 889 |
| Land next to Bianca | 1249 | Kolasin | 280/9 |
| Motel Moraca | 315 | Osredci | 1671 |
| | | | 1672 |

(hereinafter together referred to as 'the Avala and Bianca Hotels').

12.2.    enter into any management agreement or licence agreement in respect of the Avala and Bianca Hotels or the business carried on at the Avala and Bianca Hotels (whether by themselves or by causing or procuring any other person, including, in particular the Second Respondent to do so and must not do so through others acting on his behalf or on his instructions or with his instructions or by his employees or agents).

For the avoidance of doubt, nothing in this prohibition shall prevent the Second Respondent from continuing to operate the business at the Avala and Bianca Hotels in the normal course of trading.

*Shares in the Second Respondent*

13. 'The Shares' means any and all of the shares in the Second Respondent.

14. Until the return date or further order of the court, the Third, Fifth and Sixth Respondents must not, save with the prior consent in writing of the Petitioner's solicitors:

14.1.    in any way deal with, charge, encumber, or diminish the value of any of the Shares (whether by themselves or by causing or procuring any other person and must not do so through others acting on his behalf or on his instructions or with his instructions or by his employees or agents);

14.2.    cause or procure any change in the legal or beneficial ownership of the Shares.

*Monies owed by the Second Respondent*

55

15. For the purposes of the below, 'the Debt' means the right to repayment of the advances by the First Respondent to the Second Respondent of amounts totalling EUR 46,375,429.47 over the period 3/8/03 to 31/8/11 or any part thereof.

16. Until the return date or further order of the court, the Third, Fifth and Sixth Respondents must not, save with the prior consent in writing of the Petitioner's solicitors:

    16.1.    in any way deal with, charge, encumber, or diminish the value of the Debt (whether by themselves or by causing or procuring any other person and must not do so through others acting on his behalf or on his instructions or with his instructions or by his employees or agents).

## PROVISION OF INFORMATION

17. Unless paragraph 19 applies the Third, Fifth and Sixth Respondents must each immediately and to the best of their knowledge information and ability inform the Applicant's solicitors in writing of:

    17.1.    The legal and beneficial interest in the Avala and Bianca Hotels, distinguishing between the land and the buildings on it.

    17.2.    Full particulars of any transaction or transactions whereby they believe any interest in the said hotels of the First Respondent or, as the case may be, the Second Respondent has been transferred to or acquired by another person or party (including the other Respondent) since 30 November 2008.

    17.3.    The legal and beneficial interest in the Shares;

    17.4.    Full particulars of any transaction or transactions whereby any interest in the Shares has been transferred to or acquired by another person or party (including the other Respondent) since 30 November 2008

    17.5.    The legal and beneficial interest in the Debt.

    17.6.    Full particulars of any transaction or transactions whereby any interest in the Debt has been transferred to or acquired by another person or party (including the other Respondent) since 30 November 2008.

    17.7.    Their explanation of the note to the accounts dated for the year ending 30/11/09 of the Respondent in the following terms "*[BJUK] kept the investments as an Agent for the Principal based on the agency agreement dd 03 03 2003 with Lawson Trading Ltd.  The investments were transferred to the Principal.*".

18. Unless paragraph 19 applies the Third, Fifth and Sixth Respondents must provide a copy of the purported agency agreement '*the agency agreement dd 03 03 2003 with Lawson Trading Ltd*' referred to above, together with copies of all documents

56

evidencing any transfer or acquisition of an interest which is referred to in their response under paragraph 17, if they have such in their possession or control.

19. If the provision of any of this information is likely to incriminate the Respondent, he may be entitled to refuse to provide it, but is recommended to take legal advice before refusing to provide the information. Wrongful refusal to provide the information is contempt of court and may render the Respondent liable to be imprisoned, fined or have his assets seized.

20. Within 3 working days after being served with this order, the Respondent must swear and serve on the Applicant's solicitors an affidavit setting out the above information.

**PERMISSION FOR SERVICE OUT OF THE JURISDICTION**

21. The Claimant has permission to serve out of the jurisdiction of this Court the Application Notice, Petition and this Order on:

21.1.   The Second Respondent at its registered office Avala Hotel, Mediteranska br. 2, Budva, Montenegro.

21.2.   The Third Respondent at its registered office at PO Box 116, Sea Meadow House, Blackburne Highway, Road Town, Tortola, British Virgin Islands.

21.3.   The Fifth Respondent:

(i)     by delivering it to Frunzenskaya naberezhnaya 32, apartment 37, Moscow;

(ii)    by delivering it to Korobeynikov pereulok 1, apartment 2, Moscow;

(iii)   by sending it by email ialazurenko@tnk-bp.com; laser256@yahoo.com, laser256@lycos.com, la_x@mac.com and ialazurenko@gmail.com;

(iv)    By providing a copy to the Sixth Respondent as set out below; and

(v)     By notifying him by (a) telephone or voice message and (b) SMS to telephone number +7 985 764 9405.

21.4.   The Sixth Respondent at:

(i)     by delivering it to 8 Am Bach, Triesen, LI-9495, Liechtenstein; and

(ii)    by delivering it to Aeulestrasse 74, Postfach 461, 9490 Vaduz, Furstentum, Liechtenstein;

(iii)   by delivering it to the registered office of the First Respondent at 48 Queen Anne Street, Marylebone, London W1G 9JJ;

(iv)    by sending it by email to m.telser@blueaxis.net;

(v)     by sending it by facsimile to +423 236 0405; and

57

(vi)   by notifying him by (a) telephone or voice message and (b) SMS, if possible, to telephone number +423 236 0478.

## SERVICE OF THE PETITION ON THE FOURTH RESPONDENT

22. Service of the petition on the Fourth Respondent is dispensed with.

## COSTS

23. The costs of this application are reserved to the judge hearing the application on the return date.

## VARIATION OR DISCHARGE OF THIS ORDER

24. Anyone served with or notified of this order may apply to the court at any time to vary or discharge this order (or so much of it as affects that person), but they must first inform the Applicant's solicitors. If any evidence is to be relied upon in support of the application, the substance of it must be communicated in writing to the Applicant's solicitors in advance.

## INTERPRETATION OF THIS ORDER

25. A Respondent who is an individual who is ordered not to do something must not do it himself or in any other way. He must not do it through others acting on his behalf or on his instructions or with his encouragement.

26. A Respondent which is not an individual which is ordered not to do something must not do it itself or by its directors, officers, partners, employees or agents or in any other way.

## PARTIES OTHER THAN THE APPLICANT AND RESPONDENT

### *Effect of this order*

27. It is a contempt of court for any person notified of this order knowingly to assist in or permit a breach of this order. Any person doing so may be imprisoned, fined or have their assets seized.

### *Set off by banks*

28. This injunction does not prevent any bank from exercising any right of set off it may have in respect of any facility which it gave to the respondent before it was notified of this order.

*Withdrawals by the Respondent*

29. No bank need enquire as to the application or proposed application of any money withdrawn by the Respondent if the withdrawal appears to be permitted by this order.

## PERSONS OUTSIDE ENGLAND AND WALES

30. (1) Except as provided in paragraph (2) below, the terms of this order do not affect or concern anyone outside the jurisdiction of this court.

(2) The terms of this order will affect the following persons in a country or state outside the jurisdiction of this court –

(a) the Respondent or his officer or agent appointed by power of attorney;

(b) any person who –

(i) is subject to the jurisdiction of this court;

(ii) has been given written notice of this order at his residence or place of business within the jurisdiction of this court; and

(iii) is able to prevent acts or omissions outside the jurisdiction of this court which constitute or assist in a breach of the terms of this order; and

(c) any other person, only to the extent that this order is declared enforceable by or is enforced by a court in that country or state.

## ASSETS LOCATED OUTSIDE ENGLAND AND WALES

31. Nothing in this order shall, in respect of assets located outside England and Wales, prevent any third party from complying with –

(1) what it reasonably believes to be its obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between itself and the Respondent; and

(2) any orders of the courts of that country or state, provided that reasonable notice of any application for such an order is given to the Applicant's solicitors.

## COMMUNICATIONS WITH THE COURT

All communications to the court about this order should be sent to –

5th Floor, Rolls Building, Royal Courts of Justice, 7 Rolls Building, Fetter Lane, London EC4A 1NL

The telephone number is 0207 947 6754 and the offices are open between 10 a.m. and 4.30 p.m. Monday to Friday.

**SCHEDULE A**

**AFFIDAVITS**

The Applicant relied on the following affidavits–

| | | | |
|---|---|---|---|
| Zoran Becirovic | First | 2 May 2012 | Applicant |
| Vladislav Egorov | First | 26 April 2012 | Applicant |
| Mark Shaw | First | 2 May 2012 | Applicant |
| Malcolm Cohen | First | 2 May 2012 | Applicant |
| Robert James Dougans | First | 2 May 2012 | Applicant |
| Robert James Dougans | Second | 3 May 2012 | Applicant |

**SCHEDULE B**

**UNDERTAKINGS GIVEN TO THE COURT BY THE APPLICANT**

(1) If the court later finds that this order has caused loss to the Respondent, and decides that the Respondent should be compensated for that loss, the Applicant will comply with any order the court may make.

(2) As soon as practicable the Applicant will issue and serve an application in the form of the draft which was before the Court.

(3) As soon as practicable the Applicant will serve the petition.

(4) The Applicant will cause an affidavit to be sworn and filed confirming the substance of any factual material which was said to the court by the Applicant's counsel and is not contained in an affidavit or witness statement before the Court.

(5) The Applicant will serve upon the Respondent as soon as practicable –

(i) copies of the affidavits and exhibits containing the evidence relied upon by the Applicant, and any other documents provided to the court on the making of the application;

(ii) the petition; and

61

(iii) an application notice for continuation of the order.

(6) Anyone notified of this order will be given a copy of it by the Applicant's legal representatives.

(7) The Applicant will pay the reasonable costs of anyone other than the Respondent which have been incurred as a result of this order including the costs of finding out whether that person holds any of the Respondent's assets and if the court later finds that this order has caused such person loss, and decides that such person should be compensated for that loss, the Applicant will comply with any order the court may make.

(8) If this order ceases to have effect (for example, if the Respondent provides security or the Applicant does not provide a bank guarantee as provided for above) the Applicant will immediately take all reasonable steps to inform in writing anyone to whom he has given notice of this order, or who he has reasonable grounds for supposing may act upon this order, that it has ceased to have effect.

(9) The Applicant will not without the permission of the court use any information obtained as a result of this order for the purpose of any civil or criminal proceedings, either in England and Wales or in any other jurisdiction, other than this claim.

(10) The Applicant will not without the permission of the court seek to enforce this order in any country outside England and Wales

**UNDERTAKINGS GIVEN TO THE COURT BY TOC INVESTMENTS LIMITED**

(1) If the court later finds that this order has caused loss to any Respondent, and decides that the Respondent should be compensated for that loss, TOC Investments Limited will comply with any order the court may make.

TOC Investments Limited is a company incorporated in the British Virgin Islands whose registered number is 437450 and whose registered agents are Harneys Corporate Services Limited of Craigmuir Chambers, PO Box 71, Road Town, Tortola, British Virgin Islands.

(2) TOC Investments Limited undertakes to submit to the jurisdiction of this Court for the purpose of enforcement of the undertaking in (1) above but for no other purpose.

**NAME AND ADDRESS OF APPLICANT'S LEGAL REPRESENTATIVES**

The Applicant's legal representatives are –

| | | |
|---|---|---|
| Name | Richard Stewart | Robert Dougans |
| Address | Bryan Cave<br>88 Wood Street<br>London EC2V 7AJ | Bryan Cave<br>88 Wood Street<br>London EC2V 7AJ |
| Tel. (office hours) | 020 3207 1225 | 020 3207 1214 |
| Fax. (office hours) | 020 3207 1881 | 020 3207 1881 |
| Reference | RS4 / KU1 / A38 | RS4 / KU1 / A38 |
| Email | rjstewart@BryanCave.com | Robert.Dougans@BryanCave.com |
| Tel. (out of office hours) | 07977 567 195 | 07909 916 845 |

63

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

**COMPANIES COURT**

**IN THE MATTER OF BEPPLER & JACOBSON**
**LIMITED**

**AND IN THE MATTER OF THE COMPANIES ACT 2006**

**AND IN THE MATTER OF THE INSOLVENCY ACT**
**1986**

**BETWEEN**

| | |
|---|---|
| **CALDERO TRADING LIMITED** | **Petitioner** |

**and**

| | |
|---|---|
| **(1) BEPPLER & JACOBSON** | **Respondents** |
| **LIMITED** | |
| **(2) BEPPLER & JACOBSON** | |
| **MONTENEGRO D.O.O.** | |
| **(3) LEIBSON CORPORATION** | |
| **LIMITED** | |
| **(4) BELINDA CAPITAL LIMITED** | |
| **(5) MR IGOR LAZURENKO** | |
| **MR MARCEL TELSER** | |

---

**ORDER FOR APPOINTMENT OF A PROVISIONAL**
**LIQUIDATOR AND INTERIM INJUNCTIONS (AND**
**OTHER RELIEF)**

---

**BRYAN CAVE**
88 Wood Street
London
EC2V 7AJ

Tel:   020 3207 1100
Fax:   020 3207 1881

IN THE HIGH COURT OF JUSTICE

No. 3680 of 2012

CHANCERY DIVISION

COMPANIES COURT

BEFORE MR. JUSTICE NEWEY

IN THE MATTER OF BEPPLER & JACOBSON LIMITED

AND IN THE MATTER OF THE COMPANIES ACT 2006

AND IN THE MATTER OF THE INSOLVENCY ACT 1986

DATED: MONDAY THE 16th DAY of JULY 2012

BETWEEN

CALDERO TRADING LIMITED          Petitioner

and

(1) BEPPLER & JACOBSON LIMITED          Respondents
(2) BEPPLER & JACOBSON
MONTENEGRO D.O.O.
(3) LEIBSON CORPORATION
(4) BELINDA CAPITAL LIMITED
(5) MR IGOR LAZURENKO
(6) MR MARCEL TELSER
(7) LAWSON TRADING LIMITED
(8) SERGEY SCHEKLANOV

---

## ORDER

---

UPON the petition coming on for trial

AND UPON the application of the Petitioner by notice dated 6 July 2012

AND UPON hearing Counsel for the Petitioner

273180.1

65

AND UPON hearing Counsel for the Respondents (other than the First Second and Sixth Respondents)

AND UPON Mr Zoran Becirovic by the Petitioner's Counsel instructed for this purpose consenting to this order

AND UPON the Sixth Respondent by his solicitors consenting to this order

AND UPON the Court being satisfied that it is just and equitable that the First Respondent be wound up and that the affairs of the First Respondent have been conducted in a manner unfairly prejudicial to the interests of the Petitioner

AND UPON TNK-BP International Limited ("TNK-BP") (through Bryan Cave instructed for this purpose) giving the undertaking set out in Schedule 3

IT IS DECLARED THAT the Purported Agency Agreements (as defined in the Amended Points of Claim) are null, void and of no effect as against the First and Second Respondents.


AND IT IS ORDERED

1. The Third Respondent do purchase and the Petitioner do sell its shares in the First Respondent upon the terms set out in the Schedule 1 hereto, for which purpose there shall be liberty to apply to the Applications Judge for the purposes of carrying the same into effect.

2. The trial be adjourned for the determination of the investment issue in accordance with the directions in paragraph 3 below.

3. The following directions shall apply for the purpose of the trial in place of the directions contained in the order of Mr Justice Floyd dated 19 June 2012:

    (1) The trial shall be limited to the determination of any issue as to whether any sum invested in the First and/or Second Respondent was invested (or was agreed to be invested) by way of loan or capital ("the Investment Issue") and the carrying into effect of the purchase of the Petitioner's shares.

    (2) The adjourned expedited trial be listed to come on as soon as possible on or after 8 October 2012, with a current time estimate of 3 days.

    (3) The Petition shall not be advertised until further order.

    (4) The parties shall give standard disclosure by list limited to the Investment Issue by 6pm on 17 August 2012.

2

273180.1

66

(5) Any requests for inspection or copies of disclosed documents shall be made within 2 business days after service of the list.

(6) The Petitioner and the Third to Eighth Respondents shall serve on every other party the witness statements of the evidence of the witnesses which the party serving the statement intends to rely on in relation to any issues of fact to be decided at the expedited trial, those statements to be exchanged by 4.00pm on 21 September 2012(provided that before exchange the parties shall liaise with a view to agreeing a method of identification of any documents referred to in any such witness statement).

(7) Subject to the leave of the court and the provisions of the Civil Evidence Act, the evidence of the maker of any witness statement shall not be admitted unless the maker attend in person at trial for cross-examination or his attendance shall be dispensed with by agreement between the parties.

(8) The Petitioner will file with the Chancery Listing Office and serve on other parties to the trial a trial bundle for the use of the Judge by 10.00am on 1 October 2012.

(9) Skeleton arguments and chronologies shall be filed and exchanged by 10.30am on 4 October 2012.

4. Paragraph 7 of the order of HHJ Birss QC made herein on 3 May 2012 be varied as follows:

(1) The sole purpose of the provisional liquidators shall be to protect and preserve the assets of the First and Second Respondents and for that purpose alone they may exercise the powers in paragraph 7 of the order 3 May 2012, but before exercising the powers in paragraphs 7.4, 7.6 and 7.7 they shall give 7 days' notice to the Third to Eighth Respondents of the nature of the intended exercise and the grounds for it.

(2) Paragraph 7.2 shall be varied to provide as follows: "To locate, protect, secure, take possession of, collect and get in documents reasonably necessary solely for protecting and preserving the assets of the First Respondent".

(3) The Third to Eighth Respondents shall have liberty to apply in respect of any exercise or attempted exercise of the powers under paragraphs 7.4, 7.6 and 7.7 of the order of 3 May 2012 provided that they shall give 2 business days' notice to the Petitioner of any such application and shall (save in relation to any application made without notice or if the Court otherwise directs) serve upon the Petitioner any evidence relied upon and

3

273180.1

67

the Provisional Liquidators shall serve upon the Petitioner any evidence relied upon by them in relation to such application.

(4) The Provisional Liquidators shall not disclose to Caldero or to any third party any information or document obtained pursuant to their powers under paragraph 7 save (i) insofar as Caldero is legally entitled to information as a shareholder; or save (ii) as disclosure required by these proceedings, or save (iii) for the purpose of protecting and preserving the assets of the First and Second Respondents; and in any event the provisional liquidators shall give 7 days' notice to the Third to Eighth Respondents of that intended provision of information.

PROVIDED also that save for the sole purpose of protecting and preserving the assets of the First and Second Respondent:

(a) The Joint Provisional Liquidators shall not pending further order of the Court, alternatively, agreement between the Petitioner (on the one hand) and the Third to Eighth Respondents (on the other hand), undertake any further investigation of the affairs of the First Respondent pursuant to paragraph 7.3;

(b) But without prejudice to their rights under the Articles of BJM as amended by resolution on 7 June 2012, the Provisional Liquidators shall not pending further order of the Court, alternatively agreement between the Petitioner (on the one hand) and the Third to Eighth Respondents (on the other hand), exercise their powers as Provisional Liquidators so as to interfere with the day-to-day management of the Second Respondent; and

(c) The Petitioner and/or the Third to Eighth Respondents and/or the Provisional Liquidators shall be at liberty to apply to discharge or vary sub-paragraphs (a) or (b) above.

5. The Petitioner, TOC Investments Limited and TNK-BP International Limited be released from their undertakings as set out in Schedule 2 and, for the avoidance of doubt, there shall be no inquiry as to any damages resulting from the orders of 3 May 2012 and 17 May 2012.

6. Upon payment of the Purchase Price as defined in Schedule 1, this Petition be dismissed with no order as to costs (save that the costs of the Investment Issue shall be in the discretion of the Court) and the order for the appointment of the provisional liquidators be discharged.

AND IT IS ORDERED

7. THAT THE PETITIONER DO SERVE THIS ORDER

273180.1

68

## SCHEDULE 1

## SHARE PURCHASE

1. The following definitions shall apply in this Schedule:

| | |
|---|---|
| Parties | The Respondent Parties and the Petitioner |
| The Purchase Price | The fair value of the Shares as determined by the Expert in accordance with the terms hereof, together with any interest due thereon under clauses 4 and 20 hereof or any liability for the costs of the valuation exercise under clause 7 hereof (or as the case may be subject to any deduction in relation to such liability under clause 7 hereof) |
| Shares | The Petitioner's 87,501 shares held in First Respondent which shall be treated as paid up |
| Expert | The person appointed to determine the Purchase Price, to be agreed by the Petitioner and the Third Respondent or in default of agreement to be appointed by the President of the Institute of Chartered Accountants of England and Wales, and in any event to be a person who has (and whose firm or company has) done no work in the last three years for any Party to these proceedings or for any member of the TNK-BP group of companies |
| Respondent Parties | The First to Eighth Respondents |
| Order | The order of Newey J dated 18 July 2012 as the same may be amended or varied. |

All other capitalised words shall have the meaning assigned to them in the Order.

2. Zoran Becirovic's role as a director of the Second Respondent shall be limited to governmental and local affairs as set out in direction number 6 of the First Respondent dated 1 September 2011 (save that he may report matters to the provisional liquidators so far as necessary to protect and preserve the assets of the First and Second Respondents and save further that he shall be entitled to

5

make reasonable requests for information for the purposes of protecting and preserving such assets and for the purposes of fulfilling his duties and obligations as a director as set out above, to which end the Respondent Parties will procure that, so far as it is possible to comply with the same, all his reasonable requests for information and documentation shall be complied with within a reasonable time).

3. The Third Respondent shall purchase the Shares at a fair value as at either 1 October 2010 (the exclusion of the Petitioner) or 3 May 2012 (immediately before the presentation of the Petition and the appointment of provisional liquidators), the appropriate date to be determined by the Expert. The said value is to be determined by the Expert to be a value representing an equivalent proportion of the total issued share capital of the First Respondent without any discount for the Shares being a minority holding and on the following basis:

    (a) The hotels and associated businesses in the group shall be valued on a going concern basis;

    (b) applying the final determination of the Investment Issue by the English Court ("final determination" being when there is no further possibility of an appeal against the decision of a Court or the period for making such an appeal has expired);

    (c) disregarding any agency or other agreement whereby any form of ownership or interest was purportedly transferred away from the First Respondent and/or the Second Respondent to Lawson or any other person (it being warranted that no other person has acquired any interest by charge or assignment or otherwise in any such agreement or agency);

    (d) disregarding the presentation of the petition and the appointment of provisional liquidators.

4. The Expert shall have power to award interest upon the Purchase Price up to the date that payment for the same is due if he shall determine it appropriate to do so.

5. The Expert shall take into account in his valuation the determination made by the Court of the Investment Issue. The Expert shall (subject to the Parties' performance of their obligations hereunder) use his best endeavours to produce the valuation by no later than 3 months after the date of the acceptance of his appointment.

6. The Expert shall have power at any time and from time to time to take advice from:

    (a)    a competent valuer in Montenegro or elsewhere, to be agreed by the Purchasers and the Petitioner or in default nominated by the Expert, as

6

273180.1

70

to the value of any real property owned and/or business carried on by the First and/or Second Respondent; and/or

(b)   a competent accountant and/or lawyer in Montenegro or elsewhere, to be agreed by the Purchasers and the Petitioner or in default nominated by the Expert, as to the meaning and effect of any accounts produced or transactions occurring in such country or countries.

7. The costs of the valuation exercise, including any deposit required by the Expert for his own costs or those of any expert instructed by him, shall in the first instance be shared equally between the Petitioner and the Third Respondent. The Expert will decide the ultimate responsibility for the costs of the valuation as between the Petitioner and the Third Respondent.

8. The Expert shall act as an expert not as an arbitrator and in the absence of manifest error or fraud the valuation of the Shares by the Expert shall be final and binding on the Parties and not subject to any appeal or review.

9. The Petitioner and the Respondent Parties shall each provide the Expert throughout the valuation exercise with all information and assistance as the Expert reasonably requires. For the avoidance of doubt, the Expert shall be entitled at his absolute discretion to request written clarification of any matters contained within the written material received from either of the parties, which the recipient shall supply within five working days of the Expert's request. The Expert will address such requests to the Petitioner and the Respondent Parties simultaneously copying to each party requests made to the other party. For the avoidance of doubt and for use solely within the valuation exercise, the Expert shall provide to each Party copies of all documents disclosed by the other Party to the Expert; and to that end documents disclosed to the Expert shall be provided, if not electronically, then in duplicate.

10. If either Party requires a document it believes is in the possession or control of another Party for the purpose of making submissions to the Expert, it shall make a written request to that Party with a copy to the Expert. In the event of a refusal or failure to reply with 5 working days, the Party requesting the document may ask the Expert for a decision on its request. The Expert shall determine that request within 5 working days. The Expert's decision shall be final and binding on the Parties.

11. The Petitioner and the Third Respondent shall each make a "written submission" ("the First Submission") on the valuation to the Expert within such period as the Expert shall direct in the light of any decision of the Expert under the preceding paragraph. They shall each be entitled to provide such evidence in their written submissions to the Expert as they each consider relevant to the determination. The First Submission from each party shall set out a reasoned valuation of the Shareholding including the information and

7

273180.1

71

evidence on which the Party relies in support of its view on the particular matter, including any expert valuation report or reports relied upon.

12. The Parties shall further make available for inspection, if the Expert so determines, by the Expert and the other Party, the original of any document.

13. Immediately following receipt of the later of the two written initial submissions the Expert shall send one copy of the other Party's written submission to each.

14. The Petitioner and the Third Respondent shall each be entitled to make written comments ("the Second Submission") to the Expert on the written submission of the other Party, such written comments to be made as soon as reasonably practicable and in any event not later than 2 weeks from the date of receipt of the copy of the other Party's written submission. Immediately following receipt of the later of the two written comments the Expert shall send one copy of the other Party's written comments to each.

15. The Petitioner and the Third Respondent shall each be entitled to make further written comments on the Second Submission ("the Third Submission") to the Expert on the Second Submission of the other Party, such written comments to be made as soon as reasonably practicable and in any event not later than 2 weeks from the date of receipt of the copy of the other Party's Second Submission. Immediately following receipt of the later of the two Third Submission comments the Expert shall send one copy of the other Party's written comments to each, for information only.

16. Having received the Third Submissions the Expert will have a period of 3 weeks to raise matters and meet with one or more of the Parties, together or otherwise or not at all, before finalising his determination and issuance on the conditions referred to in the engagement letter.

17. The Expert shall have the right to refuse to accept any submission or document other than that provided under these terms.

18. The Expert shall have power prospectively or retrospectively to vary the procedure set out above in his discretion following consultation with the Parties.

19. All documents and submissions produced or relied upon in the valuation exercise shall be confidential as between the Parties and the Expert and their respective professional advisers. No such document or submission shall be disclosed to any third party other than for the purpose of the evaluation exercise.

20. The Third Respondent shall pay the Purchase Price to the Petitioner within 80 days of the delivery of the Expert's final valuation of the Purchase Price. In default of payment interest shall accrue at LIBOR plus 2%.

6

273180.1

21. Upon payment of the Purchase Price to the Petitioner it shall jointly apply with the Respondents to the Court for the dismissal of the Petition on the basis (subject to the provisions of clause 24(iii) below) that the fees and costs of the Provisional Liquidators shall be borne by the First Respondent and that as between the Petitioner and the Respondents there be no order for costs (save that the costs of the investment issue shall be in the discretion of the Court).

22. As security for the payment of the Purchase Price, out of the sums distributable to contributories in any winding up of the First Respondent pursuant to paragraph 24 below, the Petitioner shall have a first charge upon the Third Respondent's shares in the First Respondent, to which end the Third Respondent warrants that the same are unencumbered, no other person or entity has any interest in them or any right to challenge the validity and effect of such charge, and it has full title and power to grant a First charge over them, and hereby deposits the share certificate or certificates in respect of them with the Provisional Liquidators. The Petitioner is at liberty to put a stop notice on the register of the First Respondent. The Petitioner shall not assign, transfer or otherwise deal with its charge over the shares.

23. The Petitioner warrants that its shares in the First Respondent are unencumbered, that no other person or entity has any interest in them, that it has full title to the same and that it will not grant any charge over the same pending completion of the share purchase.

24. In the event that the Third Respondent fails to pay the Purchase Price within 80 days of the delivery of the Expert's final valuation of the Purchase Price or such further period as the Court shall allow, the Parties agree that for the purposes of enforcing the Third Respondent's liability to pay the said Price:

    (i)    The Petitioner shall retain standing as a petitioner in this petition.

    (ii)   The Petitioner will retain its rights to participate in any distributions to contributories in the winding up of the First Respondent (subject to (iv) below).

    (iii)  Upon the application of the Petitioner the Petition shall be allowed and a winding up order shall be made by the Court in respect of the First Respondent with an order that the Petitioner's costs be assessed if not agreed and paid out of the assets of the First Respondent.

    (iv)   For the avoidance of doubt, the Petitioner acknowledges that upon payment to it in cleared funds and in full of the Purchase Price, it has no further interest as shareholder in the First Respondent.

9

273180.1

(v)   The liquidator shall be appointed by agreement between the Petitioner and the Third Respondent or in default of agreement to be appointed by the President of the Institute of Chartered Accountants of England and Wales, and in any event to be a person who has (and whose firm or company has) done no work in the last three years for any Party to these proceedings or for any member of the TNK-BP group of companies. The Petitioner and the Third to Eighth Respondents shall exercise their votes at meetings of contributories and creditors of the First Respondent so as to carry into effect the above.

10

273180 1

74

## SCHEDULE 2

## RELEASED UNDERTAKINGS

1. By paragraph (1) and (7) of Schedule B (first part) of the Order of His Honour Judge Birss QC dated 3 May 2012, the Petitioner gave undertakings in the following terms:

   '(1) If the court later finds that this order has caused loss to the Respondent, and decides that the Respondent should be compensated for that loss, the Applicant will comply with any order the court may make.'

   '(7) The Applicant will pay the reasonable costs of anyone other than the Respondent which have been incurred as a result of this order including the costs of finding out whether that person holds any of the Respondent's assets and if the court later finds that this order has caused such person loss, and decides that such person should be compensated for that loss, the Applicant will comply with any order the court may make.'

2. By paragraphs (1) and (2) of Schedule B (second part), TOC Investments Limited gave undertakings in the following terms:

   (1) If the court later finds that this order has caused loss to any Respondent, and decides that the Respondent should be compensated for that loss, TOC Investments Limited will comply with any order the court may make.

   TOC Investments Limited is a company incorporated in the British Virgin Islands whose registered number is 437450 and whose registered agents are Harneys Corporate Services Limited of Craigmuir Chambers, PO Box 71, Road Town, Tortola, British Virgin Islands.

   (2) TOC Investments Limited undertakes to submit to the jurisdiction of this Court for the purpose of enforcement of the undertaking in (1) above but for no other purpose.'

3. By paragraphs (1) and (3) of Schedule A of the Order of Mr Justice Floyd dated 17 May 2012, the Petitioner gave undertakings in the following terms:

   (1) If the court later finds that this order has caused loss to the Respondent, and decides that the Respondent should be compensated for that loss, the Petitioner will comply with any order the court may make.

   (3) The Petitioner will pay the reasonable costs of anyone other than the Respondent which have been incurred as a result of this order including the costs of finding out whether that person holds any of the Respondent's assets and if the court later finds that this order has caused such person loss, and

11

273180.1

decides that such person should be compensated for that loss, the Petitioner will comply with any order the court may make.

4. On 21 May 2012, TNK-BP International Limited gave an undertaking in the following terms as recited in an order of Mr Justice Floyd dated 21 May 2012:

> "(i) As security for (a) the Petitioner's undertakings numbered (1) and (7) in the Order dated 3 May 2012 of His Honour Judge Birss QC sitting as a High Court Judge and the undertakings numbered (1) and (3) in the Order dated 17 May 2012 of Mr Justice Floyd, and (b) any liability that the Petitioner may incur in respect of the costs of the Provisional Liquidators appointed under the terms of those Orders, TNK-BP will comply with and satisfy any order the court may make thereunder against the Petitioner Provided always that the total liability of TNK-BP under this undertaking in respect of all and any claims by any person or persons shall not exceed US$30 million.
>
> (ii) TNK-BP will submit to the jurisdiction of this Court for the purpose of enforcement of the undertaking in (i) above but for no other purpose."

5. On 14 June 2012, TNK-BP International Limited extended the undertaking given by it on 21 May 2012 (as set out in the immediately preceding paragraph), giving in its place an undertaking in the following terms as recited in an order of Mr Justice Morgan dated 14 June 2012:

> '(i) As security for (a) the Petitioner's undertakings numbered (1) and (7) in the Order dated 3 May 2012 of His Honour Judge Birss QC sitting as a High Court Judge and the undertakings numbered (1) and (3) in the Order dated 17 May 2012 of Mr Justice Floyd, and (b) any liability that the Petitioner may incur in respect of (1) the costs of the Provisional Liquidators appointed under the terms of those Orders, and/or (2) any costs order in favour of any Respondent, TNK-BP will comply with and satisfy any order the court may make thereunder against the Petitioner Provided always that the total liability of TNK-BP under this undertaking in respect of all and any claims by any person or persons shall not exceed US$30 million.
>
> (ii) TNK-BP will submit to the jurisdiction of this Court for the purpose of enforcement of the undertaking in (i) above but for no other purpose.'

12

## SCHEDULE 3

## UNDERTAKING BY TNK-BP

'(i) As security for any costs order against the Petitioner in favour of any Respondent, TNK-BP will comply with and satisfy any order the Court may make thereunder against the Petitioner

Provided always that the total liability of TNK-BP under this undertaking in respect of all and any claims by any person or persons shall not exceed US $5million.

(ii) TNK-BP will submit to the jurisdiction of this Court for the purpose of enforcement of the undertaking in (i) above but for no other purpose.'

13

273180.1

N° 3680 of 2012

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

~~COMPANIES COURT~~

BEFORE MR. JUSTICE NEWEY    16 July 2012

IN THE MATTER OF BEPPLER & JACOBSON LIMITED

AND IN THE MATTER OF THE COMPANIES ACT 2006

AND IN THE MATTER OF THE INSOLVENCY ACT 1986

BETWEEN

**CALDERO TRADING LIMITED**          Petitioner

and

(1) BEPPLER & JACOBSON          Respondents
    LIMITED
(2) BEPPLER & JACOBSON
    MONTENEGRO D.O.O.
(3) LEIBSON CORPORATION
(4) BELINDA CAPITAL LIMITED
(5) MR IGOR LAZURENKO
(6) MR MARCEL TELSER
(7) LAWSON TRADING LIMITED
(8) SERGEY SCHEKLANOV

_____

ORDER

The Court sent this Order & Sealed Copies for Service to ...

BRYAN CAVE
88 Wood Street
London
EC2V 7AJ

Tel:   020 3207 1100
Fax:   020 3207 1881

The Solicitors for the Petitioner

273180.1

Signed: AJ Pooley - Chancery Associate -
020 7947 6258

78

ROYCHAMP TRADING LLC
CERTIFICATE OF STATUS

**I HEREBY CERTIFY** to the best of my knowledge and belief and according to the records kept in my office that ROYCHAMP TRADING LLC was incorporated in the State of Arkansas on the 13th day of January, 2004, with official number 800025276.

**I FURTHER CERTIFY** that to the best of my knowledge and belief and according to my records:

    (a)    Operating Manager
        President/Secretary/Treasurer
        Name: Angelika Iris Moosleithner
        Citizenship: Liechtenstein
        Date of birth: July 12, 1957
        Appointed on: March 10, 2006

    (b)    Members:
        (1) CALDERO TRADING LIMITED
            Owning 25% of the interest in the capital of the Company
            Certificate of Ownership No. 3 issued on FEBRUARY 11, 2005

        (2) PROKURATIONS-ANSTALT
            Owning 75% of the interest in the capital of the Company
            Certificate of Ownership No. 7 issued on MARCH 24, 2006

    (c)    Registered Office:
        500 MAIN STREET,
        SUITE A,
        NORTH LITTLE ROCK, AR 72114,
        UNITED STATES OF AMERICA

    (d)    The Manager of the limited liability company is empowered to authorize third persons to execute business for and on behalf of this limited liability company.

Given the 8th day of October, 2007.

            By _____
                        G. ROBERT HARDIN, ESQ.
                        Registered Agent

SWORN AND SUBSCRIBED BEFORE me the day and year first above written.

_____
Notary Public

79

**From:** Maria Phylactou <Maria.Phylactou@demetriades.com>
**Date:** Tue, 19 Jun 2012 14:43:52 +0000
**To:** zoranbecirovic@calderotrading.com<zoranbecirovic@calderotrading.com>
**Cc:** astral54@spidernet.com.cy<astral54@spidernet.com.cy>; adv.col@t-com.me<adv.col@t-com.me>
**Subject:** CALDERO TRADING LIMITED

Dear Mr. Becirovic,

Please see attached



| CHRYSSES DEMETRIADES<br>Advocates • Legal Consultants | 13 Karaiskakis Street, 3032 Limassol, Cyprus Tel.:+357 25 800 000 Fax:+357 25 342887 | **Maria Phylactou**<br>**Secretary**<br>**Registration Department**<br><br>**Email:Maria.Phylactou@demetriades.com**<br>**Tel:+357 25 800173**<br>**http://www.demetriades.com** |
|---|---|---|

This e-mail, including any attachments, is confidential and may be privileged or otherwise protected from disclosure. If you are not the intended recipient, please delete it and notify us immediately by telephoning or e-mailing the sender. You should not copy it or use it for any purpose nor disclose its contents to any other person. E-mail messages, including any attachments, may contain computer viruses or other defects, may not be accurately replicated on other systems, or may be intercepted, deleted or interfered with without the knowledge of the sender or the intended recipient. If you are not comfortable with the risks associated with e-mail messages, you may decide not to use e-mail to communicate with Chrysses Demetriades & Co. LLC. Chrysses Demetriades & Co. LLC reserves the right, to the extent and under circumstances permitted by applicable law, to retain, monitor and intercept all e-mail messages (whether related to the business of the firm or not) through its internal or external networks.

Chrysses Demetriades & Co. LLC is a lawyers' limited liability company under the Cyprus Advocates Law, Cap 2 incorporated in the Republic of Cyprus with registered number 242111. Chrysses Demetriades & Co. LLC is regulated by the Cyprus Bar Association. For further information about Chrysses Demetriades & Co. LLC, please see our website at http://www.demetriades.com.

09/08/2012

80



# ROYCHAMP TRADING LLC

*Correspondence address:*
Aeulestrasse 74
Postfach 461
9490 Vaduz
Fürstentum Liechtenstein

Telefon +423 – 236 04 78
Telefax +423 – 236 04 05

**THIS DOCUMENT IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION.** If you are in any doubt as to the action you should take, you should consult your Stockbroker, Bank Manager, Solicitor, Accountant or Financial Adviser immediately. **IF YOU HAVE SOLD OR OTHERWISE TRANSFERRED** your membership in Roychamp Tarding LLC please send this circular and accompanying documents, including the Form of Proxy, as soon as possible to the purchaser or transferee of or the Stockbroker, Bank or other agent whom the sale or transfer was effected, for transmission to the purchaser or transferee.

BY REGISTERED MAIL

CALDERO TRADING LIMITED
Arch. Makariou III, 284
Fortuna Court Block, 2nd Floor
P.C. 3105, Limassol
Cyprus

Vaduz, 6th of June 2012

Dear Sirs,

**MEMBER MEETING OF ROYCHAMP TRADING LLC (the "Company")**

The Operating Manage of the Company has convened a Member Meeting of the Company to be held at the Hyatt Hotel in Zurich at the, 21th of June 2012 at 3.00 p.m. The Notice convening the Member Meeting accompanies this letter.

This meeting is requested by the Maricio Imvestments Limited the owner of 75% of the membership.

Yours faithfully,

*Angelika Moosleithner Batliner*

**Angelika Moosleithner Batliner**
**Operating Manager**

Encl.:      Notice of General Meeting

81

## ROYCHAMP TRADING LLC

*Correspondence address:*
Aeulestrasse 74
Postfach 461
9490 Vaduz
Fürstentum Liechtenstein

Telefon +423 – 236 04 78
Telefax +423 – 236 04 05

Dated: 6th of June 2012

### NOTICE OF MEMBER MEETING

Notice is hereby given that a Member meeting (the **"Meeting"**) of Roychamp LLC, a company organized in Arkansas on the 15th of January 2004 with official number 800025276 *and whose registered office is situated at 500 Main Street, Suite A, North Little Rock, AR 72114* (the **"Company"**) will be held at the Park Hyatt Zurich, Beethoven-Strasse 21, CH-8002 Zurich, on the 21st of June 2012 at 3.00 p.m. to transact the following business.

The Member meeting will consider and if thought fit, approve the following resolution as ordinary resolution, namely:

**ORDINARY RESOLUTION:**

1.  to accept the resignation of **Angelika Moosleithner-Batliner** as Operating Manager and to discharge her for her services;

2.  to appoint *Patric Caduff* as the new Operating Manager of the Company;

*In the name of the Company*

**Angelika Moosleithner - Batliner**

# FRIDAY ELDREDGE & CLARK LLP

| Kevin A. Crass | Attorney | 400 West Capitol Avenue |
| --- | --- | --- |
| Direct: (501) 370-1592 | | Suite 2000 |
| Fax: (501) 244-5370 | | Little Rock, Arkansas 72201-3522 |
| E-mail: crass@fridayfirm.com | | www.FridayFirm.com |

June 20, 2012

*VIA FACSIMILE & E-MAIL*

ROYCHAMP TRADING LLC
Aeulestrasse 74
Postfach 461
9490 Vaduz
Furstentum Liechtenstein

ATTN: Mrs. Angelika Moosleithner Batliner, Operating Manager
a.moosleithner@blueaxis.net

*Re Your Notice dated June 6, 2012*

Dear Ms. Moosleithner Batliner:

Our law firm has been retained to represent the interest of Caldero Trading Limited which is beneficially owned by Mr. Zoran Becirovic. I am writing to you in your capacity as Operating Manager for Roychamp Trading LLC. As you know, Caldero Trading Limited owns twenty-five percent (25%) of Roychamp Trading LLC. Based upon a Certificate of Status which was executed on October 8, 2007 (which I attach as Exhibit "A"), the remaining seventy-five percent (75%) of Roychamp Trading LLC was owned by Prokurations-Anstalt.

In the High Court of Justice in London, litigation is on-going between Caldero Trading Limited, Mr. Igor Lazurenko and others regarding, among other things, the purchase of hotels and plots of land in Montenegro. I am instructed that Roychamp Trading LLC has been used as a vehicle to purchase plots of land in Montenegro. I am also instructed that Mr. Becirovic has at all times understood and believed that Prokurations-Anstalt was beneficially owned of by Mr. Lazurenko.

I write with respect to two matters:

1.  The Notice of Members meeting of Roychamp Trading LLC, though dated June 6, 2012, was sent from Liechtenstein and not received by the Cypriot secretaries of Caldero Trading Limited (Chrysses Demetriades) until June 15, 2012. The Notice refers to the Members meeting being scheduled for June 21, 2012 at the Park Hyatt in Zurich. Clearly, our client has not been given proper and sufficient notice of the meeting in accordance with the terms of the

1849113 1

83

June 20, 2012
Page 2

Operating Agreement. On this basis, we would ask you, on behalf of our client, to reschedule the meeting and serve our client with a Notice for a new date for the meeting in accordance with the notification provisions of the Operating Agreement. If the meeting proceeds on 21 June, it is our client's position that it will not have been properly constituted and any resolution carried at the meeting will be null and void.

      2.      According to the transmittal letter of the Notice, the meeting "is requested by Maricio Investments Limited, the owner of seventy-five percent (75%) of the membership." On behalf of Caldero Trading Limited, I would ask you to provide me, as soon as possible, with a current Certificate of Status for Roychamp Trading LLC (pursuant to Article VI of the Operating Agreement) and any documents reflecting the sale or otherwise transfer of seventy-five (75%) of Roychamp Trading LLC to Maricio Investments Limited. Arkansas law requires that this type of information be available to members of Arkansas LLCs. I would greatly appreciate your immediate attention to this matter.

Yours truly,

Kevin A. Crass

KAC/tm

cc:
Mr. Craig Deuchrass
Bryan Cave
88 Wood Street
London, England EC2V7AJ
Craig.Deuchrass@BryanCave.com

1849113 1

84



**FRIDAY** ELDREDGE
**& CLARK** LLP

Kevin A. Crass | Attorney
Direct: (501) 370-1592
Fax: (501) 244-5370
E-mail: crass@fridayfirm.com

400 West Capitol Avenue
Suite 2000
Little Rock, Arkansas 72201-3522
www.FridayFirm.com

June 20, 2012

***VIA FACSIMILE***

Mr. G. Robert Hardin
Hardin & Grace P.A.
500 Main Street, Suite "A"
North Little Rock, Arkansas  72114

Re:   *Roychamp Trading LLC*

Dear Mr. Hardin:

Our law firm has been retained to represent the interest of Caldero Trading Limited which is beneficially owned by Mr. Zoran Becirovic.  I am writing to you in your capacity as registered agent for Roychamp Trading LLC.  Caldero Trading Limited owns twenty-five percent (25%) of Roychamp Trading LLC.  Based upon a Certificate of Status executed by you on October 8, 2007 (which I attach as Exhibit "A"), the remaining seventy-five percent (75%) of Roychamp Trading LLC was owned by Prokurations-Anstalt.

In the High Court of Justice in London, litigation is on-going between Caldero Trading Limited, Mr. Igor Lazurenko and others regarding, among other things, the purchase of hotels and plots of land in Montenegro. I am instructed that Roychamp Trading LLC has been used as a vehicle to purchase plots of land in Montenegro.  I am also instructed that Mr Becirovic has at all times understood and believed that Prokurations-Anstalt was beneficially owned by Mr Lazurenko.

Very recently, Caldero Trading Limited received a Notice of Member Meeting of Roychamp Trading LLC to be held June 21, 2012 at the Park Hyatt in Zurich.  I have written separately to the Operating Manager challenging the validity of the Notice on the grounds of a lack of timely notification of the meeting to our client, but I wish to raise a further point with you. According to the transmittal letter of the Notice, the meeting "is requested by Maricio Investments Limited, the owner of seventy-five percent (75%) of the membership." On behalf of Caldero Trading Limited, I would ask you to provide me, as soon as possible, with a current Certificate of Status for Roychamp Trading LLC (pursuant to Article VI of the Operating Agreement) and any documents reflecting the sale or otherwise transfer of seventy-five (75%) of

1849099.1

85

June 20, 2012
Page 2


Roychamp Trading LLC to Maricio Investments Limited.  As you know, Arkansas law requires that this type of information be available to members of Arkansas LLCs.  I would greatly appreciate your immediate attention to this matter.

Yours truly,

Kevin A. Crass

KAC/tm

1849099 1

June 20, 2012
Page 2


bcc:
cc Mr. Craig Deuchrass
Bryan Cave
88 Wood Street
London, England  EC2V7AJ
Craig.Deuchrass@BryanCave.com

ROYCHAMP TRADING LLC
CERTIFICATE OF STATUS

**I HEREBY CERTIFY** to the best of my knowledge and belief and according to the records kept in my office that ROYCHAMP TRADING LLC was incorporated in the State of Arkansas on the 13th day of January, 2004, with official number 800025276.

**I FURTHER CERTIFY** that to the best of my knowledge and belief and according to my records:

(a)    Operating Manager
       President/Secretary/Treasurer
       Name: Angelika Iris Moosleithner
       Citizenship: Liechtenstein
       Date of birth: July 12, 1957
       Appointed on: March 10, 2006

(b)    Members:
       (1) CALDERO TRADING LIMITED
           Owning 25% of the interest in the capital of the Company
           Certificate of Ownership No. 3 issued on FEBRUARY 11, 2005

       (2) PROKURATIONS-ANSTALT
           Owning 75% of the interest in the capital of the Company
           Certificate of Ownership No. 7 issued on MARCH 24, 2006

(c)    Registered Office:
       500 MAIN STREET,
       SUITE A,
       NORTH LITTLE ROCK, AR 72114,
       UNITED STATES OF AMERICA

(d)    The Manager of the limited liability company is empowered to authorize third persons to execute business for and on behalf of this limited liability company.

Given the 8th day of October, 2007.

By: _____
       G. ROBERT HARDIN, ESQ.
       Registered Agent

SWORN AND SUBSCRIBED BEFORE me the day and year above written.

_____
Notary Public

88

**From:** "p.caduff@blueaxis.net" <p.caduff@blueaxis.net>
**Date:** July 4, 2012 2:22:12 AM CDT
**To:** "Kevin A. Crass" <Crass@fridayfirm.com>
**Cc:** "m.telser@blueaxis.net" <m.telser@blueaxis.net>, "t.beck@blueaxis.net"
<t.beck@blueaxis.net>, "schuermann@batlinergasser.com"
<schuermann@batlinergasser.com>
**Subject: Member Meeting of Roychamp Trading LLC 23rd of August**

Dear Mr. Crass

Further to your letter dated 19th of June 2012, which was received by email on the 20th of June 2012
at 22:47 PM.

We would like to inform you, that the Member Meeting of the above mentioned Company will take
place on the 23rd of August 2012 at 13:00 PM in Zurich, Switzerland at The Hyatt Hotel . The official
Notice will be sent to the Registered Agent in Cyprus.

If you need any clarification do not hesitate to contact us.

Yours sincerely

Patric Caduff

Patric Caduff
lic. iur.
Client Advisor

First Advisory Group
Aeulestrasse 74 / P.O. Box 86
LI-9490 Vaduz / Fürstentum Liechtenstein
T +423 236 30 00 / D +423 236 36 77 / F +423 236 30 01
E-Mail: p.caduff@blueaxis.net / www.firstadvisorygroup.com

The information contained in this email and in any attachments is confidential and is designated solely for the attention and use of the
intended recipient(s). This information may be subject to legal professional privilege. If you are not an intended recipient of this email,
you must not use, disclose, copy, distribute or retain this message or any part of it. If you have received this email in error, please
notify us immediately and delete all copies of this email from your computer system(s).

From: "p.caduff@blueaxis.net" <p.caduff@blueaxis.net>
        Date: July 13, 2012 9:12:27 AM EDT
        To: "Kevin A. Crass" <Crass@fridayfirm.com>
        Cc: "m.telser@blueaxis.net" <m.telser@blueaxis.net>,
"t.beck@blueaxis.net" <t.beck@blueaxis.net>,
"schuermann@batlinergasser.com" <schuermann@batlinergasser.com>
        Subject: WG: Member Meeting of Roychamp Trading LLC 2nd of August
2012


        Dear Mr. Crass

        I'm writing to you regarding the above mentioned Meeting. Due to
the fact that the 23rd of August 2012 is not convenient for one of the
Members, the Operating Manager has decided to move the Member Meeting
forward and to have it on the 2nd of August 2012 in Prague instead of
the 23rd of August 2012.

        Please find attached the official notice of the meeting, which we
sent today by courier TNT to CYPRUS (TRACKING No. GE992733420WW).



        Yours sincerely

        Patric Caduff



        PS: We would be very grateful if your could confirm to us the
receipt of this email.



        (See attached file: CALDERO_Member Meeting.PDF)




        Patric Caduff
        lic. iur.
        Client Advisor

        First Advisory Group
        Aeulestrasse 74 / P.O. Box 86
        LI-9490 Vaduz / Fürstentum Liechtenstein
        T +423 236 30 00 / D +423 236 36 77 / F +423 236 30 01

E-Mail: p.caduff@blueaxis.net / www.firstadvisorygroup.com

The information contained in this email and in any attachments is confidential and is designated solely for the attention and use of the intended recipient(s). This information may be subject to legal professional privilege. If you are not an intended recipient of this email, you must not use, disclose, copy, distribute or retain this message or any part of it. If you have received this email in error, please notify us immediately and delete all copies of this email from your computer system(s).

# ROYCHAMP TRADING LLC

*Correspondence address:*
Aeulestrasse 74
Postfach 461
9490 Vaduz
Fürstentum Liechtenstein

Telefon +423 – 236 04 78
Telefax +423 – 236 04 05

**THIS DOCUMENT IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION.** If you are in any doubt as to the action you should take, you should consult your Stockbroker, Bank Manager, Solicitor, Accountant or Financial Adviser immediately. **IF YOU HAVE SOLD OR OTHERWISE TRANSFERRED** your membership in Roychamp Trading LLC please send this circular and accompanying documents, as soon as possible to the purchaser or transferee of or the Stockbroker, Bank or other agent whom the sale or transfer was effected, for transmission to the purchaser or transferee.

## BY COURIER

CALDERO TRADING LIMITED
Arch. Makariou III, 284
Fortuna Court Block B, 2nd Floor
P.C. 3105, Limassol
Cyprus

Vaduz, 13 July 2012

Dear Sirs,

## MEMBER MEETING OF ROYCHAMP TRADING LLC (the "Company")

The Operating Manager of the Company has convened a Member Meeting of the Company to be held on the 2nd of August 2012 at 10:00 a.m. at the Hotel Olshanka, of.328, Czech Republik, Prague-3, 13000, Taboritska str. 1000/23. The Notice convening the Member Meeting accompanies this letter.

This meeting is requested by Maricio Investments Limited the owner of 75% of the membership.

Yours faithfully,

**Angelika Moosleithner-Batliner**
**Operating Manager**

*Enclosure:   Notice of Member Meeting*

92

# ROYCHAMP TRADING LLC

*Correspondence address:*
Aeulestrasse 74
Postfach 461
9490 Vaduz
Fürstentum Liechtenstein

Telefon +423 – 236 04 78
Telefax +423 – 236 04 05

## NOTICE OF MEMBER MEETING

Notice is hereby given that a Member Meeting (the **"Meeting"**) of Roychamp Trading LLC, a company organized in Arkansas on the 15th of January 2004 with official number 800025276 and whose registered office is situated at 500 Main Street, Suite A, North Little Rock, AR 72114 (the **"Company"**) will be held on the 2nd of August 2012 at 10:00 a.m. at the Hotel Olshanka, of.328, Czech Republik, Prague-3, 13000, Taboritska str. 1000/23 to transact the following business.

The Member Meeting will consider and if thought fit, approve the following resolution as ordinary resolution, namely:

**ORDINARY RESOLUTION:**

**THAT:**

1.     to accept the resignation of **Angelika Moosleithner-Batliner** as Operating Manager and to discharge her for her services;

2.     to appoint **Luman Tungayev** as the new Operating Manager of the Company;

In the name of the Company

**Angelika Moosleithner-Batliner**
**Operating Manager**

Dated:     13 July 2012

*Registered address: 500 Main Street, Suite A, North Little Rock, AR 72114*

93

From: Kevin A. Crass [mailto:Crass@fridayfirm.com]
Sent: Mon 7/16/2012 2:45 PM
To: 'p.caduff@blueaxis.net'
Subject: Roychamp LLC

Dear Mr. Caduff:

   This will acknowledge receipt of your email of July 13, 2012 giving
Notice of the change of the meeting date and location. In my previous
correspondence with you, I have requested documentation of the transfer
of the 75% interest. Please respond to that request at your earliest
convenience or, at least, let me know you will not be providing the
requested documentation so that we may take appropriate action.


Kevin

KEVIN A. CRASS <mailto:Crass@fridayfirm.com>    |    ATTORNEY
  <http://www.fridayfirm.com/>
Crass@fridayfirm.com   |   Direct: (501) 370-1592   |   Fax (501) 244-
5370
400 West Capitol Avenue, Suite 2000
Little Rock, Arkansas 72201-3522   |   www.FridayFirm.com
<http://www.fridayfirm.com/>

This e-mail message and any attachments contain confidential
information that may be legally privileged. If you are not the intended
recipient, you must not review, retransmit, convert to hard copy, copy,
use or disseminate this e-mail or any attachments to it. If you have
received this e-mail in error, please immediately notify us by return
e-mail or by telephone at 501-370-1592 and delete this e-mail. Please
note that if this e-mail contains a forwarded message or is a reply to
a prior message, some or all of the contents of this message or any
attachments may not have been produced by Friday, Eldredge & Clark,
LLP. Receipt of e-mail does not establish an attorney-client
relationship.



FRIDAY ELDREDGE & CLARK LLP

Kevin A. Crass | Attorney
Direct: (501) 370-1592
Fax: (501) 244-5370
E-mail: crass@fridayfirm.com

400 West Capitol Avenue
Suite 2000
Little Rock, Arkansas 72201-3522
www.FridayFirm.com

July 25, 2012

***VIA FACSIMILE & E-MAIL***

ROYCHAMP TRADING LLC
Aeulestrasse 74
Postfach 461
9490 Vaduz
Furstentum Liechtenstein

ATTN:  Mrs. Angelika Moosleithner Batliner, Operating Manager
       a.moosleithner@blueaxis.net

    Re:  *Roychamp Trading LLC*

Dear Ms. Batliner:

    As you know, our law firm has been retained to represent the interest of Caldero Trading Limited. I am writing to you in your capacity of Operating Manager of Roychamp Trading LLC. As you know, Caldero Trading Limited owns 25% of Roychamp Trading LLC, an Arkansas limited liability company.

    After initially receiving Notices of Member Meeting for June 21 and August 23, 2012, you more recently sent a Notice of Member Meeting calling for a meeting on August 2, 2012, in Prague. According to the Notice, the business at the meeting is to accept your resignation as Operating Manager and to appoint Luman Tungayev as the new Operating Manager of Roychamp Trading LLC. I am writing for several purposes. First, please respond to my previous request and provide me with a current Certificate of Status and any other documents reflecting the sale, assignment or transfer of 75% of Roychamp Trading LLC to Maricio Investments Limited. If we do not immediately receive this documentation, we will proceed with action in Arkansas courts to obtain that relief. As I am sure you know, Arkansas law requires that this information be provided to a member of an Arkansas LLC upon request.

    Second, please explain the reasons for your resignation as Operating Manager; the reason that Patric Caduff is not being appointed the new Operating Manager; and the reasons Luman Tungayev is being appointed as the Operating Manager.

    Finally, on behalf of Caldero Trading Limited, please be advised that under Arkansas law, in absence of contrary provisions in the Operating Agreement, an assignment of

1887669.1

95

July 25, 2012
Page 2

memberships in an Arkansas limited liability company does not entitle the assignee to participate in the management and affairs of the limited liability company, or to become or exercise any rights of a member until such time as the other members unanimously consent.  See Ark. Code. Ann. § 4-32-704 and § 4-32-706.  Until such time as the Notice of Member Meeting for June 21st was received, Caldero was not even aware of an alleged transfer or assignment from Prokurations-Anstalt to Maricio Investments Limited.  As such, Caldero has not consented to Maricio becoming a member of Roychamp Trading LLC and objects to Maricio participating in the management and affairs of Roychamp Trading LLC, including but not limited to, conducting the meeting on August 2, 2012.

Please feel free to call me if you have any questions or wish to discuss this matter.

Yours truly,

Kevin A. Crass

KAC/tm

cc:
Mr. Patric Caduff
Client Advisor
First Advisory Group
Aeulestrasse 74 / P.O. Box 86
LI-9490 Vaduz / Furstentum Liechtenstein
P.Caduff@BlueAxis.net

1887669.1

96

From: Tena Maness [mailto:TManess@fridayfirm.com]
Sent: 25 July 2012 16:41
To: 'a.moosleithner@blueaxis.net'
Cc: 'p.caduff@blueaxis.net'; Kevin A. Crass
Subject: Roychamp Trading LLC


Ms. Batliner,


Please see the attached correspondence from Kevin Crass for your
review.


Tena

From: Max Riederer von Paar [mailto:mriederer@mrlawnet.com]
Sent: Friday, July 27, 2012 10:45 AM
To: Kevin A. Crass
Subject: Notice Re Cancellation of Meeting


Dear Kevin,

as discussed, please find attached the notice of cancellation of the
August 2 meeting.

All the Best

Max

## ROYCHAMP TRADING LLC

*Correspondence address:*
Aeulestrasse 74
Postfach 461
9490 Vaduz
Fürstentum Liechtenstein

Telefon +423 – 236 04 78
Telefax +423 – 236 04 05

BY COURIER

CALDERO TRADING LIMITED
Arch. Makariou III, 284
Fortuna Court Block, 2nd Floor
P.C. 3105, Limassol
Cyprus

## NOTICE OF MEMBER MEETING

Notice is hereby given that the announced Member Meeting of Roychamp Trading LLC, a company organized in Arkansas on the 15th of January 2004 with official number 800025276 and whose registered office is situated at 500 Main Street, Suite A, North Little Rock, AR 72114 for the 2nd of August 2012 at 10:00 a.m. at the Hotel Olshanka, of.328, Czech Republik, Prague-3, 13000, Taboritska str. 1000/23 will be postponed until further notice.

The notice for a rescheduled meeting will be sent shortly.

Roychamp Trading LLC

**Angelika Moosleithner-Batliner**
**Operating Manager**

Dated:     27 July 2012

Registered address: 500 Main Street, Suite A, North Little Rock, AR 72114

99

From: Max Riederer von Paar [mailto:mriederer@mrlawnet.com]
Sent: Wednesday, August 01, 2012 10:49 AM
To: Kevin A. Crass
Subject: Roychamp documents


Dear Kevin,

Please find enclosed the certificate of status and the latest
accounting. I do not believe that the LLC was required to file tax
returns, it did not have any reportable income.

Please do not hesitate to let me know if you need anything else.

Regards
Max


PLEASE NOTE MY NEW EMAIL ADDRESS

Please consider the environment before printing this e-mail.

In accordance with Circular 230, the content of this E-mail is not to
be relied upon for the preparation of a tax return or to avoid tax
penalties imposed by the Internal Revenue Code. If you desire a formal
opinion on a particular tax matter for the purpose of avoiding the
imposition of any penalties, please contact us to discuss the further
Treasury requirements that must be met and whether it is possible to
meet those requirements under the circumstances, as well as the
anticipated time and additional fees involved.


Max Riederer von Paar
Partner
Rubin, Winston, Diercks, Harris & Cooke LLP
1201 Connecticut Avenue, N.W.
Suite 200
Washington DC 20036
USA
PH:   + 1 202 861 0870 ext 128
FAX:  + 1 202 521 3984
CELL: + 1 202 256 7880
EMAIL:  mriederer@mrlawnet.com

NOTICE:  This e-mail and any attachments are for the exclusive and
confidential use of the individual(s) named as recipients and is
covered by the Electronic Communications Privacy Act, 18 U.S.C. §§
2510-2521. If you received this in error, please do not read,
distribute, or take action in reliance upon this message.  Instead,
please notify us immediately by return email and promptly delete this
message and its attachments from your computer system.  We do not waive
attorney-client or work product privilege by the transmission of this
message.
Unless we have been formally retained, nothing contained in this email
shall be construed as legal advice.

**ROYCHAMP TRADING LLC**
**CERTIFICATE OF STATUS**

**I HEREBY CERTIFY** to the best of my knowledge and belief and according to my records that **ROYCHAMP TRADING LLC** was organized in Arkansas on the 15th day of January, 2004 with official number 800025276.

**I FURTHER CERTIFY** to the best of my knowledge and belief and according to my records:

(a) **Operating Manager**
**President/Secretary/Treasurer:**

Name: Angelika Iris Moosleithner
Citizenship: Liechtenstein
Date of Birth: July 12, 1957
Appointed on: March 10, 2006

(b) **Members:**

(1) **CALDERO TRADING LIMITED**
Owning 25% of the interest in the capital of the Company
Certificate of Ownership No. 3 issued on February 11, 2005

(2) **PROKURATIONS-ANSTALT**
Owning 75% of the interest in the capital of the Company
Certificate of Ownership No. 7 issued on March 24, 2006

(c) **Registered Office:** 500 Main Street, Suite A
North Little Rock, AR 72114

(d) The Manager of the limited liability company is empowered to authorize third persons to execute business for and on behalf of this limited liability company.

Given the 31st day of July, 2012

_Moosleithner_

Angelika Moosleithner-Batliner
Operating Manager

Beatrix Walser
Urkundsperson

3 1. Juli 2012

102

## APOSTILLE

(Convention de La Haye du 5 octobre 1961)

1. Land: Fürstentum Liechtenstein

   Diese öffentliche Urkunde

2. ist unterschrieben von Frau Beatrix Walser

3. in ihrer Eigenschaft als Beglaubigungsperson

4. sie ist versehen mit dem Siegel/Stempel der
   Fürstl. Liecht. Landgerichtskanzlei

Bestätigt

5. in 9490 Vaduz        6. am  3 1. Juli 2012

7. durch Regierungskanzlei Vaduz

8. unter Nr. 12.08032-

9. Siegel/Stempel          10. Unterschrift

C. Sch

Christoph Scherzer
Verwaltungs-Angestellter

# ROYCHAMP TRADING LLC

### US Little Rock, Arkansas

## Statement of Assets and Liabilities

## 31.12.2011

| | |
|---|---|
| Currency: | USD |
| Date: | 09 July 2012 |

ROYCHAMP TRADING LLC

## STATEMENT OF ASSETS AND LIABILITIES

| | Notes | 31.12.2011 USD | 31.12.2010 USD | +/- USD | +/- % |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Investment, Roychamp Trading Montenegro d.o.o. | 1) | 10'687'174.22 | 11'052'838.68 | -365'664.46 | -3% |
| Investment, Roychamp Trading LLC | 2) | 2'215.86 | 2'380.00 | -164.14 | -7% |
| *Total Other Assets* | | *10'689'390.08* | *11'055'218.68* | *-365'828.60* | *-3%* |
| **TOTAL ASSETS** | | 10'689'390.08 | 11'055'218.68 | -365'828.60 | -3% |
| | | | | | |
| **LIABILITIES AND EQUITY** | | | | | |
| Loan, Luburia Invest and Trade SA | 3) | 15'946'298.81 | 15'405'248.42 | 541'050.38 | 4% |
| *Total Liabilities* | | *15'946'298.81* | *15'405'248.42* | *541'050.38* | *4%* |
| Authorised capital | 4) | 1.00 | 1.00 | 0.00 | 0% |
| Other reserves / Additional capital | | -4'350'030.74 | -3'531'751.46 | -818'279.28 | 23% |
| Annual profit (+) / Annual loss (-) | | -906'878.99 | -818'279.28 | -88'599.71 | 11% |
| *Total Equity* | | *-5'256'908.73* | *-4'350'029.74* | *-906'878.99* | *21%* |
| **TOTAL LIABILITIES AND EQUITY** | | 10'689'390.08 | 11'055'218.68 | -365'828.61 | -3% |

## ROYCHAMP TRADING LLC

Angelika Moosleithner-Batliner
(Operating Manager)

ROYCHAMP TRADING LLC

**NOTES to the Statement of Assets and Liabilities**

General Notes

ROYCHAMP TRADING LLC was incorporated in Arkansas as an International Business Company on 15.01.2004.

The first statement of assets and liabilities was prepared as of 31.12.2009. Therefore it is possible that transactions and activities effected before this date have not been included in this statement.

The equitable value of financial assets and investments has been shown; where these values are not known, the acquisition value has been used. If all values are not known, then a nominal value of 1 has been used.

Fixed assets have been declared at cost values; if these values are not known, then a nominal value of 1 has been used.

In principal, no accruals for expenses and income have been made. All outgoings and revenues have been recorded in the cash flow statement. In doing so, interest accrued on purchase or sale of bonds has not been included in the profit and loss statement.

Notes to the positions

|  |  | Currency | exch.rate | USD |
|---|---|---|---|---|
| 1) | Investment, Roychamp Trading Montenegro d.o.o., Montenegro |  |  |  |

Roychamp Trading LLC holds 100% of the share capital of Roychamp Trading Montenegro d.o.o., Montenegro. The investment is valuated at net equity value according to the balance sheet dated 31.03.2012 for the business year 2011.

| 31.12.2010 | Capital, Reserves and accumulated Profit / Loss | EUR | 8'238'550.00 |  |  |
|---|---|---|---|---|---|
| 31.12.2011 | Increase / Decrease of Capital | EUR | 0.00 |  |  |
| 31.12.2011 | Profit / Loss for the business year 2011 | EUR | -5'614.00 |  |  |
| | Total Investment, Roychamp Trading Montenegro d.o.o., Montenegro | EUR | 8'232'936.00 | 1.2981 | 10'687'174.22 |

2) Investment, Roychamp Trading LLC "Branch Company"

Roychamp Trading LLC holds 100% of the share capital of Roychamp Trading LLC "Branch Company". The investment is valuated at net equity value according to the balance sheet dated 31.03.2012 for the business year 2011.

| 31.12.2010 | Capital, Reserves and accumulated Profit / Loss | EUR | 1'774.00 |  |  |
|---|---|---|---|---|---|
| 31.12.2011 | Increase / Decrease of Capital | EUR | 0.00 |  |  |
| 31.12.2011 | Profit / Loss for the business year 2011 | EUR | -67.00 |  |  |
| | Total Investment, Roychamp Trading LLC "Branch Company", Montenegro | EUR | 1'707.00 | 1.2981 | 2'215.86 |

ROYCHAMP TRADING LLC

Page 4

## NOTES to the Statement of Assets and Liabilities

|  |  | Currency | exch.rate | USD |
|---|---|---|---|---|
| 3) | Loan, Luburia Invest and Trade SA, BVI | | | |

The loan is given from Luburia Invest and Trade SA, BVI according to the loan agreement dated 07 October 2004 between Luburia Invest and Trade SA and Roychamp Trading LLC. The original base compound interest rate is 6.5%. In case the borrower (Roychamp Trading LLC) misses the term for reimbursement of the loan as at 31.12.2010, he shall not only pay back the loan with the interest to the lender, but he shall also pay to the lender a compound interest at the 9.5% annual rate.

| Date | Description | Currency | Amount | exch.rate | USD |
|---|---|---|---|---|---|
| 31.12.2004 | Payments | EUR | 5'330'470.00 | 1.3333 | 7'107'115.65 |
| 31.12.2004 | Interest 6.5% for the business year 2004 | EUR | 76'143.08 | 1.3333 | 101'521.57 |
|  |  | EUR | 5'406'613.08 | 1.3333 | 7'208'637.22 |
| 31.12.2005 | Payments | EUR | 1'651'672.90 | 1.1862 | 1'959'214.39 |
| 31.12.2005 | Interest 6.5% for the business year 2005 | EUR | 394'317.65 | 1.1862 | 467'739.60 |
| 31.12.2005 | Value adjustment on loan | | | | -844'499.97 |
|  |  | EUR | 7'452'603.63 | 1.1796 | 8'791'091.24 |
| 31.12.2006 | Payments | EUR | 592'040.00 | 1.2783 | 756'804.73 |
| 31.12.2006 | Interest 6.5% for the business year 2006 | EUR | 531'284.39 | 1.2783 | 679'140.84 |
| 31.12.2006 | Value adjustment on loan | | | | 1'082'039.47 |
|  |  | EUR | 8'575'928.02 | 1.3187 | 11'309'076.28 |
| 24.04.2007 | Invoice First Advisory Trust Reg. | EUR | 702.89 | 1.3212 | 928.66 |
| 31.12.2007 | Interest 6.5% for the business year 2007 | EUR | 575'930.13 | 1.4567 | 838'957.42 |
| 31.12.2007 | Value adjustment on loan | | | | 1'232'997.14 |
|  |  | EUR | 9'152'561.04 | 1.4621 | 13'381'959.50 |
| 16.04.2008 | Invoice First Advisory Trust Reg. | EUR | 905.79 | 1.5331 | 1'388.67 |
| 31.12.2008 | Interest 6.5% for the business year 2008 | EUR | 614'663.50 | 1.2688 | 779'885.05 |
| 31.12.2008 | Value adjustment on loan | | | | -584'555.24 |
|  |  | EUR | 9'768'130.33 | 1.3901 | 13'578'677.97 |
| 30.04.2009 | Invoice First Advisory Trust Reg. | EUR | 584.76 | 1.2907 | 754.75 |
| 23.10.2009 | Payment | EUR | 70'000.00 | 1.4477 | 101'339.00 |
| 28.10.2009 | Payment | EUR | 90'000.00 | 1.4477 | 130'293.00 |
| 04.11.2009 | Payment | EUR | 100'000.00 | 1.4770 | 147'700.00 |
| 31.12.2009 | Interest 6.5% for the business year 2009 | EUR | 658'947.82 | 1.4891 | 981'239.20 |
| 31.12.2009 | Value adjustment on loan | | | | 394'654.82 |
|  |  | EUR | 10'687'662.91 | 1.4348 | 15'334'658.74 |
| 08.02.2010 | Payment | EUR | 3'442.72 | 1.4365 | 4'945.47 |
| 08.02.2010 | Payment | EUR | 6'000.00 | 1.4365 | 8'619.00 |
| 30.04.2010 | Invoice First Advisory Trust Reg. | EUR | 3'319.98 | 1.3600 | 4'515.17 |
| 03.05.2010 | Payment | EUR | 2'000.00 | 1.3452 | 2'690.40 |
| 03.05.2010 | Payment | EUR | 15'000.00 | 1.3452 | 20'178.00 |
| 13.08.2010 | Payment for Capital of Roychamp Trading Mont. d.o.o. | EUR | 45'000.00 | 1.2609 | 56'740.50 |
| 31.12.2010 | Interest 6.5% for the business year 2010 | EUR | 720'317.70 | 1.3803 | 994'254.52 |
| 31.12.2010 | Value adjustment on loan | | | | -1'021'353.38 |
|  |  |  | 11'482'743.31 | 1.3416 | 15'405'248.42 |
| 08.04.2011 | Invoice First Advisory Trust Reg. | EUR | 5'871.95 | 1.3948 | 8'190.20 |
| 04.08.2011 | Payment | EUR | 9'000.00 | 1.4277 | 12'849.30 |
| 15.11.2011 | Payment | EUR | 4'000.00 | 1.3584 | 5'433.60 |
| 21.11.2011 | Payment | EUR | 4'000.00 | 1.3584 | 5'433.60 |
| 08.12.2011 | Payment | EUR | 7'000.00 | 1.3701 | 9'590.70 |
| 31.12.2011 | Interest 6.5% for the business year 2011 | EUR | 771'722.47 | 1.3701 | 1'057'336.96 |
| 31.12.2011 | Value adjustment on loan | | | | -557'783.97 |
| Total loan, Luburia Invest and Trade SA, BVI | | EUR | 12'284'337.73 | 1.2981 | 15'946'298.81 |

**107**

First Advisory Group > Portrait > Owners



Company Registration No. 04318805 (England and Wales)

# BEPPLER AND JACOBSON LTD

## ABBREVIATED ACCOUNTS

## FOR THE YEAR ENDED 30 NOVEMBER 2009

THURSDAY

*AS85TSWW*

A04     31/03/2011     61

COMPANIES HOUSE

109

# BEPPLER AND JACOBSON LTD

## CONTENTS

| | Page |
|---|---|
| Independent auditors' report | 1 |
| Abbreviated balance sheet | 2 |
| Notes to the abbreviated accounts | 3 - 4 |

# BEPPLER AND JACOBSON LTD

## INDEPENDENT AUDITORS' REPORT TO BEPPLER AND JACOBSON LTD

## UNDER SECTION 449 OF THE COMPANIES ACT 2006

We have examined the abbreviated accounts set out on pages 2 to 4, together with the financial statements of Beppler and Jacobson Ltd for the year ended 30 November 2009 prepared under section 396 of the Companies Act 2006

This report is made solely to the company, in accordance with Chapter 10 of Part 15 of the Companies Act 2006  Our work has been undertaken so that we might state to the company those matters we are required to state to it in a special auditors' report and for no other purpose  To the fullest extent permitted by law, we do not accept or assume responsibility to anyone other than the company, for our work, for this report, or for the opinions we have formed

### Respective responsibilities of the director and auditors

The director is responsible for preparing the abbreviated accounts in accordance with section 444 of the Companies Act 2006  It is our responsibility to form an independent opinion as to whether the company is entitled to deliver abbreviated accounts  to the Registrar of Companies and whether the abbreviated accounts have been properly prepared in accordance with the regulations made under that section and to report our opinion to you

We conducted our work in accordance with Bulletin 2008/4 issued by the Auditing Practices Board  In accordance with that Bulletin we have carried out the procedures we consider necessary to confirm, by reference to the financial statements, that the company is entitled to deliver abbreviated accounts and that the abbreviated accounts to be delivered are properly prepared

### Opinion

In our opinion the company is entitled to deliver abbreviated accounts prepared in accordance with section 444(3) of the Companies Act 2006, and the abbreviated accounts have been properly prepared in accordance with the regulations made under that section

**A. Butcher (Senior Statutory Auditor)**
**for and on behalf of Newman Peters**                 24 March 2011

**Chartered Accountants**
**Statutory Auditor**                                  19 Fitzroy Square
                                                       London
                                                       W1T 6EQ

# BEPPLER AND JACOBSON LTD

## ABBREVIATED BALANCE SHEET

## AS AT 30 NOVEMBER 2009

| | Notes | 2009 £ | £ | 2008 £ | £ |
|---|---|---|---|---|---|
| **Fixed assets** | | | | | |
| Investments | 2 | | - | | 1,732,616 |
| **Current assets** | | | | | |
| Debtors | | 417,220 | | 350,000 | |
| Cash at bank and in hand | | 19,109 | | 520 | |
| | | 436,329 | | 350,520 | |
| **Creditors: amounts falling due within one year** | | (12,154) | | (1,671,235) | |
| Net current assets/(liabilities) | | | 424,175 | | (1,320,715) |
| Total assets less current liabilities | | | 424,175 | | 411,901 |
| **Capital and reserves** | | | | | |
| Called up share capital | 3 | | 350,000 | | 350,000 |
| Profit and loss account | | | 74,175 | | 61,901 |
| Shareholders' funds | | | 424,175 | | 411,901 |

These abbreviated accounts have been prepared in accordance with the provisions applicable to companies subject to the small companies regime within Part 15 of the Companies Act 2006

Approved by the Board and authorised for issue on 24 March 2011

Marcel Telser
**Director**

Company Registration No. 04318805

# BEPPLER AND JACOBSON LTD

## NOTES TO THE ABBREVIATED ACCOUNTS

## FOR THE YEAR ENDED 30 NOVEMBER 2009

**1    Accounting policies**

**1.1   Accounting convention**
The financial statements are prepared under the historical cost convention

**1.2   Compliance with accounting standards**
The financial statements are prepared in accordance with applicable United Kingdom Accounting Standards (United Kingdom Generally Accepted Accounting Practice), which have been applied consistently (except as otherwise stated)

**1.3   Turnover**
Turnover represents amounts receivable for goods and services net of VAT and trade discounts

**1.4   Investments**
Fixed asset investments are stated at cost less provision for diminution in value

**1.5   Deferred taxation**
Deferred taxation is provided in full in respect of taxation deferred by timing differences between the treatment of certain items for taxation and accounting purposes   The deferred tax balance has not been discounted

**1.6   Foreign currency translation**
Monetary assets and liabilities denominated in foreign currencies are translated into sterling at the rates of exchange ruling at the balance sheet date  Transactions in foreign currencies are recorded at the rate ruling at the date of the transaction  All differences are taken to profit and loss account

**2    Fixed assets**

|                       | Investments £ |
|-----------------------|--------------:|
| **Cost**              |               |
| At 1 December 2008    | 1,732,616     |
| Disposals             | (1,732,616)   |
| At 30 November 2009   | -             |
| At 30 November 2008   | 1,732,616     |

Beppler and Jacobson Ltd kept the investments as an Agent for the Principal based on the agency agreement dd 03 03 2003 with Lawson Trading Ltd   The investments were transferred to the Principal

# BEPPLER AND JACOBSON LTD

## NOTES TO THE ABBREVIATED ACCOUNTS (CONTINUED)

## FOR THE YEAR ENDED 30 NOVEMBER 2009

| | | 2009 £ | 2008 £ |
|---|---|---|---|
| 3 | Share capital | | |
| | **Allotted and called up** | | |
| | 350,000 Ordinary share of £1 each | 350,000 | 350,000 |

75% of the Ordinary shares capital were paid in May 2010

**Von:** "M. Telser" <marcel.telser@me.com>

**Betreff: BJM**

**Datum:** 8. Juni 2012 02:04:23 GMT+01:00

**An:** mark.shaw@bdo.co.uk

**Kopie:** Victor Golikov <victor.golikov12@yahoo.com>, Masoud Zabeti <Masoud.Zabeti@Mishcon.com>, Amanda Pullinger <apullinger@rooksrider.co.uk>

**Blindkopie:** Serge Cookie <serge.cookie@yahoo.com>

Dear Mr. Shaw

I write you in my capacity as director of BJL and recall you on our common meeting where I stated that costs have to be kept low in your capacity as provisional liquidators of BJL. So did I during my time as sole director. I also told you that there are modern communication medias to keep costs low in interaction with BJM. Obviously you do not care and do the complete opposite of my requests. Your position ordered by court is restricted to secure the assets.

All your announced requests could have been dealt by email.

I find it completely exaggerated that you fly with 3 persons at least to Montenegro, to occupy precious time of Victor Golikov (I told you that now high season starts) and you even think you need a paid security person. Furthermore, you colleague of Martineau as UK lawyer is of no use. Finally, you knew that in todays court hearing your actions have been a subject. Nevertheless you went to Montenegro, causing expenses, and did turn up more or less without notice there. The fees for security and Martineau will not be paid by BJL.

I await written report by you by tomorrow, 12.00 about the aim of your visit, the results of your work and your intended actions down in Montenegro.

Please also forward me the expenses caused by your trip to Montenegro, including all relating expenses for your lawyers.

I consider your actions so far as abuse of position and will check to inform the court about your actions. What I will certainly do is to inform BDO about your behavior should I not receive my requested full justification of this trip as well as the fees occurred. I cannot tolerate this and actions like this were not the intention when the court has put you into position as PLs.

For the future, I kindly ask you to behave in a professional and appropriate manner and refrain from all actions that lead to further damage of our operation as you did with your actions of past weeks. Please note that we observe your destructive actions and will not hesitate to make you responsible for all actions that are not appropriate in your position.

You can always revert to me to seek for advise. This standing offer was already communicated on the occasion of our meeting. You should probably consider this in the future a little more serious.

Yours Sincerely
Marcel Telser

**From:** M. Telser [mailto:marcel.telser@me.com]
**Sent:** Saturday, June 09, 2012 12:40 PM
**To:** Mark Shaw
**Cc:** George Jacobs; Victor Golikov <victor.golikov12@yahoo.com>; peskov.mikhail@gmail.com
<peskov.mikhail@gmail.com>; Amanda Pullinger <apullinger@rooksrider.co.uk>; Masoud Zabeti
<Masoud.Zabeti@Mishcon.com>
**Subject:** Urgent: BJL/BJM (Trip to Montenegro)

Dear Mr. Shaw

I hope you are well and could find some time to profit of the beauty of Montenegro.

I refer to my yesterdays e-mail as well as our short telephone conversation through Mr. Golikovs phone
where you promised me to call me back.
As you did neither call me back nor give me a written report about your actions in Montenegro, as I
requested,I would kindly remind you that we have on Monday a Hearing dealing securing the assets on a
more elegant and cost effective way, that does not destroy the commercial reputation of our hotel business
for all times. Nevertheless you registered in our branch company a heavy content that was not appropriate. I
still have the impression that you are not sticking to the court order and understand your engagement in a
much more aggressive way that securing the assets (which are - by the way - secure). Futhermore I wonder
why you go to Montenegro whilst Mr. Becirovic, the General Director of BJM, is and was not in the office
the last days. Did you meet him outside of the Office? Please indicate where and when, if so.

I also asked you yesterday to pass me a complete listing of your expenses for your trip to Montenegro as I
cannot agree as director wasting large sums for little or no advantage to the company. I was meanwhile
reported that you turned this fastly arranged and not properly announced business trip to a family holiday. I
really do not understand the way you behave. However, as I recalled yesterday, your engagement for
BJL/BJM is generously funded by TKN BP. This pushes me to have serious doubts now. As I cannot judge
upon your possible personal relationship with TKN BP and possible existing, undisclosed bilateral, oral
agreements in regard to the use of these funds, I would leave it like that, assuming that you know what you
do and what you can and should do in the current situation. Please be advised that your actions could be able
to touch your professional integrity as well as the reputation of your company, BDO. You will have to
admit, that your behavior and your recent actions which I only can judge to to run down the business and
decreasing the value of the company rise heavy doubts in this direction. I really hope that you will prove me
that my evident assumptions are without ground and you did not deliver privileged material or information
to TKN BP in the context of the proceedings. However, this you will have to explain this at a later stage.

I wait for a written report of all relevant content of your trip to Montenegro in relation to BJL and BJM by
tomorrow Sunday, June 10, 3pm the latest as we have as I mentioned a court application that will be heard
on Monday. Would you please also give me a feedback on your progress in Montenegro in relation to the
urgent matters, such as the urgently needed credit.

If you do not reply in time we will be obliged to consider it against you and BDO to your disadvantage.
Needless to say that all this happenings throw a very dark light on your position as PL installed by court and
the general reputation of BDO.

I thank you very much in advance.

I case I can help you to deal with the international matters of BJL, I am glad to help you as I see your
difficulties dealing with these issues.

Best Regards
Marcel Telser



sgh | martineau

Our ref: IGW/KR/BEP1-1
When telephoning please ask for: Ian Williams
(Direct dial: 020 7264 4454, Email: ian.williams@sghmartineau.com)
Your ref: AXP/CJB/LE1013-003

*Please Reply to our London Office*

Rooks Rider Solicitors LLP
Challoner House
19 Clerkenwell Close
London
EC1R 0RR

| BY FACSIMILE TRANSMISSION TO: | | FAX NUMBER | |
|---|---|---|---|
| Number of pages: 3 | | 020 7689 7001 | |
| **SGH Martineau LLP** | **From UK** | **International** | |
| Telephone | 020 7264 4444 | +44 20 7264 4444 | |
| Fax | 020 7264 4440 | +44 20 7264 4440 | |
| **N.B. This fax is intended only for the addressee and may contain information that is confidential or privileged from disclosure. If this fax is not addressed to you then you must not copy, disseminate or distribute it. If this fax has been sent to you in error please accept our apologies and notify this office.** | | | |

FAO Amanda Pullinger

2 August 2012

Dear Sirs,

### Beppler & Jacobson Limited (BJUK) (Provisional Liquidators Appointed)

We write further to the Order of Newey, J of 16 July 2012 (**Newey Order**). We have also seen a copy of a letter that Mr Telser wrote to Mr Becirovic, Mr Peskov and Mr Golikov (**BJM Directors**) dated 26 July 2012. We note that Mr Telser did not send a copy of his letter to the provisional liquidators (**PLs**).

In this letter, we will set out the actions that the PLs now propose to take. Accordingly, insofar as necessary, this letter constitutes notice pursuant to the terms of the Newey Order.

1. **Books and Records of BJUK**

   In order to protect and preserve the assets of BJUK (which for these purposes naturally includes choses in action), it is imperative that the PLs obtain the complete set of original books and records. The PLs need to ascertain what the assets of BJUK consist of and therefore need to see what assets BJUK has, has had, and has disposed of. This is particularly important in this case given the allegations made in relation to the way in which certain accounting treatment has been applied.

   Mr Telser has still not handed over the original books and records in his possession despite repeated requests that he do so. Copies of selected documents are not acceptable given the circumstances and certainly do not constitute the books and records of BJUK.

   We are therefore giving you notice that we intend to issue proceedings in Liechtenstein and/or the UK to compel delivery up by Mr Telser of all the books and records in his possession or under this control and if necessary to examine him in court should any

SGH Martineau LLP is a Limited Liability Partnership registered in England & Wales (registration number OC300286) and authorised and regulated by the Solicitors Regulation Authority (SRA number 347123). The registered office is One America Square, Crosswall, London EC3N 2SG.






questions arise in relation to them and/or his failure to comply with his obligations to the PLs pursuant to section 235 Insolvency Act 1986 (**IA 1986**).

**2.   Mr Telser's letter of 26 July 2012**

The PLs advised Mr Telser shortly after their appointment that the appointment of PLs divests the directors of their powers of management. Accordingly, Mr Telser does not have, and the Newey Order certainly did not give him, any power to act as a director or even as an agent of BJUK.  Consequently, the PLs require the following:

(a)  Mr Telser must <u>forthwith</u> write to the BJM Directors revoking the instructions ("requests") he purported to give them in the letter; and

(b)  Mr Telser must undertake in writing by the close of business Monday 6 August 2012 (i) that he will cease and desist from interfering in any way in the business and affairs of BJUK and its subsidiary BJM; and (ii) that he will not facilitate, cause or procure any amendments to the constitution of BJM to be made or registered in the Montenegrin Companies Registry.

In accordance with the PLs' protect and preserve mandate, it is imperative that they receive information about BJM. Mr Golikov has been asked by Mr Shaw previously for an up to date cashflow which has not been provided.

As you know, Mr Telser is under a direct statutory duty to co-operate with the PLs under section 235 IA 1986 and, should he not comply with the above, we reserve the right to apply on an urgent basis for an injunction restraining Mr Telser from interfering further.  The PLs will be writing to the BJM Directors separately.

**3.   BJM**

(a)  Provision of Financial Information

In accordance with the PLs' protect and preserve mandate, it is imperative that they receive information about BJM.  Mr Golikov has been asked by Mr Shaw previously for an up to date cashflow which has not been provided.

Such information as does come from Mr Golikov arrives in a haphazard fashion and often with questions as to the motives behind its provision.  In particular, Mr Golikov was requested some time ago to provide an updated cash flow forecast which demonstrated why the funding gap which Mr Golikov previously claimed existed had been solved.  This was not provided.  However, Mr Golikov subsequently requested certain funds in the hands of BJUK to be provided to BJM, again with no adequate reasons being provided.  This request, too, now seems no longer to exist.

This has caused the PLs to re-assess their strategy in relation to BJM given their clear need for accurate and current information to fulfil their duties.  Accordingly, the PLs require the following information:

(i)  A weekly cashflow forecast covering the period from now until the end of 2012.

(ii) A receipts and payments account for the period since the start of May 2012 to the present date covering receipts and payments into all BJM bank accounts, in the same format as the forecast above.

(iii) Actual monthly profit and loss accounts for May, June and July 2012.

(iv) Forecast profit and loss accounts for each month from August 2012 until December 2012.



Naturally, the PLs may well ask for additional information and the same information on a rolling basis in the future. The BJM Directors will be asked to provide the information set out in paragraphs (i) to (iv) above by no later than Thursday, 9 August 2012.

Only if this information is provided and the PLs are satisfied it is reliable and accurate can the PLs stand back and not "interfere in the day to management of BJM" as envisaged by the Newey Order. Given the previous issues which have arisen, this is clearly consistent with the Newey Order.

(b) Due Diligence into litigation conducted by Harrisons

Notwithstanding Mr Telser's intervention, the due diligence process will continue so that the PLs can take an independent view of the various claims being made against BJM.

This is clearly necessary as the existence of such litigation and the way that BJM deals with it will naturally affect the value of BJM and therefore the value of the assets of BJUK.

The BJM Directors must therefore continue to supply the necessary information to Harrisons. It is not possible to know the extent of the threats or potential threats that BJM faces without this information. This again is entirely consistent with their duty to protect and preserve the assets of BJM.

Yours faithfully,

SGHM LLP.

**SGH Martineau LLP**

Cc. Mishcon de Reya

**FAO Masoud Zabeti**

Cc. Bryan Cave

**FAO Richard Stewart and Robert Dougans**

3

119

# BEPPLER & JACOBSON LTD.
### (PROVISIONAL LIQUIDATORS APPOINTED)

To: Zoran Becirovic, Managing director (becirovic@calderotrading.com)
To: Mikhail Peskov, Finance director (peskov.mikhail@gmail.com)
To: Victor Golikov; Administrative director (victor.golikov@t-com.me)
    Beppler & Jacobson d.o.o.
    Mediteranska 2, P.O. Box 44
    85310, Budva,
    Montenegro

Vaduz, 26 July 2012  bec

**Direction**

Dear Mr. Becirovic, Mr. Golikov and Mr. Peskov

I am writing to you as the directors of Beppler & Jacobson Montenegro to let you officially know from the side of Beppler & Jacobson LTD that according to the order of high court of justice chancery division which was sealed 17.07.2012 it was ordered (connected to Beppler & Jacobson Montenegro d.o.o.) that:

1. The sole purpose of provisional liquidators of Beppler & Jacobson Ltd. (UK) shall be to protect and preserve the assets of Beppler & Jacobson Montenegro d.o.o.

2. Zoran Becirovic's role as a director of Beppler & Jacobson Montenegro shall be limited to governmental and local affairs as set out in Direction Number 6 of Beppler & Jacobson LTD.

Having said this I kindly request you as directors of Beppler & Jacobson LTD:

1. To stop the delivery of requested information and documentation from the side of the provisional liquidators in regard to due diligence purposes or to any other third party. Responsible directors:  Zoran Becirovic, Victor Golikov and Mikhail Peskov;

2. To provide me till Tuesday 31.07.2012 a report with current status of negotiations with Budva municipality in respect of amount of communal tax payable. Responsible directors: Zoran Becirovic and Victor Golikov;

---

*Registered address: 55 Baker Street, London W1U 7EU, United Kingdom*

3. To inform the senior management of Beppler & Jacobson Montenegro d.o.o. about the organisational structure of Beppler & Jacobson Montenegro d.o.o. as it was set out in Direction Number 6 and the areas of responsibilities of directors of Beppler & Jacobson Montenegro d.o.o. in writing. Responsible director: Michael Peskov;

4. To inform me about the current status in regard to the Casino and a proposal how this case can be settled in the economic interest of Beppler & Jacobson Montenegro d.o.o. in writing until Tuesday, 31.07.2012. Responsible director: Zoran Becirovic;

5. To elaborate a written proposal for weekly directors meetings with a standardised agenda and meeting notes. Responsible director: Victor Golikov.

6. To examine all financial advantages of the directors or senior management of Beppler & Jacobson Montenegro d.o.o. and to establish a written report on that to my hands. Responsible director: Mikhail Peskov.

7. To refrain from all public and internal statements that may damage the reputation of Beppler & Jacobson Montenegro d.o.o or Beppler & Jacobson Ltd. Responsible directors: Zoran Becirovic, Victor Golikov and Mikhail Peskov.

8. Finally, I would like to draw your attention that the directors of Beppler & Jacobson Montenegro d.o.o., Beppler & Jacobson Ltd. or related parties to them will not have discretionary accommodation or any other hotel services with immediate effect. I kindly ask you to review the discretionary guest list and make me a new proposal until Tuesday, 31.07.2012. Responsible directors: Zoran Becirovic, Victor Golikov, Michael Peskov.

I thank you very much for your co-operation and your efforts to keep track in this very important high season.

Attached to this mail you can find the scanned copy of sealed order dated 17.07.2012.

Best regards

lic.iur. Marcel Telser
Director

**From:** <m.telser@blueaxis.net>
**Date:** Tue, 31 Jul 2012 17:13:16 +0200
**To:** becirovic<becirovic@calderotrading.com>
**Cc:** george.jacobs@bdo.co.uk<george.jacobs@bdo.co.uk>; goran.martinovic@harrison-solicitors.com<goran.martinovic@harrison-solicitors.com>;
Mark.Shaw@bdo.co.uk<Mark.Shaw@bdo.co.uk>;
peskov.mikhail@gmail.com<peskov.mikhail@gmail.com>; victor.golikov@t-com.me<victor.golikov@t-com.me>; zbecirovic@gmail.com<zbecirovic@gmail.com>
**Subject:** Antwort: >>: letter bjm

Dear Mr. Becirovic

Thank you very much for your message. I would like to draw your attention to the fact that the role of the PLs was reduced to "keeping the assets" as seen in the court order attached to my email, as well as that "Direction 6" was ordered to be put back in place. I am still Director of BJL and was not replaced by the PLs as you have in mind.

In this regard, I think wether you agree or not, you will have to consider the directions that I pass to you, which are at the end of the day established to the benefit of the BJL and BJM.

I wait therefore for your report in regard to the Casino issue until tomorrow, Wednesday August 1, evening.
I thank you very much in advance for your kind cooperation.

Best Regards

Marcel Telser


becirovic ---31.07.2012 16:56:56---Dear Mr Telser, I confirm that on 30.07.2012 I received a document titled "Direction" dated 26.07.20

Von: becirovic <becirovic@calderotrading.com>
An: "m.telser@blueaxis.net" <m.telser@blueaxis.net>, "victor.golikov@t-com.me" <victor.golikov@t-com.me>, "peskov.mikhail@gmail.com" <peskov.mikhail@gmail.com>
Kopie: "Mark.Shaw@bdo.co.uk" <Mark.Shaw@bdo.co.uk>, "george.jacobs@bdo.co.uk" <george.jacobs@bdo.co.uk>, "goran.martinovic@harrison-solicitors.com" <goran.martinovic@harrison-solicitors.com>, "zbecirovic@gmail.com" <zbecirovic@gmail.com>
Datum: 31.07.2012 16:56
Betreff: >>: letter bjm



Dear Mr Telser,

I confirm that on 30.07.2012 I received a document titled "Direction" dated 26.07.2012, apparently originating from you.

I am firmly of the position that from 3 May 2012 when the provisional liquidators were appointed and until they are discharged by the English court you are in no capacity and have no authority to give any directions and/or instructions

to the directors of B&J Montenegro, including myself. Whatever adjustments to the scope of the provisional liquidators' tasks have been made by English court does not affect the fact of their appointment, and does not affect the fact that they effectively replaced you.

If you have any issues with my position, please, address all your queries and complaints to the provisional liquidators and English court.

On a practical note, I will be working with my colleague directors of B&J Montenegro and the provisional liquidators to make sure that the company's assets are preserved, and that the day-to-day management of B&J Montenegro is done effectively and properly.

Regards,

Zoran Becirovic

---

**От:** p.eleganti@blueaxis.net [p.eleganti@blueaxis.net]
**Отправлено:** 30 июля 2012 г. 9:57
**Кому:** becirovic; peskov.mikhail@gmail.com; victor.golikov@t-com.me
**Тема:** letter bjm
*E-Mail on behalf of Marcel Telser*

Please find attached letter in name of Marcel Telser:

*(See attached file: letter bjm.PDF)     (See attached file: 2012.07.16 Sealed Order of Newey J (2).pdf)*

Best regards,
Pia Eleganti

**From:** "Victor Golikov" <victor.golikov@t-com.me>
**Date:** Mon, 30 Jul 2012 17:36:08 +0400
**To:** 'Vido Đakonović'<adv.djakonovic@gmail.com>
**Subject:** info to Harrisons

Dear Vido,

Please do not provide any further info to Harrisons.

In case they will ask for additional info  -  please let me know.

Best regards
Victor




85310 Budva, Montenegro ▓▓▓▓▓▓ PO BOX 44

| | |
|---|---|
| Telefon: | +382 33 441 560 |
| Fax: | +382 33 441 567 |
| Broj PIB | 02391082 |
| Broj PDV | 30/31-03264-3 |
| Žiro račun: | 55710-604-1-4726 |
| Registarski broj: | 5-0191462/003 |

**From:** Mikhail Peskov
**To:** All Department Heads and Managers
Beppler & Jacobson Montenegro
**Date:** 31.07.2012.
**Meeting started:** 11:30

Attendance:

1. Mikhail Peskov

2. Milan Pavicević

3. Dušan Bećir

4. Marea Puhiz

5. Milena Radivojević

6. Milana Svdnjar

7. Saša Culibrk

8. Dražen Pavhć

9. Marko Bulatović

10. Komnen Bakić

11. Željko Jotić

12. Marganna Viominova

13. Dragana Mustur

14. Bosa Šćepanović

15. Milan Keker,
Advokatska kancelarija Karanović
& Nikolić

85310 Budva, Mo̶̶̶̶̶̶̶̶̶

| | |
|---|---|
| Telefon | +382 33 441 560 |
| Fax | +382 33 441 567 |
| Broj PIB | 0239108.. |
| Broj PDV | 30-31-03254 .. |
| Žiro račun | 55710-604-1-47.. |
| Registarski broj | 5-0191462/003 |

Sastanak je vodio administrativni direktor, Mikhail Peskov (u daljem tekstu: **"MP"**)

**MP:** Dana 30.07.2012. su direktori "Beppler & Jacobson Montenegro"DOO Zoran Bećirović, izvršni direktor, Peskov Mikhail, finansijski direktor i Victor Golikov administrativni direktor dobili pismo od zvaničnog direktora matične firme "Beppler & Jacobson" UK, Marcela Telcera.

Saglasno ovom pismu ja kao finansijski direktor "Beppler & Jacobson Montenegro" DOO dobio sam naređenje da vas obavijestim o sledećem:

1. Riešenjem Visokog Suda Pravde u Londonu br. 2630 od 2012. **od 17.07.2012. direktiva matične firme #6** izdata od strane opunomoćenika 03.09.2012. **ostaje na snazi i njen sadržaj se ne mijenja.**

2. Prilog ove direktive je šema organizacione strukture „Beppler & Jacobson Montenegro" DOO (u daljem tekstu „BJM"). Ova šema reguliše obaveze i pripadajuće **nadležnosti svakog od direktora BJM**

   - Izvršni direktor Zoran Bećirović odgovara za Službu za državne odnose.
   - Finansijski direktor Mikhail Peskov odgovara za finansije i računovodstvo.
   - Administrativni direktor Victor Golikov odgovara za operativni rad hotela.
   - Direktorima hotela nadređen je administrativni direktor Victor Golikov.
   - Direktori BJM podređeni su direktoru matične firme BJ UK.
   - U skorije vrijeme biće završena nova detaljna sistematizacija u skladu sa ovom direktivom.
   - Služba Prodaje i Marketinga, Nabavna služba i Pravna služba BJM su raspuštene. Zaposleni u ovim sektorima će biti raspoređeni na druga radna mjesta u skladu sa Zakonom.
   - Formira se služba za državne odnose. Organizaciona struktura službe za državne odnose je definisana Direktivom #6
     korporativna služba prodaje i marketinga i korporativna služba nabavke odgovaraju predstavniku dijela stranog društva BJ London Ltd u Budvi, Victoru Golikovu.
   - Služba računovodstva i Finansijska služba su podređene Finansijskom direktoru.
   - GM svih hotela, sve druge službe osim Finasijske službe, Službe računovodstva i Službe za državne odnose su podređeni Administrativnom direktoru.

Nadam se da ćete kao visoko profesionalni i kvalifikovani menadžeri poštovati ovu direktivu i organizacionu strukturu firme kao što je bilo i ranije, u suprotnom to će biti procijenjeno kao povreda radnih obaveza.

Molim svakog od vas da o ovoj direktivi obavijesti sve svoje zaposlene do kraja radnog vremena i pošalje mi zvanični mail da je to obavijerio.

2




85310 Budva, M̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶ P.O. BOX 44

| | |
|---|---|
| Telefon: | + 382 33 441 550 |
| Fax: | + 382 33 441 551 |
| Broj PIB: | 02391083 |
| Broj PDV | 30/31-03264 3 |
| Žiro račun: | 55710-604 1-4725 |
| Registarski broj: | 5-0191462/003 |

Konstatuje... da su svi menadžeri su dobili kopije direktive #6 sa prevodom na crnogorski jezik. Svim menadžer... na ... data na uvid direktiva Marcela Teixera sa kopijom Rješenjea Visokog Suda Pravde u Londonu.

Zapisnik sa ... og sastanka potpisuju svi prisutni.

Zapisnik je urađen u tri primjerka, od kojih se

- ... ...mjerak dostavlja Arhivi, gdje se postoji u mogu dobiti kopiju,
- Finansijskom direktoru Mikhailu Peskovu
- Matičnoj kompaniji BJ London

Zapisničar                                                                                                  U Budvi,
                                                                                                                   31.07.2012

_____

Milica Kastratović

3

**GRAND HOTEL & VILLAS** **Managed by:** 85310 Budva, Montenegro, Mediteranska 2 P.O. Box 44
**AVALA** **BEPPLER &** **Phone: +382 33 441 560**
MONTENEGRO **JACOBSON** Fax:    + 382 33 441 567
Company no: 02391082
**VAT no:** 30/31-03264-3
Transfer acc: 55710-604-1-4725
Registration no: 5-0191462/003

From: Mikhail Peskov
To: All Department Heads and Managers          BEPPLER & JACOBSON MONTENEGRO D.O.O.
Beppler & Jacobson Montenegro                Number 770
Date: 31st July 2012                              Budva, 31th July 2012

**Meeting started: 11:30**

Attendance:

1. **Mikhail Peskov**
   _____
   **(signature illegible)**

2. **Milan Pavićević**
   _____
   (signature illegible)

3. **Dušan Bećir**
   _____
   **(signature illegible)**

4. **Matea Puljiz**
   _____
   (signature illegible)

5. **Milena Radivojević**
   _____
   **(signature illegible)**

6. **Milana Šušnjar**
   _____
   **(signature illegible)**

7. **Saša Ćulibrk**
   _____
   (signature illegible)

8. **Dražen Pavlić**
   _____
   **(signature illegible)**

9. **Marko Bulatović**
   _____
   (signature illegible)

10. Komnen Bakić
    _____
    **(signature illegible)**

11. **Željko Jotić**
    _____
    (signature illegible)

12. Marianna Mominova
    _____
    **(signature illegible)**

13. **Dragana Mustur**
    _____
    (signature illegible)

14. Bosa Šćepanović
    _____
    **(signature illegible)**

15. **Milan Keker**
    _____
    (signature illegible)

   Law Office Karanović & Nikolić



128

GRAND HOTEL & VILLAS   Managed by:   85310 Budva, Montenegro, Mediteranska 2 P.O. Box 44

# AVALA
MONTENEGRO

**BEPPLER &
JACOBSON**

Phone: +382 33 441 560
Fax:    + 382 33 441 567
Company no: 02391082
VAT no:      30/31-03264-3
Transfer acc: 55710-604-1-4725
Registration no: 5-0191462/003

**The meeting was conducted by the Administrative Director Mikhail Peskov (henceforward: MP)**

MP: On 30th July 2012 the Director of Beppler & Jacobson Montenegro DOO Zoran Bećirović, executive Director , Mikhail Peskov, Financial Director and Victor Golikov, Administrative Director received a letter from an official Director of the mother company Beppler & Jacobson UK, Marcel Telcer.

According to this letter, I, as a Financial Director of Beppler & Jacobson DOO, have received an order to inform you about the following:

1. By the decision of the High Court of Justice in London no. 3680, dated 17th July 2012, the directive of the mother company #6 issued by the authorised persons on 1st September 2012 remains in force and its content does not change.
2. An attachment to this directive is the scheme of the organisational structure of Beppler & Jacobson Montenegro DOO (henceforward: BJM). This scheme regulates the obligations and competence of each of the Directors of BJM.

- executive Director Zoran Bećirović is responsible for the Department of National Relations
- Financial Director Mikhail Peskov is responsible for the finance and accounting
- Administrative Director Victor Golikov is responsible for the management of the hotel business
- the Administrative Director Victor Golikov is superior to the Directors of the hotel
- the Director of the mother company BJ UK is superior to the Directors of BJM
- Very soon a new detailed systematisation of posts according to this directive will be completed
- The Department of Sales and Marketing, Procurement Department and legal Department of BJM will be dissolved. The employees from these sectors will be given other posts in accordance with the law.
- Department of National Relations is formed. The organisational structure of the Department of National Relations is defined by the directive #6.
- the corporate Department of Sales and Marketing and corporate Department of Procurement are subordinated to the representative of the part of the foreign company BJ London BJ Ltd in Budva, Victor Golikov
- The accounting Department and Financial Department are subordinated to the Financial Director
- GM of both hotels, all other Departments apart from Financial Department , accounting Department and Department of National Relations are subordinated to the Administrative Director .

I hope that you, as highly professional and qualified managers, will comply with this directive and the organisational structure of the company as it used to be before, otherwise it will be understood as the violation of employment relationships.

I ask everyone to inform their employees about this by the end of the working hours and send an official mail that it has been done.



Branislav
Pantović

129

| GRAND HOTEL & VILLAS | Managed by: | 85310 Budva, Montenegro, Mediteranska 2 P.O. Box 44 |
|---|---|---|
| **AVALA** | **BEPPLER &** | Phone: +382 33 441 560 |
| MONTENEGRO | **JACOBSON** | Fax:    + 382 33 441 567 |
| | | Company no: 02391082 |
| | | VAT no:       30/31-03264-3 |
| | | Transfer acc: 55710-604-1-4725 |
| | | Registration no: 5-0191462/003 |

I state that all the managers have received copies of the directive #6 with translation to Montenegrin language. All the managers have been granted inspection of the Marcel Telcer directive with a copy of the decision of the High Court of Justice in London.

The minutes from this meeting are signed by all the present individuals.

The minutes consist of three copies:

- One copy is for the Records, where all the signatories can get a copy
- One copy for the Financial Director Mikhail Peskov
- One copy for the mother company BJ London


Recording clerk,


_____ (signature illegible)
Milica Kastratović                    Oval seal: Beppler & Jacobson          In Budva
                                      Montenegro, a limited liability        31ˢᵗ July 2012
                                      company, Budva



# Beppler & Jacobson Ltd.
## Branch office Budva
HOSPITALITY           TOURISM           DEVELOPMENT

Mainski put b.b., P.O. Box 164
Budva, 85310, Montenegro

To: Zoran Becirovic, Managing director
To: Mikhail Peskov, Finance director
To: Victor Golikov, Administrative director
**Beppler & Jacobson d.o.o.**
Mediteranska 2, P.O. Box 44
85310, Budva,
Montenegro

Direction #6 from 01.09.2011

Dear Mr. Becirovic, Mr. Peskov and Mr. Golikov,

On the base of Art. 36 and Art. 37 of By-Laws of Beppler & Jacobson Montenegro d.o.o., to increase of business performance and transparency of all activities of Beppler & Jacobson Montenegro d.o.o. for shareholders, Beppler & Jacobson Ltd (UK), being mother company of Beppler & Jacobson Montenegro d.o.o., made following changes in organization structure of Beppler & Jacobson Montenegro d.o.o.:

1. **Sales & Marketing department** in Beppler & Jacobson Montenegro d.o.o. has been dissolved. Reservation Department (RD) has to be formed in both hotels and include up to 3 reservation clerks in Avala resort and Villas and up to 2 reservation clerk in Bianca resort and Spa. Reservation department should be responsible for entering reservations in Fidelio system and for communication with individual clients. The reservation departments are subordinated to General Managers of hotels. All sales and marketing decisions and actions are transferred to Beppler & Jacobson LTD (UK) branch office in Budva;

2. **Purchasing Department** in Beppler & Jacobson Montenegro d.o.o. has been dissolved. Storing Departments (SD) have to be formed in both hotels and include up to 2 storekeepers in Avala resort and Villas and up to 2 storekeepers in Bianca resort and Spa. Storing departments are subordinated to GM of hotels. All purchase decisions and activities are transferred to Beppler & Jacobson LTD (UK) branch office in Budva;

3. **Legal Department** in Beppler & Jacobson Montenegro d.o.o. has  been dissolved. Human resource assistants (1 person per hotel) are subordinated to GM of hotels. Human resource assistants will be responsible for all official papers in respect of hiring and dismissing of staff. The other legal activities are transferred to Beppler & Jacobson LTD (UK) branch office in Budva;

131

# Beppler & Jacobson Ltd.

## Branch office Budva

HOSPITALITY               TOURISM               DEVELOPMENT

Mainski put b.b., P.O. Box 164
Budva, 85310, Montenegro

4. **Government Relations** (GR) department has to be formed in Beppler & Jacobson Montenegro d.o.o. This department has to include up to 2 managers and subordinated to Managing director of Beppler & Jacobson Montenegro d.o.o. This department will be responsible for communication with various inspections, various officials, receiving of various licenses, permissions and other official documents which Beppler & Jacobson d.o.o. has to have for performing of the business operations as per positive norms and regulations of Montenegro;

5. **Accounting Department** and **Finance Department** are subordinated to Finance director;

6. **General Managers** of hotels, all other departments, except finance, accounting and GR departments are subordinated to Administrative director of Beppler & Jacobson Montenegro d.o.o

Please issue needed orders, instructions and other official documents which need to be issues and implement new structure to be acting from 08.09.11.

Needed changes have to be done in staff list of Beppler & Jacobson Montenegro d.o.o., labor contracts with particular workers, salary calculation systems. Staff from dissolved departments needs to be transferred to other departments in which Beppler & Jacobson Montenegro d.o.o. has lack of qualified workers. In case it will be impossible to transfer mentioned workers to other departments such workers need to be fired from Beppler & Jacobson Montenegro d.o.o.

Managers of Beppler & Jacobson Montenegro d.o.o. have to be informed in official way about this direction (signed copy of the direction to all of the managers of Beppler & Jacobson Montenegro d.o.o. need to be stored together with this direction in the special book with all directions from Beppler & Jacobson LTD (UK) and official notice need to be sent to other workers as well as to place proper information from this direction on bulletin board.

**Responsible for execution:**

Managing Director of Beppler & Jacobson d.o.o. mr. Zoran Becirovic,

Finance Director of Beppler & Jacobson d.o.o. mr. Mikhail Peskov and

Administrative Director of Beppler & Jacobson d.o.o. mr. Victor Golikov.

**Time of execution of actions from this direction – till 08.09.2011.**

Please report about results of execution of this direction till the end of business day 08.09.2011.

132

# Beppler & Jacobson Ltd.

### Branch office Budva

HOSPITALITY             TOURISM             DEVELOPMENT

Mainski put b.b., P.O. Box 164
Budva, 85310, Montenegro
Attachment:

Organization chart. (1pcs on 1 page)


Best regards,

Roman Kopylkov

Official representative of Beppler and Jacobson Ltd (UK) in Montenegro



134



Richard Stewart
Partner
Tel: 020 3207 1225
rjstewart@bryancave.com

31 July 2012

Our ref:  RS4/KU1/A38/0337021
Your ref:  GCD/SYR/LEI013-003

**Bryan Cave**
88 Wood Street
London  EC2V 7AJ
Tel +44 (0) 20 3207 1100
Fax +44 (0) 20 3207 1881
www.bryancave.com

Rooks Rider Solicitors
Challoner House
19, Clerkenwell Close
London
EC1R 0RR

*A multinational partnership of solicitors and registered foreign lawyers authorised and regulated by the Solicitors Regulation Authority (SRA No. 00072291).*

*A list of the partners and their professional qualifications is open to inspection at the above address.*

Dear Sirs,

**Re: Beppler & Jacobson Petition No. 3680 of 2012**

*In Association With Bryan Cave LLP*

**Bryan Cave Offices**

We attach a letter dated 26 July 2012 sent by your client to the directors of BJM.  The letter was accompanied by a copy of the order of Mr. Justice Newey dated 16 July 2012.  We also attach an email sent by him today to Mr. Becirovic.

From the contents of the letter and the email, Mr. Telser appears to be labouring under the misapprehension that he still exercises authority over the affairs of BJUK and BJM.   As you will be aware, the appointment of Provisional Liquidators over BJUK on 3 May 2012 displaced the authority of Mr. Telser to manage the affairs the company and its subsidiary.   The order of Mr. Justice Newey did not change that position.

Cleary you need urgently to enlighten Mr. Telser as to the realities of his current relationship with BJUK and BJM.  We should be grateful if you would also advise him immediately to cease any further interference in the affairs of BJUK or BJM.  If he does not, then we are instructed to take such steps as may be necessary to protect our client's position without further notice.

Yours faithfully,

*Bryan Cave*

**Bryan Cave**

Cc BDO
**FAO. Mark Shaw and Malcolm Cohen**

Cc. SGH Martineau LLP
**FAO. Ian Williams and Kim Richie**

Atlanta
Charlotte
Chicago
Dallas
Hamburg
Hong Kong
Irvine
Jefferson City
Kansas City
London
Los Angeles
New York
Paris
Phoenix
San Francisco
Shanghai
Singapore
St. Louis
Washington, DC

**Bryan Cave**
**International Consulting**
*A TRADE AND CUSTOMS CONSULTANCY*

www.bryancaveconsulting.com

Bangkok
Beijing
Jakarta
Kuala Lumpur
Manila
Shanghai
Singapore
Tokyo

273718.1



Tel: +44 (0)20 7486 5888     55 Baker Street
Fax: +44 (0)20 7935 3944     London W1U 7EU
DX 9025 West End W1
www.bdo.co.uk

Messrs Z Becirovic, M Peskov, V Golikov
Beppler & Jacobson  Montenegro d.o.o
Mediteranska 2,
PO Box 44
85310 Budva
MONTENEGRO


<u>BY EMAIL AND PROCESS SERVER</u>


2 August 2012


Gentlemen,

**Beppler & Jacobson Limited (BJUK) (Provisional Liquidators Appointed)**
**Beppler & Jacobson Montenegro doo (BJM)**

It has come to my attention that Mr Telser has sent you all a letter dated 26 July 2012, which is headed **"Direction"**, in which he purports to give you instructions on a number of issues affecting BJM (enumerated 1 to 8).

Please note that Mr Telser has no authority to give such instructions and my lawyers have written to his lawyers demanding that those instructions are immediately revoked.

**Please note, for the avoidance of doubt, that the appointment of me and my partner as provisional liquidators (PLs) of BJUK in May of this year completely divested Mr Telser of his powers to direct and manage BJUK and he has no authority to act on behalf of BJUK as he has purported to do.**

If you have any doubt as to the legal position of Mr Telser as a director of BJUK following our appointment as PLs, I suggest you urgently seek legal advice from an English lawyer.

I have also received minutes of a meeting, held by Messrs Peskov and Golikov with senior employees of BJM on 31 July 2012 at which certain decisions following on from Mr Telser's letter were communicated.

We, as PLs of BJUK, control BJUK's shareholder interests in BJM, as the latter is its wholly-owned subsidiary.  As such, only the PLs can act as BJM's founder in any decisions or strategies, in accordance with our mandate as PLs of BJUK to protect and preserve its assets and those of BJM.

You acknowledge that you understand this hierarchy in bullet point 5 under numbered paragraph 2 of the minutes of your meeting, although you use the term "director".  We have never had a desire to interfere in the day-to-day management of BJM, and this will remain the case provided (1) we can be assured and satisfied that you will act in the best interests of BJM and thus BJUK (2) you co-operate with us and (3) you provide us with sufficient accurate and reliable information to enable us objectively to determine that BJM is not at risk and is adequately protected.  To the extent that we feel insecure or in doubt in these areas, we will have no option other than to apply back to court to amend the latest order and to obtain enhanced powers.

BDO LLP, a UK limited liability partnership registered in England and Wales under number OC305127, is a member of BDO International Limited, a UK company limited by guarantee, and forms part of the international BDO network of independent member firms. A list of members' names is open to inspection at our registered office, 55 Baker Street, London W1U 7EU. BDO LLP is authorised and regulated by the Financial Services Authority to conduct investment business.



Accordingly, we should be grateful if you would confirm in writing by return that you will do the following:

(i)     Provide a weekly cashflow forecast covering the period from now until the end of 2012.

(ii)    Provide a receipts and payments account for the period since the start of May 2012 to the present date covering receipts and payments into all BJM bank accounts, in the same format as the forecast above.

(iii)   Provide actual monthly profit and loss accounts for May, June and July 2012.

(iv)    Provide forecast profit and loss accounts for each month from August 2012 until December 2012.

(v)     That you and BJM's lawyers will continue to supply such information as our lawyers, Harrisons, require to complete the due diligence into the legal actions extant or threatened against BJM and that you will fully co-operate in this regard.

(vi)    That you will comply with Mr Becirovic's reasonable requests for information as required by paragraph 2 of Schedule 1 of the court order that Mr Telser sent you with his letter.  Notwithstanding the technical limiting of his role by the order, this does not change the fact that he remains a director of BJM under Montenegrin law (which is acknowledged in the court order itself) and as such you should seek to work together in BJM's best interests.  BJUK, as founder of BJM, wishes to see all directors of BJM discharge their duties collectively to BJM, consistent with Montenegrin law.

Please provide the information in paragraphs (i) to (vi) above by no later than Thursday, 9 August 2012.  Naturally, the PLs may well ask for additional information and the same information on a rolling basis in the future.

There are two other issues I wish to raise with you:

1.   Negotiations with ERSTE Bank and CKB Bank

In your email of 29 July 2012, you ask me whether there is any way we will consent to remove the entry in the central registry we placed (as we were obliged to do under Montenegrin law) or "provide the banks with reasonable info...".  I trust you will appreciate that it is very difficult for me to form a view as to whether it would be appropriate for me to assist you with obtaining this loan when I am not in a position to understand the true financial position of BJM.  I have asked before for an up to date cash flow to follow on from the one I prepared when I came to Montenegro in June; this has not been forthcoming.

2.   The Casino

I am concerned that this issue does not appear to have been satisfactorily resolved, or has not been resolved at all.  It is imperative that you ensure that this is dealt with as a priority as, if it is not, the business of BJM is likely to be significantly damaged during the autumn and winter months when revenues are lower.  Please could you confirm therefore that you will make this a priority and let me know within the next two weeks what progress you have made in resolving this matter.

I make no comment here on the relative merits of the issues.  My concern here is to see a solution to what I believe is likely to be a seasonal cash flow problem after the summer.

Conclusion

We have reached an important stage in the provisional liquidation and this is an important letter. Consequently, so that there are no misunderstandings, I am having this letter translated into Russian, which I know you all understand.  This will be delivered to you personally at The Avala Hotel so that I know that you have received it.

I look forward to hearing from you and thank you for your assistance.


Yours sincerely
For and on behalf of
Beppler & Jacobson Limited



Mark Shaw
Joint Provisional Liquidator

Our Ref:     AXP/CJB/TEL009-001



Bryan Cave
88 Wood Street
London
EC2V 7AJ

Rooks Rider Solicitors LLP
Challoner House
19 Clerkenwell Close
London EC1R 0RR

Telephone:  +44(0)20 7689 7000
Facsimile:   +44(0)20 7689 7001
DX 53324 Clerkenwell

www.rooksrider.co.uk

BY POST AND EMAIL:
robert.dougans@bryancave.com
cc: masoud.zabeti@mishcon.com
michael.armstrong@mishcon.com
edwin.chik@mishcon.com

6 August 2012

Dear Sirs

**Re: Beppler & Jacobson Petition No. 3680 of 2012**
**Our Client: Marcel Telser**

We refer to your letters of 31st July 2012 and 3rd August 2012 and to the Provisional Liquidators' Solicitors' fax of 2nd August 2012, a copy of which is attached ("the Fax").

We have addressed the issue raised in the last paragraph of your letter of 31st July 2012 in our correspondence in response to the Fax, copies of which (excluding attachments) are attached hereto.

We now turn to your letter dated 3rd August 2012 and accompanying application. We have to say that we are surprised at your precipitous course of conduct, particularly given that there was no deadline in your letter of 31st July 2012 and we are now at a time of year when people are more difficult to contact. Further the length of, and scope of the allegations made in, the accompanying Second Affidavit of Zoran Becirovic suggest that the evidence has been in preparation for some considerable time. We therefore reject the suggestion in the first paragraph of your letter that there is any causative link between the absence of an immediate reply to your letter of 31st July 2012 and the issue of your client's application. Furthermore, if you had waited until we had responded to the Fax, which we have now done (see below), you would have realised that the application was entirely unnecessary.

*Members*
Christopher Cooke • Nicholas Jenkins • James John • Anthony Shalet • Karen Methold • Lindsey Hemingway
*Senior Associates*
Amanda Pullinger • Lucy Riley
*Associates*
Gary Nelson • Nicola Stewart • Robert Drysdale • Gemma Davis
*Consultant*
Nicholas Cheshire

Rooks Rider Solicitors is the trading name of Rooks Rider Solicitors LLP, a limited liability partnership registered in England and Wales with registered number OC362841 and is regulated by the Solicitors Regulation Authority                    Main\AXP\1736501-1

**139**